**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE PERRIGO COMPANY PLC      )  Case No.: 1:19-cv-00070-DLC
SECURITIES LITIGATION          )
_____ )

**AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I.     NATURE OF THE ACTION ................................................................................ 1

II.    INTRODUCTION ............................................................................................... 2

III.   JURISDICTION AND VENUE ........................................................................ 7

IV.   THE PARTIES.................................................................................................... 7

     A.    Lead Plaintiffs ........................................................................................7

     B.    Defendants .............................................................................................8

V.    OVERVIEW OF THE FRAUD .......................................................................... 9

     A.    Background of Perrigo, Elan, and Tysabri............................................9

     B.    Perrigo Buys Elan in an Irish "Tax Inversion" to Avoid US Corporate
         Taxes ...................................................................................................10

     C.    Under Irish Law and Revenue Guidance, Elan and Perrigo's Tax
         Treatment of Tysabri Was Blatantly Wrong........................................11

     D.    Perrigo Sells Its Tysabri Royalty Stream, and Irish Revenue Audits
         Perrigo and its Tysabri Transactions...................................................12

     E.    Irish Revenue Informs Perrigo That it Owes $2 Billion in Taxes—and
         Perrigo Willfully Fails to Disclose That Information to Investors ........14

     F.    The Truth Is Revealed..........................................................................16

VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
     AND OMISSIONS ......................................................................................... 20

VII.  DEFENDANTS VIOLATED GAAP AND ACCOUNTING PROVISIONS ................ 22

     A.    General GAAP and Accounting Provisions...........................................22

     B.    GAAP Provisions Regarding Tax Positions .........................................26

     C.    GAAP Provisions Regarding Loss Contingencies................................24

     D.    GAAP Provisions Regarding Subsequent Events.................................25

VIII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ............................ 28

IX.    LOSS CAUSATION..........................................................................................................33

X.    PRESUMPTION OF RELIANCE.....................................................................................35

XI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ...............................................................................36

XII.    CLASS ACTION ALLEGATIONS ................................................................................37

XIII.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT............................................39

        COUNT I ........................................................................................................................39

        COUNT II .......................................................................................................................41

XIV.    PRAYER FOR RELIEF ..................................................................................................43

XV.    JURY DEMAND.............................................................................................................43

## I.    NATURE OF THE ACTION

1.    Lead Plaintiffs the City of Boca Raton General Employees' Pension Plan ("Boca Raton GE") and Palm Bay Police and Firefighters' Pension Fund ("Palm Bay P&F") (together, "Lead Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following upon personal knowledge as to themselves and their acts, and upon information and belief as to all other matters, based upon the ongoing investigation of their counsel.  Many of the facts related to Lead Plaintiffs' allegations are known only by Defendants, or are exclusively within Defendants' custody or control.  Lead Counsel's investigation included, among other things, review and analysis of: (i) Perrigo's public filings with the Securities and Exchange Commission (the "SEC"); (ii) in-depth research reports by securities and financial analysts; (iii) transcripts of Perrigo's conference calls with analysts and investors; (iv) presentations, press releases, news and media reports regarding the Company; (v) review of Irish tax law and U.S. Generally Accepted Accounting Principles ("GAAP"); and (vi) data reflecting the stock price of Perrigo's common stock.  Lead Plaintiffs believe that substantial additional evidentiary support for their allegations will be developed after a reasonable opportunity for discovery.

2.    Lead Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against Defendants Perrigo Company PLC ("Perrigo" or the "Company"), its Chief Executive Officer ("CEO") Murray S. Kessler ("Kessler"), and its former Chief Financial Officer ("CFO") Ronald L. Winowiecki ("Winowiecki" and, together with Kessler, the "Individual Defendants, and, together with Perrigo, "Defendants"), and Section 20(a) of the Exchange Act against the Individual Defendants, on behalf of all investors who purchased or otherwise acquired common stock of Perrigo between November 8, 2018 and December 20, 2018, inclusive (the "Class Period").

## II. <u>INTRODUCTION</u>

3.     Perrigo is a pharmaceutical company that is operationally based in the United States and domiciled for tax purposes in Ireland. This case concerns the willful failure of Perrigo to timely disclose its exposure to a staggering $2 billion tax liability—the largest such tax assessment in Irish history, and a catastrophic result for a Company with just $400 million in cash on hand.

4.     In December 2013, Perrigo, which maintained its corporate headquarters in Michigan, acquired Irish pharmaceutical company Elan Corporation Plc ("Elan") for the sole purpose of establishing its tax domicile in Ireland, in order to evade U.S. taxes and take advantage of Ireland's extremely low 12.5% corporate income tax rate. Just months prior to Perrigo's acquisition of Elan in 2013, Elan had sold off its sole remaining core asset—a 50% stake in its multiple sclerosis flagship drug Tysabri—for $3.25 billion plus contingent royalty payments. Significantly, Tysabri represented 100% of Elan's revenues at that time—such that, after its disposition, Elan no longer had any remaining commercialized products in Ireland and had virtually ceased its business operations there. Indeed, as one press report described, Elan's sale of Tysabri left that company "a shell, flush with cash and in search of a purpose."

5.     That purpose came when Perrigo purchased Elan in search of a better tax rate. There was one key problem with Perrigo's plan: for years, Perrigo incorrectly treated the substantial income stream from Tysabri as ordinary income, or "trading income," which was taxed at the lower 12.5% rate (instead of the 33% capital gains rate). This incorrect tax treatment clearly violated Irish tax law and lasted from 2013 (when Perrigo purchased Elan) through 2017 (when Perrigo sold off its remaining rights in the Tysabri royalty stream to Royalty Pharma). Perrigo applied the lower tax rate to ***over $6 billion*** in Tysabri transactions (including the

resulting royalties). However, this tax treatment was blatantly wrong. Indeed, as the Irish Office of the Revenue Commissioners ("Irish Revenue") (the Irish counterpart to the IRS) would ultimately and conclusively determine, the Tysabri asset sale was not part of the ordinary trade of Elan, but was an extraordinary and major disposition of Elan's remaining core revenue-generating capital asset—meaning that all proceeds from both the 2013 and 2017 Tysabri transactions should have been taxed at the much higher 33% capital gains tax rate.

6. In late 2017, Irish Revenue commenced an in-depth audit of Perrigo's tax treatment of the Tysabri transactions—its first audit of Perrigo's tax filings since the Company's acquisition of Elan. Tellingly, Perrigo did not disclose the existence of this audit to investors until March 1, 2018, and even then, it did so only in passing, in a single sentence buried among a list of ongoing ordinary course tax audits in various other jurisdictions in its Form 10-K. Indeed, Perrigo did not disclose that (i) the audit directly concerned Elan and Perrigo's tax treatment of the Tysabri transactions, which, collectively, amounted to over $6 billion; or (ii) that the specific issue Irish Revenue was examining was whether the much higher 33% capital gains rate should have applied to those sizeable transactions—which, if applied, would result in Perrigo owing billions of dollars in back-taxes.

7. Irish Revenue's audit concluded in the fall of 2018, and, on October 30, 2018, Irish Revenue delivered to Perrigo and its most senior officers an "audit findings letter" (the "Audit Findings Letter") that fully and unequivocally disclosed to Perrigo Irish Revenue's audit findings—the results of which were devastating and clearly material to the Company and its investors. The Audit Findings Letter stated that Perrigo and its predecessor, Elan, had improperly availed themselves of the 12.5% corporate income tax rate in connection with the Tysabri transactions, when in fact those transactions should have been assessed at the

significantly higher capital gains tax rate of 33%. Defendants could easily do the math. Applying that much higher percentage to the over $6 billion in Tysabri transactions, Irish Revenue's conclusion meant that Perrigo owed <u>close to $2 billion in back-taxes</u>. With potential interest and penalties factored in, Perrigo could owe approximately $3.9 billion.

8.     Significantly, the $2 billion tax liability alone amounted to ***five times*** Perrigo's available cash, completely eclipsed its third quarter sales of $1.3 billion, and equaled nearly 40% of the Company's annual revenues and nearly 30% of its market capitalization—in short, the liability could prove devastating for Perrigo's financial prospects. Despite the obvious import of this liability, Perrigo did not disclose Irish Revenue's audit findings to investors. Instead, in Perrigo's November 8, 2018 Form 10-Q for the third quarter of 2018, Perrigo disclosed only that it had received an "audit finding letter" from Irish Revenue on October 30, 2018, and falsely claimed that, because Perrigo disagreed with Irish Revenue's determination, any resulting tax assessment "<u>cannot be quantified at this stage</u>," and only "<u>could</u> be material."

9.     Defendants' failure to disclose the tax liability imposed in Irish Revenue's Audit Finding Letter was not only highly misleading to investors, it was a blatant violation of Generally Accepted Accounting Principles ("GAAP"). Indeed, GAAP specifically requires public companies to disclose loss contingencies and subsequent events, including actual or possible claims and assessments, and provide an estimate of the loss. GAAP states that the "disclosure of [a] contingency shall be made when there is at least a *reasonable possibility* that a loss ... may have been incurred and the amount of loss is estimable." Here, Irish Revenue—after an in-depth, year-long investigation of Perrigo's tax treatment of the Tysabri transactions and royalty revenue—directly provided Perrigo with an Audit Findings Letter that specifically quantified a tax liability of $2 billion on October 30, 2018. Rather than report this clearly

identifiable estimable loss, Defendants instead falsely informed investors that "the amount of adjustments . . . cannot be quantified at this stage." Defendants' failure to disclose this tax liability in Perrigo's Form 10-Q filed <u>over a week</u> after receiving the Audit Findings Letter directly violated these and other applicable GAAP and accounting provisions.

10. Remarkably, Perrigo <u>still</u> did not disclose the massive $2 billion tax liability when, less than a month later on November 29, 2018, <u>Perrigo received from Irish Revenue a final Notice of Amended Assessment ("NoA") for $2 billion in back-taxes owed</u>. Specifically, the NoA unequivocally stated that Perrigo owed 1.636 billion euros—or nearly $2 billion—in back taxes for the Tysabri transactions, which should have been taxed at the significantly higher 33% capital gains rate. However, not only did Perrigo fail to immediately disclose this highly material adverse determination, it waited <u>over three weeks</u> before finally revealing the truth.

11. It was not until December 20, 2018, after the market closed, that Perrigo shocked investors by disclosing, in a Form 8-K, that it had received the $2 billion tax assessment from Irish Revenue. Perrigo also revealed, for the first time, <u>that it had known</u> that Irish Revenue assessed Tysabri at the 33% capital gains tax rate when it received the Audit Findings Letter nearly two months earlier on October 30, 2018. Indeed, contrary to Defendants' prior representations, Perrigo <u>could</u> have easily quantified its massive tax liability, and thus already knew as of the receipt of the October 30, 2018 Audit Findings Letter that Irish Revenue's assessment <u>would</u> be highly material to the Company.

12. Further, while Perrigo also asserted in the 8-K that Irish Revenue's tax assessment was incorrect, the sole reason Perrigo gave as to why was telling. Perrigo claimed that because Elan had engaged in several IP disposals over the past 20 years—each of which Elan treated as "trading income" at the 12.5% rate—it had a justifiable expectation that the Tysabri sale would

be treated the same. But this defense was nonsense. Indeed, as Irish Revenue had concluded after a year-long audit, the Tysabri sale was decidedly <u>not</u> part of Elan's ordinary trade, nor was it at all the same as prior routine IP disposals Elan had made in the past. Rather, it was an outsized and extraordinary disposal of Elan's only remaining and long-held commercialized flagship drug that left Elan as little more than a shell company to be acquired for tax purposes.

13.     In response to Defendants' stunning revelations, Perrigo's stock price collapsed. The stock fell precipitously by $15.33 per share, from a close of $52.36 on the previous trading day to a close of $37.03—a staggering 30% drop that wiped out nearly $2.1 billion in market capitalization in just one day.

14.     Significantly, in the wake of Defendants' December 20, 2018 disclosure, analysts excoriated Defendants for their prior misleading statements regarding Irish Revenue's audit and their failure to timely disclose the obviously material impact of Irish Revenue's findings. For example, Morgan Stanley "<u>question[ed] management transparency</u>" with regard to the Company's delay in disclosing its massive new tax liability. Similarly, Wells Fargo noted that, regardless of Perrigo's disagreement with and intent to appeal Irish Revenue's findings, the assessment was "sizeable" and "<u>had a specific value attached to it in November that we are only hearing about in late December.</u>" Without a better explanation, Wells Fargo said, "<u>investors will be skeptical of why it had not been disclosed earlier.</u>" Similarly, IBI Brokerage stated that "<u>the delay in full disclosure has damaged investor confidence in Perrigo</u>" that "<u>couldn't have come at a worse time.</u>"

15.     As a result of Defendants' violations of the federal securities laws, investors who purchased Perrigo common stock at artificially inflated prices during the Class Period have suffered substantial losses. This action seeks redress on behalf of these aggrieved shareholders.

## III. JURISDICTION AND VENUE

16.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.  In addition, Defendants' common stock is traded on the New York Stock Exchange ("NYSE").

18.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## IV. THE PARTIES

### A.    Lead Plaintiffs

19.    Lead Plaintiff Boca Raton GE is a public pension system organized for the benefit of current and retired public employees of the City of Boca Raton, Florida.  As of September 30, 2017, it had approximately $220 million in pension assets under management.  As set forth in its certification (*see* ECF No. 17-2), Boca Raton GE purchased Perrigo common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  On Friday, March 22, 2019, the Court appointed Boca Raton GE as a Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  ECF No. 35.

20.     Lead Plaintiff Palm Bay P&F is a public pension system organized for the benefit of current and retired employees of the police and fire departments of the City of Palm Bay, Florida.  As of December 31, 2018, it had approximately $178 million in assets under management.  As set forth in its certification (*see* ECF No. 17-2) Palm Bay P&F purchased Perrigo common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  On Friday, March 22, 2019, the Court appointed Palm Bay P&F as a Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  ECF No. 35.

**B.     Defendants**

21.     Defendant Perrigo is a global healthcare supplier that develops, manufactures, and distributes healthcare products.  Perrigo is legally headquartered in the Republic of Ireland for tax purposes, and is operationally headquartered in Allegan, Michigan.   Perrigo's common stock trades on the NYSE under the ticker symbol PRGO.

22.     Defendant Kessler has been the CEO and a member of Perrigo's Board of Directors since October 8, 2018.

23.     Defendant Winowiecki became Perrigo's Acting CFO in February 2017 and its CFO on February 20, 2018.  Winowiecki joined Perrigo in 2008 and served in various other financial and accounting roles for the Company prior to becoming Acting CFO, including as Corporate Comptroller and Senior Vice President, Business Finance.  Winowiecki resigned as CFO on March 20, 2019.

24.     During the Class Period, Defendants Kessler and Winowiecki made materially false and misleading statements and omissions in its SEC filings.  Defendants Kessler and Winowiecki also reviewed, approved, signed, and certified Perrigo's filings with the SEC,

including its quarterly report for the third quarter of 2018 filed on Form 10-Q on November 8, 2018 (the "3Q 2018 10-Q").

## V. OVERVIEW OF THE FRAUD

### A. Background of Perrigo, Elan, and Tysabri

25. Perrigo is a pharmaceutical company with its operational headquarters in Allegan, Michigan. Prior to its 2013 merger with Elan, Perrigo was a United States corporation, and although Perrigo is now domiciled in Ireland for tax purposes, it continues to generate roughly 65% of its net sales in the United States and less than 1% of its net sales in Ireland. Indeed, in 2018, Perrigo maintained 45 facilities in the United States, compared to just one in Ireland, and 40 in all other countries combined.

26. Until its merger with Perrigo in 2013, Elan Corp was an Irish pharmaceutical company, with its flagship drug being the multiple sclerosis drug Tysabri.

27. Elan co-developed Tysabri with Biogen Idec Inc. ("Biogen") and first brought the drug to market in 2004. Subsequently, Elan maintained a 50% stake in a partnership with Biogen for the development, marketing and commercialization of Tysabri. In 2012, Tysabri reached $1.6 billion in global sales and was considered the most effective treatment for multiple sclerosis.

28. Elan, however, was plagued by a decade of accounting scandals, financial troubles, and failed drugs, and, by 2012, Tysabri was Elan's only remaining successfully commercialized drug, constituting the entirety of Elan's business. Indeed, as Elan's 2012 Form 20-F explained: "Sales of our only marketed product Tysabri represented approximately 100% of our total continuing and discontinued revenues during 2012."

29.     On February 6, 2013, Elan announced that it was selling its 50% stake in Tysabri to its partner, Biogen, for an up-front cash payment of $3.25 billion upon closing, plus contingent royalty payments (12% of global net sales of Tysabri for the first twelve months, and, thereafter, 18% of annual global net sales of Tysabri up to $2 billion, and 25% on annual global net sales exceeding $2 billion). The sale closed in April 2013.

30.     Significantly, after this sale, Elan would no longer play any role in the marketing and promotion of Tysabri, nor, indeed, in any other business activities surrounding the drug—all of which would be taken over by Biogen. Moreover, Elan would become an entity with little business activity of any kind, and virtually no operations in Ireland, effectively rendering it a shell company that owned a royalty stream and a store of cash.

**B.     Perrigo Buys Elan in an Irish "Tax Inversion" to Avoid US Corporate Taxes**

31.     With Elan stripped of all of its productive assets, and with only the Tysabri royalty stream remaining, Elan had poised itself to be a perfect takeover target for companies seeking to domicile themselves in Ireland for tax purposes, in order to take advantage of Ireland's unusually low corporate tax rate of 12.5% on ordinary business income (known as "trading income" under Irish tax law). Thus, in 2013, through a then-popular strategy sometimes referred to as a "tax inversion," Perrigo purchased the Irish-domiciled Elan for a mix of cash and stock worth a total of $8.6 billion and effectively merged into Elan, enabling it to take advantage of an Irish tax domicile and evade U.S. taxes while maintaining Perrigo's U.S. operational headquarters.[1] As *The Wall Street Journal* explained: "<u>The biggest appeal of buying Dublin-based Elan is the comparatively low Irish corporate tax rate of 12.5%</u>."

---

[1] The Perrigo-Elan merger was announced July 29, 2013 and closed December 18, 2013.

32.     In addition to obtaining an Irish tax domicile, Perrigo also received the rights to Elan's Tysabri royalty stream as well as the cash still on Elan's balance sheet from the initial payment.   Perrigo would not, however, play any active role in Tysabri's manufacture, distribution, marketing, promotion, development, licensing, or any other business activity.   Like Elan, Perrigo would merely continue to collect royalties on Tysabri, while only Biogen would play an active role in the Tysabri business.

**C.     Under Irish Law and Revenue Guidance, Elan and Perrigo's Tax Treatment of Tysabri Was Blatantly Wrong**

33.     Ireland is generally seen as a favorable tax jurisdiction for corporations, with "trading income"—i.e. ordinary income from the routine profit-generating operations of a business—taxed at a low 12.5% under Section 21 of the Irish Taxes Consolidation Act of 1997 (the "Irish Taxes Act").   However, one exception to this is Ireland's corporate capital gains tax (Section 28(3) of the Irish Taxes Act), which generally applies to the disposition of capital assets and imposes a tax at a much higher rate of 33%.

34.     From the moment of its purchase of Elan, Perrigo treated the contingent royalty payments it received as part of the sale of Tysabri as trading income, in order to avail itself of the 12.5% income tax rate.   Under Irish tax law, however, "trading income" applies only to the purchase and sale of "trading assets" that are intended for sale at a profit in the course of a company's regular business activities.   Applying the "trading income" tax also specifically "presupposes activity" in Ireland—*i.e.*, employees in Ireland who are actively marketing and developing the IP in question.   Here, once Elan sold its rights to Tysabri to Biogen in 2013, neither Elan nor Perrigo engaged in any activity whatsoever in connection with Tysabri in Ireland or elsewhere.

35.	Indeed, following Elan's sale of its Tysabri rights, which was a core capital asset that accounted for 100% of Elan's revenues prior to sale, Elan no longer had any commercialized drugs or any "trade" at all in Ireland.  Moreover, after the sale, Elan and then Perrigo did not have any active role in Tysabri's revenue-generating activities.  Instead, Elan and then Perrigo only had the right to passively receive a portion of the royalty stream—there was no "activity" surrounding Tysabri whatsoever, let alone activity "controlled in Ireland."

36.	Significantly, as Irish Revenue ultimately conclusively determined, income from Elan's one-off major disposition of Tysabri—its flagship drug and its only revenue-producing asset—was clearly not part of the ordinary "trade" of Elan and therefore did not qualify as "trading income" for tax purposes at the favorable 12.5% trading income tax rate.  To the contrary, Elan had clearly developed Tysabri with the intention of exploiting it as its flagship drug—not selling it off—and indeed did so for decades before it finally sold its share of Tysabri to its joint venture partner under the terms of their collaboration agreement (rather than on the open market as part of regular dealing in IP rights).

**D.	Perrigo Sells Its Tysabri Royalty Stream, and Irish Revenue Audits Perrigo and its Tysabri Transactions**

37.	On February 27, 2017, Perrigo sold its remaining interest in the Tysabri royalty stream to Royalty Pharma in exchange for $2.2 billion in cash plus up to $650 million in two additional milestone payments.  Perrigo first reported this transaction to Irish Revenue in or about September 2017, when it filed, along with its 2016 tax returns, its Directors Report and Consolidated Financial Statements ("Irish Financial Statements"), which disclosed Perrigo's sale of its rights to the Tysabri royalty stream.

38.	In late 2017, Irish Revenue began an audit of the Tysabri transactions, expressly focusing on the appropriate tax rate that should have been applied to the initial 2013 sale of

Elan's stake in Tysabri as well as Perrigo's 2017 sale of its remaining rights to the contingent royalty payments that formed part of Tysabri's purchase price. This was Irish Revenue's first audit of Perrigo in its history as an Irish company, and the first audit of either Perrigo or Elan since Elan had sold its stake in Tysabri.

39.  Under its standard corporate tax audit process, Irish Revenue would specifically have apprised Perrigo *from the beginning of the audit* that it concerned Elan and Tysabri— meaning that the precise issue under examination was whether Perrigo had correctly applied the lower 12.5% tax rate to the Tysabri transactions as "trading income," or whether those transactions and royalty revenue should have been taxed at the significantly higher 33% capital gains rate. Irish Revenue's Code of Practice for Revenue Audit and other Compliance Interventions ("Irish Revenue Code of Practice") clearly sets forth that corporate taxpayers will be promptly notified of the subject matter of an audit:

2.6      Notification of a Revenue Audit

Twenty-one days notice of a Revenue Audit is generally given to both the taxpayer and his or her agent. Where a Revenue Audit is to be scheduled, the letter issued will include the wording: 'Notification of a Revenue Audit' and will show the date the audit will start. All audit notification letters issued to a taxpayer and agent will clearly indicate the nature of the Revenue intervention. The scope of the audit will also be set out, and will range from a single tax-head or single issue for a specific period or year to a comprehensive audit for a number of years.

40.  Moreover, even assuming the Notification of Revenue Audit merely disclosed the tax years under audit (2012 and 2013), the implication would have been plain: Perrigo did not pay Irish taxes until tax year 2014 (after closing its merger with Elan in December 2013) so the audit clearly concerned Elan. Further, Elan had no revenues in 2012 and 2013 other than from Tysabri and its sale to Biogen in 2013. Therefore, Perrigo and its senior officers knew that the Irish Revenue audit concerned the tax treatment of the Tysabri transactions and royalty revenue.

41.      Notably, Perrigo did not breathe a word of the audit until March 1, 2018.  On that day, Perrigo filed its Form 10-K for the year ended December 31, 2017 (the "2017 10-K").  Buried in the 2017 10-K in the Company's discussion of numerous routine audits in other jurisdictions was a single sentence stating simply that Irish Revenue had begun an audit of Perrigo for the tax years 2012 and 2013, providing no further explanation, nor even mentioning that the audit concerned the tax treatment of the over $6 billion Tysabri transactions and whether a significantly higher 33% tax rate applied to those transactions:

> We have ongoing audits in multiple other jurisdictions the resolution of which remains uncertain. These jurisdictions include, but are not limited to, the U.S., Israel, Ireland and other jurisdictions in Europe. In addition to the matters discussed above, the IRS is currently auditing our fiscal years ended June 29, 2013, June 28, 2014, and June 27, 2015. The Israel Tax Authority is currently auditing our fiscal years ended June 29, 2013 and June 28, 2014 (which covers the period of the Elan transaction). <u>The Ireland Tax Authority is currently auditing our years ended December 31, 2012 and December 31, 2013</u>.

**E.      Irish Revenue Informs Perrigo That it Owes $2 Billion in Taxes—and Perrigo Willfully Fails to Disclose That Information to Investors**

42.      On October 30, 2018, Irish Revenue issued the Audit Findings Letter informing the Company about the results of its audit for the tax years 2012-2013.   According to Defendants' own admissions, the contents of the letter (which Perrigo has to date failed to make publicly available) were devastating: Irish Revenue informed Perrigo that it had conclusively determined, after an extensive year-long audit, that the Tysabri transactions should have been taxed at the higher capital gains rate of 33%, not the "trading income" rate of 12.5%, because Tysabri was a one-off disposition of a major capital asset and not a routine trade.  Applying the higher percentage to the over $6 billion Tysabri transactions, Defendants could easily do the math: Perrigo owed approximately $2 billion in back taxes.  As Defendants knew full well throughout the pendency of the audit, this staggering tax liability was indisputably highly

material, as it constituted nearly five times the amount of cash the Company had on its balance sheet, 40% of the Company's annual revenues, and nearly 30% of its market capitalization.

43.     Significantly, however, Defendants did not disclose this highly material information to investors.  Instead, Perrigo merely disclosed that it had received the Audit Finding Letter on November 8, 2018, in its 3Q 2018 10-Q, but minimized the significance of the letter, just as it had done with the audit.  In fact, despite Irish Revenue's clear imposition of a nearly $2 billion tax liability, the 3Q 2018 10-Q's description of the Audit Finding Letter misleadingly claimed that the financial impact of Irish Revenue's audit "cannot be quantified at this stage," that the "amount of any future assessment could be material," and that no final determination had been made:

> On October 31, 2018, we received an audit finding letter from the Irish Office of the Revenue Commissioners ("Irish Revenue") for the years under audit 2012-2013. The audit finding letter relates to Elan's taxation of the 2013 sale of the Tysabri® intellectual property and other assets related to Tysabri® to Biogen Idec from Elan. The consideration paid by Biogen to Elan took the form of an upfront payment and future contingent royalty payments. We disagree with the Irish Revenue position as asserted in the audit finding letter and intend to contest it, and therefore the amount of adjustments, if any, that may ultimately be asserted by the Irish Revenue cannot be quantified at this stage. The amount of any future assessment could be material.

44.     Defendants knew the exact opposite was true:  they could in fact easily quantify the tax liability they were facing, and the amount was in fact highly material.  Nor did Defendants' assertion in the 3Q 2018 10-Q that they "disagree[d] with the Irish Revenue position" relieve them of their disclosure obligations.  Indeed, based on Irish Revenue's determination that the 33% capital gains rate should have been applied to the over $6 billion Tysabri transactions, the Company owed nearly $2 billion in back taxes—a clearly quantifiable, material amount for a Company with only $400 million in available cash, $5 billion in annual revenues and a $7 billion market capitalization.

45.     Moreover, Defendants' failure to disclose this $2 billion tax liability—which had already been quantified by Irish Revenue and which was on its face a highly material, Company-implicating amount—constituted a blatant violation of GAAP.  Indeed, as discussed in greater detail below at Section VII, multiple GAAP provisions specifically required Perrigo to disclose and record this liability in the Company's November 8, 2019 3Q 2018 10-Q following the receipt of the Audit Findings Letter, and regardless of whether or not Defendants disputed the ultimate amount that Irish Revenue would impose upon the Company.

46.     Compounding Defendants' misconduct, on November 29, 2018, Perrigo received from Irish Revenue a <u>final Notice of Amended Assessment ("NoA") assessing corporate tax liability against Perrigo in the amount of 1.636 billion euros, or nearly $2 billion</u>.  Tellingly, Perrigo <u>still</u> did not disclose this highly material information for investors, and in fact <u>would not do so for over three weeks</u>—a baffling move that angered analysts and investors alike.

**F.      The Truth Is Revealed**

47.     Not until December 20, 2018—nearly two months after Perrigo was informed of its $2 billion tax liability by the Audit Findings Letter—did Perrigo reveal the truth to investors.  Specifically, on December 20, 2018, after the market close, Perrigo filed a Form 8-K with the SEC disclosing, for the first time, the massive and devastating impact of Irish Revenue's audit findings for the Company.  Specifically, Perrigo revealed that, contrary to its prior statements that the audit results "might be material," in fact, Ireland was assessing the Company with a staggering $1.9 billion (1.6 billion euros) in taxes owed on the Tysabri transactions, not including interest and penalties:

> Perrigo Pharma International, a designated activity company organized under the laws of Ireland, formerly known as Elan Pharma International Limited ("Elan Pharma") and currently a subsidiary of Perrigo Company plc ("Perrigo" or the "Company"), will timely file an appeal with the Irish Tax Appeals Commission

regarding a Notice of Amended Assessment ("NoA") issued by the Irish Office of the Revenue Commissioners ("Irish Revenue") for the calendar year ended December 31, 2013. <u>The NoA is dated November 29, 2018, and assesses an Irish corporation tax liability against Elan Pharma in the amount of €1,636 million, not including interest or any applicable penalties</u>.

48. Moreover, in direct contradiction to its prior representations that it could not "quantify" the potential impact of the audit on the Company, Perrigo now admitted that it had received notice in the October 30, 2018 Audit Findings Letter that the Company had improperly applied a 12.5% trading income tax rate, instead of the legally appropriate 33% capital gains tax rate, to the over $6 billion Tysabri transactions. Specifically, the December 20, 2018 Form 8-K disclosed:

> <u>On October 30, 2018</u>, two months before the expiry of the applicable five year statutory limitation period, <u>Irish Revenue issued an audit findings letter to Elan Pharma asserting the claim (a) that IP sales transactions by Elan Pharma, including the sale of Tysabri, were not part of the trade of Elan Pharma and therefore should have been treated as chargeable gains subject to an effective 33% tax rate, rather than the 12.5% tax rate applicable to trading income, and (b) that all amounts received in respect to both the Tysabri transaction and the related transaction entered into with RPI Finance Trust in 2017 should be taxed in Elan Pharma's 2013 tax year</u>.

49. Thus, investors learned that Perrigo unquestionably could have quantified the back-taxes it owed based on the information in the October 30, 2018 letter—which, as Defendants now admitted, informed them that the appropriate tax rate for the Tysabri Transactions was 33% rather than 12.5%. As such, Defendants would clearly have known that the resulting tax assessment would not only be material, but devastating to the Company's financial condition.

50. Defendants further stated in the 8-K that they believed Irish Revenue's assessment—which, again, was the result of an extensive year-long audit—was wrong, and that they would seek judicial review of the NoA. However, the support that Defendants provided for

their position was telling: they claimed that because Elan had made prior IP disposals over the past 20 years that it had treated as "trading income" for tax purposes, the Company had a justifiable expectation that the Tysabri transaction would be treated the same. However, Irish Revenue—who was undoubtedly aware of Elan's prior IP disposals—had clearly determined that the disposition of Tysabri (Elan's flagship drug for decades) <u>was not part of Elan's ordinary trade</u>, causing it to issue, as an Irish Times article remarked, "<u>the biggest tax demand in Irish history and the largest to arise from the Revenue's own investigations</u>."

51.     As a result of these shocking disclosures, on December 21, 2018, Perrigo's stock price fell precipitously, plummeting $15.33 per share from a close of $52.36 on the previous trading day to a close of $37.03—a staggering 30% drop that wiped out nearly $2.1 billion in market capitalization in a single trading day.

52.     Analysts reacted to Defendants' stunning admissions in the December 20, 2018 8-K with incredulity and skepticism, specifically with regard to Defendants' prior misleading disclosures. Indeed, one analyst called Defendants' mention of the Audit Findings Letter on November 8, 2018 a "token" disclosure, while others excoriated Defendants for their inexplicable decision to wait <u>over three weeks</u> to disclose the highly material information in the November 29, 2018 NoA (not to mention <u>nearly two months</u> to disclose the substance of the Audit Findings Letter). For example, a Morgan Stanley research report called the disclosure of the Company's massive $2 billion tax liability a "negative surprise" and questioned why it had not been disclosed earlier, a failure that would cause investors to "<u>question management transparency</u>," emphasizing that Irish Revenue had first issued its audit findings on October 30, 2018.

53.     A Wells Fargo research report found it "concerning" that "the [NoA] letter from the tax commission to Perrigo is dated November 29, 2018, but Perrigo did not file an 8-k for approximately three weeks" and stated that, when its analysts "met with the new CEO last week…this topic was not raised."   Moreover, Wells Fargo warned that "a $1.9 billion tax bill plus penalties and interest would be challenging for a company with only approximately $440 million in cash and approximately $3.0 billion of long-term debt."

54.     Wells Fargo further noted that, although Perrigo disagreed with Irish Revenue's findings and intended to appeal them, the assessment was "sizeable" and "had a specific value attached to it in November that we are only hearing about in late December."  Without a better explanation, Wells Fargo said, "investors will be skeptical of why it had not been disclosed earlier."   Further, Wells Fargo expressed skepticism of the success of an appeal, noting that "given the tax authority makes the rules, it seems reasonable to think they may have the upper hand in this argument."

55.     A note from IBI Brokerage also pointed out that "the delay in full disclosure has damaged investor confidence in Perrigo and with a new CEO having taken over just a few weeks ago, it couldn't have come at a worse time."

56.     On February 27, 2019, Jefferies published an analyst report stating that, according to an "Irish tax expert" that had spoken with Jefferies, there was a significant risk that "beyond the $1.9B in back taxes, additional interest (already>$600M) could be levied" against Perrigo by Irish Revenue, and that "on top of this, penalties could be levied between a 3% general penalty and 100% penalty" if Defendants were "determined to have intentionally misled Irish Revenue," creating a "worst-case scenario" in which Perrigo would owe $3.9 billion—an amount equal to 80% of the Company's market capitalization as of December 21, 2018.

57.     Perrigo therefore attempted to dodge its clear disclosure duties by claiming that it "strongly disagreed" with Irish Revenue and intended to appeal the NoA.  However, the mere fact that Perrigo disliked the audit results did not allow it to violate both GAAP and Section 10(b) of the Exchange Act by misleading investors about its massive tax liability.  The Audit Findings Letter and subsequent NoA represented a final determination of tax liability by Irish Revenue, and the mere fact that Perrigo sought relief from this determination did not make it any less material to investors, nor did it change Perrigo's clear disclosure and accounting obligations under GAAP.

58.     Tellingly, mere months after the revelation of Defendants' fraud, on March 20, 2019, Defendant Winowiecki announced that he would resign as Perrigo's CFO.

## VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

59.     Defendants made materially false and misleading statements or omitted to state material facts during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, including in Perrigo's public filings made with the SEC.  Indeed, in their statements, Defendants fraudulently claimed that any risk of a material adverse tax assessment by Irish Revenue for the years ended 2012-2013 was merely contingent, could not be quantified, and only "could be material."

60.     Defendants' statements were false.  Indeed, when the Company received the October 30, 2018 Audit Findings Letter stating that Irish Revenue had conclusively determined that the Tysabri transactions should have been taxed at the higher capital gains rate of 33%, Defendants immediately knew that Perrigo would owe nearly $2 billion in unpaid back-taxes— an assessment that was not only unquestionably highly material but potentially devastating to the

Company's financial position. Yet, significantly, Perrigo did not disclose this highly material information to the market until nearly two months after receiving the letter.

61. Defendants' material misstatements and omissions thus created in the market an unrealistically positive assessment of Perrigo's business, operational status, financial position, and future growth prospects.

62. On November 8, 2018, the Company filed with the SEC its 3Q 2018 10-Q, which was signed by Defendants Kessler and Winowiecki, and issued its third quarter earnings press release the same day.

63. The 3Q 2018 10-Q disclosed that on October 30, 2018, Perrigo had "received an audit finding letter from [Irish Revenue]" relating to "Elan's taxation of the 2013 sale of Tysabri intellectual property and other assets related to Tysabri to Biogen Idec from Elan." While the Form 10-Q asserted that Perrigo "disagree[ed] with the Irish Revenue position as asserted in the audit finding letter," significantly, it did not provide any details to investors about what Irish Revenue's position was or the massive tax liability Irish Revenue had assessed against the Company as a result of its year-long audit.

64. The 3Q 2018 10-Q further claimed that the "the amount of adjustments, if any, that may ultimately be asserted by the Irish Revenue cannot be quantified at this stage," and warned that "[t]he amount of any future assessment" only "could be material":

> On October 3[0], 2018, we received an audit finding letter from [Irish Revenue] for the years under audit 2012-2013. The audit finding letter relates to Elan's taxation of the 2013 sale of the Tysabri intellectual property and other assets related to Tysabri to Biogen Idec from Elan. The consideration paid by Biogen to Elan took the form of an upfront payment and future contingent royalty payments. We disagree with the [Irish Revenue] position as asserted in the audit finding letter and intend to contest it, and therefore the amount of adjustments, if any, that may ultimately be asserted by [Irish Revenue] cannot be quantified at this stage. The amount of any future assessment could be material.

65. The statements in paragraphs 63-64 above were materially false and misleading and omitted to state material facts when made. In particular, it was false and misleading for Defendants to aver that the "amount of adjustments . . .ultimately [] asserted by [Irish Revenue]" as a result of its audit of the Tysabri transactions "<u>cannot be quantified at this stage</u>," and that any future assessment only "<u>could</u> be material." In truth, Irish Revenue's October 30, 2018 Audit Findings Letter to Perrigo explicitly informed Defendants that Irish Revenue had conclusively determined—after an extensive audit—that Elan's 2013 sale of its flagship drug Tysabri was not a sale in the ordinary trade of Elan such that it was subject to the lower 12.5% "trading income" tax rate, but was clearly an extraordinary disposition of Elan's long-held core capital asset that should have been taxed at the significantly higher 33% capital gains tax rate.

66. Furthermore, applying the higher capital gains percentage to the over $6 billion Tysabri transactions, it was crystal clear to Defendants that Perrigo owed nearly $2 billion in unpaid back-taxes upon their receipt of this letter. Thus, contrary to Defendants statements in the Form 10-Q, the "amount of adjustments" assessed by Irish Revenue was a matter of simple math and could easily be quantified by Defendants. Irish Revenue's findings were also unquestionably "material" to Perrigo, as the nearly $2 billion tax liability amounted to over five times Perrigo's available cash of $400 million, fully eclipsed Perrigo's third quarter sales of $1.3 billion, and equaled nearly 40% of Perrigo's approximately $5 billion in annual revenues in 2017 and nearly 30% of its $7 billion in market capitalization.

## VII. DEFENDANTS VIOLATED GAAP AND ACCOUNTING PROVISIONS

### A. General GAAP and Accounting Provisions

67. GAAP are those principles recognized by the accounting profession and the SEC as the uniform rules, conventions, and procedures necessary to define accepted accounting

practices at a particular time, against which financial presentations should be measured. GAAP are the official accounting standards and have been codified and are primarily promulgated by the Financial Accounting Standards Board ("FASB"). These standards have been adopted by the SEC, which requires the financial statements of filers to adhere to such. The FASB's mission is "to establish and improve standards of financial accounting and reporting that foster financial reporting by nongovernmental entities that provides decision-useful information to investors and other users of financial reports."

68. In 2009, the FASB announced the launch of its Accounting Standards Codification ("ASC" or the "Codification"), declaring it to be "the single source of authoritative nongovernmental U.S. generally accepted accounting principles." The Codification, effective as of September 2009, organizes the many existing pronouncements that constituted U.S. GAAP at the time into a consistent, searchable format organized by Topics. The FASB has also established its Statement of Financial Accounting Concept No. 8 "Conceptual Framework for Financial Reporting" ("Concept Statement 8") (superseding the previous FASB Accounting Concept Nos. 1 & 2) that sets forth, among other things, accounting principles and assumptions that guide recognition, de-recognition, and disclosure, as well as the classification and presentation of information in financial statements.

69. Footnote disclosures are an essential element of financial statements that are purportedly prepared in accordance with GAAP. Information disclosed in footnotes "amplifies or explains information recognized in the financial statements." Concept Statement 8.

70. The GAAP provisions violated by Defendants, and discussed in detail below, were not new or untested provisions of GAAP and did not involve complex accounting issues. To the contrary, these provisions clearly imposed upon Defendants a duty to disclose and record

in Perrigo's 3Q 2018 10-Q the $2 billion tax liability issued in the October 30, 2018 Audit Findings Letter. Defendants' failure to do so violated GAAP and accounting provisions governing contingent losses, subsequent events, and tax positions.

### B. GAAP Provisions Regarding Loss Contingencies

71. Defendants' failure to disclose the $2 billion tax liability in the Audit Findings Letter violated GAAP provisions governing loss contingencies. Specifically, ASC 450-20, *Loss Contingencies*, provides the guidance for the recognition and disclosure of loss contingencies, including actual or possible claims and assessments.[2]

72. Significantly, ASC 450 requires that <u>the disclosure</u> of a contingency shall be made when there is at least a *reasonable possibility* that a loss may have been incurred. According to ASC 450, an event is "reasonably possible" if "the chance of the future events or events occurring is more than remote but less than likely." ASC 450-20-20. If there is a reasonable possibility that an entity will incur a contingent liability and the amount of loss (or range of loss) is estimable, ASC 450 mandates that the entity disclose: (a) the nature of the contingency and (b) an estimate of the loss or range of loss, or state that such an estimate cannot be made and why. ASC 450-20-50-4.

73. Here, there is no question that Perrigo received information before the November 8, 2018 3Q 10-Q was issued that indicated that it was reasonably possible that a liability had been incurred as of the date of that financial statement. Moreover, it cannot be credibly argued that the amount of the loss could not be reasonably estimated. Indeed, the Audit Findings Letter could not be clearer: Irish Revenue spent a year investigating Perrigo's tax treatment for the

---

[2] Subsequent to the Codification, FASB Statement of Financial Accounting Standards No. 5 ("FAS 5"), *Accounting for Contingencies*, is included in ASC subtopic 450-20, *Loss Contingencies*.

Tysabri transactions and royalty revenue and had issued the detailed results of its investigation, which imposed upon Perrigo a massive tax liability of $2 billion that implicated the very financial survival of the Company.

74.     The amount of this loss contingency was thus at minimum reasonably possible and estimable, which triggered a requirement under ASC 450 that Perrigo disclose the nature of the contingency and provide the estimate or range of the loss.

### C.     GAAP Provisions Regarding Subsequent Events

75.     Even if Defendants could maintain that this loss contingency was not even reasonably possible under the loss contingency provisions of GAAP—which they clearly cannot—Perrigo was still obligated to disclose the $2 billion liability imposition in the Audit Findings Letter as a subsequent event under GAAP.  GAAP defines "subsequent events" as events or transactions that occur after the balance sheet date but before financial statements are issued or are available to be issued.  There are two types of subsequent events.  The first type of subsequent events are events or transactions that provide additional evidence about conditions that existed at the balance sheet date.  ASC 855-10.  The second type of subsequent events provide evidence about conditions that did not exist at the balance sheet date but arose subsequent to that date.  *Id.*  Subsequent events that provide additional evidence about conditions that existed at the balance sheet date should be recognized in the financial statements.

76.     It is indisputable that the Audit Findings Letter provided additional evidence about conditions that existed at Perrigo at the time of the balance sheet date (i.e. that a loss was at minimum reasonably possible).  Indeed, by the end of the third quarter of 2018, the Tysabri transactions had been consummated years earlier; Perrigo had already recognized the revenue on the Tysabri royalty payments for multiple years; and the Company had been under an Irish

Revenue audit for a year, where Perrigo knew that the tax rates being reviewed were either the application of a 12.5% tax rate or a 33% tax rate. The Audit Findings Letter thus provided additional evidence that Perrigo's tax treatment of the Tysabri-related revenue violated Irish tax law and imposed upon the Company a massive tax liability, which Irish Revenue determined approached $2 billion.

77. However, even if the tax liability represented in the Audit Findings Letter did not relate to a condition that existed at the balance sheet date, ASC 855-10 provides that even unrecognized subsequent events must be disclosed if they are of such a nature that omitting them would cause the financial statements to be misleading. For these events, the nature of the event and an estimate of its financial effect, or a statement that an estimate cannot be made, must be disclosed.

78. There is no question that omitting the information in the Audit Findings Letter caused Perrigo's financial statements to be misleading, and that the nature of the event and an estimate of its financial effect must have been disclosed. Indeed, a potential $2 billion tax liability specifically disclosed in an Audit Findings Letter from a tax authority that had just completed a year-long audit—an amount that clearly was estimable and was five times Perrigo's $400 million in cash at hand at the time—was indisputably a material development that should have been disclosed to investors. In fact, when the contents of the letter were belatedly disclosed on December 20, analysts excoriated the Company's management for a lack of transparency in their failure to promptly disclose the Audit Findings Letter.

**D.   GAAP Provisions Regarding Tax Positions**

79. Moreover, based on information that was readily available to the Company at the time, not only should Perrigo have disclosed to investors the amount of the $2 billion tax

liability, the Company should have recognized and recorded the liability in its financial statements. Specifically, under ASC 740, an "entity shall initially recognize the financial statement effects of a tax position when it is more likely than not, based on the technical merits, that the position will be sustained upon examination. The term *more likely than not* means a likelihood of more than 50 percent." ASC 740-10-25-6. ASC 740 further provides that the "determination of whether or not a tax position has met the more-likely-than-not recognition threshold shall consider the facts, circumstances, and information available at the reporting date." In making this required assessment, "[i]t shall be presumed that the tax position will be examined by the relevant taxing authority that has full knowledge of all relevant information," and "[t]echnical merits of a tax position derive from sources of authorities in the tax law (legislation and statutes, legislative intent, regulations, rulings, and case law) and their applicability to the facts and circumstances of the tax position." ASC 740-10-25-7.

80. There is no question that the tax imposition in the Audit Findings Letter met the "more likely than not" threshold requiring Perrigo to recognize the financial statement effects of this tax position. The Audit Findings Letter did not represent a theoretical position that could have been imposed as a result of a possible future audit. To the contrary, the Audit Findings Letter was a specific, written determination by Irish Revenue that represented the culmination of a year-long, in-depth audit of the Company's improper tax treatment of the Tysabri transactions and royalty revenue—an undertaking that obviously involved extensive review and discussions regarding Perrigo's Tysabri-related revenue tax treatment. Regardless of whether or not Perrigo intended to dispute these findings, Irish Revenue's informed position was clear: Perrigo had violated Irish tax law and was facing a tax liability approaching $2 billion. Under ASC 740, Perrigo was thus obligated to recognize the financial effects of Irish Revenue's determination.

# VIII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

81. Numerous facts raise a strong inference that Defendants knew or were severely reckless in disregarding the true facts concerning Perrigo's false and misleading statements. These facts include, in addition to the allegations set forth above, the following.

82. *Defendants' direct receipt of Irish Revenue's October 30, 2018 Audit Findings Letter—and their failure to disclose the material details of its contents, including the magnitude of Irish Revenue's assessment, which, despite Defendants' false representations, was easily quantifiable—is highly probative of their scienter.* In Perrigo's November 8, 2018 Form 10-Q, the Company disclosed that it had received an "audit findings letter" from Irish Revenue "relat[ing] to Elan's taxation of the 2013 sale of the Tysabri intellectual property." This letter was directly issued to senior management, including to Defendants Kessler and Winowiecki. Significantly, despite knowing the full contents of the October 30, 2018 letter—which Defendants would only disclose to investors nearly two months later at the end of the Class Period—Defendants did <u>not</u> disclose in its November 8, 2018 Form 10-Q that the letter stated (i) that Irish Revenue had conclusively determined that Elan's taxation of the 2013 Tysabri sale— and Perrigo's follow-on 2017 sale of its remaining rights to the Tysabri royalty stream—were incorrectly taxed at the ordinary trading income rate of 12.5% instead of the significantly higher 33% capital gains rate; and (ii) that, applying the higher capital gains rate, Perrigo owed nearly $2 billion in back taxes to Irish Revenue, greatly exceeding its available cash, eclipsing its third quarter sales, and amounting to nearly 40% of its annual revenues. Defendants' deliberate concealment of this highly material information—which Defendants unquestionably knew, being direct recipients of the October 30, 2018 Audit Findings Letter, and having later publicly

acknowledged their complete knowledge of its material contents in the December 20, 2018 8-K—is a fact that strongly supports scienter.

83.     *Despite directly receiving the Notice of Amended Assessment from Irish Revenue on November 29, 2018—which explicitly stated that Perrigo owed nearly $2 billion in back taxes for the Tysabri transactions—Defendants did not disclose this highly material adverse tax assessment to investors until over three weeks later on December 20, 2018.*  In the Company's December 20, 2018 8-K, Defendants admitted that Perrigo had received the NoA from Irish Revenue <u>over three weeks earlier</u> on November 29, 2018, and that it assessed "an Irish corporation tax liability against Elan Pharma in the amount of 1,636 [euros]," or nearly $2 billion, "not including any interest or penalties."  As set forth above, this assessment was obviously highly material to the Company, amounting to nearly 40% of its annual revenues, and dwarfing the amount of cash the Company had on hand at the time ($400 million).

84.     Yet, significantly, Defendants provided no explanation to investors for why they failed to disclose the contents of the NoA for weeks, other than to claim that the NoA came "out of nowhere"—despite several facts indicating that, to the contrary, Irish Revenue had issued the assessment only after a lengthy back and forth process with the Company in which it repeatedly rejected the Company's contrary position and clearly indicated that its original tax assessment was final.  For example: (i) Irish Revenue issued the October 30, 2018 Audit Findings Letter only after it had conducted an extensive year-long audit of the Tysabri transactions—indeed, Irish Revenue had to have commenced its audit of Tysabri's 2012 and 2013 tax years by the end of 2017 in order to remain within the statute of limitations; (ii) the October 30, 2018 Audit Findings Letter explicitly stated that Irish Revenue had concluded that the Tysabri transactions should be taxed at the higher 33% capital gains rate, which would result in a nearly $2 billion tax

assessment against the Company; and (iii) Irish Revenue had met with Defendants in person regarding its conclusions in the Audit Findings Letter and had even allowed the Company to provide two written submissions—yet still did not budge from its original conclusive assessment first issued to the Company nearly a month prior.

85.     Defendants' failure to timely communicate the material contents of the NoA to investors was met by incredulity and skepticism from analysts. For example, a Morgan Stanley report stated that investors could "question management transparency" considering the company's weeks-long delay in disclosing its massive new tax liability. A Wells Fargo report agreed, stating that "investors will be skeptical of why [the NoA] had not been disclosed earlier." The report further commented that it was "concerning" that "the letter from the tax commission to Perrigo is dated November 29, 2018, but Perrigo did not file an 8-k for approximately three weeks," and added that, when Wells Fargo analysts "met with the new CEO last week[,]…this topic was not raised." An RBC report likewise questioned: "Why disclose[] this now when notice was received more than 3 weeks ago?" The report added: "[T]here is some clear and understandable frustration from investors around timing." Finally, an IBI Brokerage report similarly questioned why Defendants did not disclose the NoA sooner, stating that the Company had only included a "token disclosure" of the Audit Findings Letter that was received more than a week before the filing of Perrigo's Form 10-Q for the third quarter, and commenting that "the delay in full disclosure has damaged investor confidence in Perrigo."

86.     Defendants' failure to timely disclose the highly material contents of the NoA until over three weeks after their direct receipt of it is highly probative of Defendants' scienter.

87.     *The manner in which the improper tax treatment came to light supports scienter.* Significantly, Defendants' fraud was not voluntarily reported, nor was its erroneous tax treatment

of the Tysabri sales corrected as a result of routine internal auditing. To the contrary, Defendants' fraud was revealed to investors only after Irish Revenue issued an Audit Findings Letter to Perrigo in October 2018, followed by an official NoA in November 2018, both of which stated that the Tysabri transactions should have been treated as capital gains at the tax rate of 33% as opposed to the statutory trading income tax rate of 12.5% because the transactions were not part of the ordinary trade of Elan—concluding that the Company owed nearly $2 billion in back taxes. However, tellingly, even after receiving Irish Revenue's Audit Findings Letter and the NoA assessing $2 billion in taxes against the Company, Defendants <u>still</u> did not come clean, but rather left investors in the dark for several weeks. The fact that Defendants belatedly and reluctantly disclosed the truth about their erroneous tax treatment of the Tysabri transactions and the resulting $2 billion in back tax liability only after Irish Revenue issued an Audit Findings Letter and a final NoA is highly probative of Defendants' scienter.

88. *The highly material amount of the $2 billion tax assessment supports scienter.* As set forth above, Irish Revenue's $2 billion tax assessment against the Company—which was the largest assessment of its kind in Irish history—was highly material to the Company, and was critical information for investors to know, as confirmed by the precipitous 30% stock price drop upon its ultimate revelation. Indeed, the $2 billion tax liability dwarfed the Company's available cash of $400 million, completely eclipsed its third quarter sales of $1.3 billion, and comprised nearly 40% of its $5 billion in annual revenues and approximately 30% of its market capitalization. The highly material nature of the $2 billion tax assessment, which would have and did motivate Defendants to conceal this significant liability from the market, supports Defendants' scienter.

89. *Defendants' violations of GAAP are highly probative of scienter.* As outlined further above at Section VII, by failing to disclose and recognize its roughly $2 billion in tax liability after it received the Audit Findings Letter, Defendants clearly violated several GAAP provisions, further supporting scienter. First, Defendants violated ASC 450-20, *Loss Contingencies*, by failing to disclose a loss that was reasonably possible and estimable—namely, the roughly $2 billion that Perrigo knew it was being assessed with as a result of the Audit Findings Letter. Moreover, Defendants *at a minimum* violated ASC 855-10—which requires disclosure of events that occurred after the balance sheet date but before the date of a quarterly or annual financial statement is filed. Under ASC 855-10, Perrigo was required not only to disclose that it had received the Audit Findings Letter, but also to provide a financial estimate of its impact on the Company. Finally, Defendants violated ASC 740, which obligated Perrigo to "recognize the financial statement effects of a tax position when it is more likely than not, based on the technical merits, that the position will be sustained upon examination." These GAAP violations thus further support scienter.

90. *The nature and duration of Irish Revenue's audit of Perrigo is probative of scienter.* According to the procedure set forth in the Irish Revenue Code of Practice, Irish Revenue would have sent Perrigo a letter *three weeks prior to the start of their audit* that outlined the nature and subject matter of their audit, putting Defendants on notice that Irish Revenue was calling into question the tax treatment of Tysabri no later than the end of 2017. Indeed, Perrigo's management would have been able to deduce the precise subject matter of the audit merely from the fact that it concerned tax year 2012 and 2013. Perrigo had not yet obtained an Irish tax domicile during those years, and therefore it was apparent that the audit

concerned Elan.  Moreover, Elan's only revenues during tax years 2012 and 2013 came from Tysabri and its sale to Biogen.

91.     By the time Perrigo received the October 30, 2018 Audit Findings Letter, the Company had already been under audit for nearly a year—an audit that was specifically focused on the tax treatment for the Tysabri transactions and related royalty revenue.  As such, Defendants were well aware that Irish Revenue would reassess Perrigo's treatment of Tysabri well before the issuance of the Audit Findings Letter.  Moreover, the substantial length of Irish Revenue's audit supports an inference that Irish Revenue engaged in a thorough and robust process of examination prior to issuing the Audit Findings Letter, thereby providing additional support for scienter.

92.     *Defendant Winowiecki's suspiciously timed March 20, 2019 resignation is probative of scienter.*  Defendant Winowiecki abruptly resigned from his position as CFO of the Company only three months after Defendants revealed the truth about the massive $2 billon tax liability assessed against the Company by Irish Revenue.  The fact that Defendant Winowiecki— who, as CFO of the Company, would have been directly responsible for the Company's income tax reporting—resigned so soon after Defendants revelation of the $2 billion tax liability is highly probative of his scienter.

IX.     **LOSS CAUSATION**

93.     Throughout the Class Period, the price of Perrigo common stock was artificially inflated as a result of Defendants' materially false and misleading statements identified above. Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of Perrigo common stock, by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations

33

and fraudulent conduct were disclosed and became apparent to the market, the price of Perrigo common stock fell precipitously as the prior artificial inflation dissipated. As a result of their purchases of Perrigo common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

94.     By issuing materially false and misleading financial statements, among other adverse facts detailed herein, Defendants presented a misleading picture of Perrigo's business. Defendants' false and misleading statements had the intended effect and caused Perrigo common stock to trade at artificially inflated levels throughout the Class Period, with shares of Perrigo common stock closed as high as $65.58 per share on November 12, 2018. On December 20, 2018, the last trading day before Defendants' fraud began to be revealed, Perrigo common stock traded at $52.36 per share, the last closing price prior to indication of issues with Irish Revenue.

95.     Defendants' after-market disclosures on December 20, 2018 revealed to the market the false and misleading nature of Defendants' statements and omissions. On that day, as described above, Perrigo finally disclosed its enormous tax liability in a Form 8-K filing, and further explicitly acknowledged that it had known by no later than October 30, 2018, when it received the Irish Revenue audit finding letter, that Irish Revenue had determined it owed almost $2 billion in back taxes.

96.     In response to Defendants' disclosures, the price of Perrigo common stock precipitously declined. The Company's share price plummeted by nearly 30%, falling from $52.36 on December 20, 2018 to $37.03 on December 21, 2018, a drop of $15.33 per share, wiping out nearly $2.1 billion in market capitalization in one day, on unusually heavy trading volume.

97.     Analysts were stunned by the Company's admissions and negatively reacted to Perrigo's financial fallout caused by its staggering $2 billion tax liability. For example, Morgan Stanley lamented the "negative surprise" and said that investors could "question management transparency" considering the Company's delay in disclosing its massive new tax liability. Wells Fargo noted that, regardless of Perrigo's disagreement with and intent to appeal Irish Revenue's findings, the assessment was "sizeable" and "had a specific value attached to it in November that we are only hearing about in late December." Without a better explanation, Wells Fargo said, "investors will be skeptical of why it had not been disclosed earlier."

98.     As shown above, the drastic and continuing decline in Perrigo's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the Company's stock price negates any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## X.     PRESUMPTION OF RELIANCE

99.     At all relevant times, the market for Perrigo's common stock was efficient for the following reasons, among others:

      a.     Perrigo's common stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

      b.     As a regulated issuer, Perrigo filed periodic reports with the SEC and the New York Stock Exchange;

      c.     Perrigo regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as

communications with the financial press and other similar reporting services; and

d. Perrigo was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

100. As a result of the foregoing, the market for Perrigo's common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Perrigo's common stock. All purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of Perrigo stock at artificially inflated prices, and a presumption of reliance applies.

101. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Perrigo's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

102. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly

current facts and conditions at the time the statements were made, including statements about Perrigo's present business and operations, its present financial condition, and its internal controls, among others.

103.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Perrigo's material adverse tax assessment by Irish Revenue, among others. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Perrigo were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

104.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Perrigo who knew that the statement was false when made.

## XII.    CLASS ACTION ALLEGATIONS

105.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased, or otherwise acquired, the common stock of Perrigo between November 8, 2018 and December 20, 2018, inclusive (the "Class"), and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of Perrigo at all relevant times, members of their immediate families, and their

legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

106.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Perrigo common stock was actively traded on the New York Stock Exchange.  As of November 2, 2018, there were over 135.856 million shares of Perrigo common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members of the proposed Class. Class members who purchased Perrigo common stock may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

107.     Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as complained of herein.

108.     Lead Plaintiffs will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

109.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

      a.     whether the federal securities laws were violated by Defendants' acts, as alleged herein;

      b.     whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

       c.      whether Defendants acted with scienter; and

       d.      the proper way to measure damages.

110.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act,**
**and SEC Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

111.    Lead Plaintiffs repeats and re-allege each and every allegation set forth above as if fully set forth herein.

112.    This Count is asserted on behalf of all members of the Class against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

113.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they recklessly disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

114.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b)

made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and other investors similarly situated in connection with their purchases of Perrigo common stock during the Class Period.

115.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Perrigo common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the other members of the Class, regarding, among other things, Perrigo's business and operations; (b) artificially inflate and maintain the market price of Perrigo common stock; and (c) cause Lead Plaintiffs and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

116.    Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

117.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misrepresentations and omissions of material facts set forth herein, which

presented a danger of misleading buyers or sellers of Perrigo common stock, were either known to the Defendants, or were so obvious that the Defendants should have been aware of them.

118.    Lead Plaintiffs and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Perrigo common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiffs and the other members of the Class would not have purchased Perrigo common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

119.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Perrigo common stock during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act
### (Against Defendants Kessler and Winowiecki)

120.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

121.    This Count is asserted on behalf of all members of the Class against Defendants Kessler and Winowiecki for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

122.    During their tenures as officers and/or directors of Perrigo, each of these Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act.  *See* ¶¶22-24.  By reason of their positions of control and authority as officers and/or directors of Perrigo, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to

engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Perrigo during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

123. In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Kessler and Winowiecki had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions. Defendants Kessler and Winowiecki signed the Company's SEC filings during the Class Period, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by Perrigo during the Class Period. Defendants Kessler and Winowiecki were also directly involved in providing false information, and Defendants Kessler and Winowiecki certified and approved the false statements disseminated by Perrigo during the Class Period. As a result of the foregoing, Defendants Kessler and Winowiecki together and individually, were controlling persons of Perrigo within the meaning of Section 20(a) of the Exchange Act.

124. As set forth above, Perrigo violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

125. By virtue of their positions as controlling persons of Perrigo, and as a result of their own aforementioned conduct, Defendants Kessler and Winowiecki are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs, and the other members of the Class, who purchased or otherwise acquired Perrigo common stock. As detailed above in ¶¶22-24, Sections V and VI, during the

respective times these Defendants served as officers and/or directors of Perrigo, each of these Defendants was culpable for the material misstatements and omissions made by the Company.

126. As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or other acquisition of Perrigo common stock.

## XIV. PRAYER FOR RELIEF

127. WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

    a.     Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

    b.     Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiffs and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

    c.     Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

    d.     Such other and further relief as the Court may deem just and proper.

## XV. JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury.

Dated: April 12, 2019

                        Respectfully submitted,

                        **SAXENA WHITE P.A.**

                        By: */s/ Steven B. Singer*
                        Steven B. Singer (SS-5212)
                        Kyla Grant
                        Joshua H. Saltzman
                        10 Bank Street, 8th Floor
                        White Plains, NY 10606
                        Tel: (914) 437-8551

Fax: (888) 216-2220
ssinger@saxenawhite.com
kgrant@saxenawhite.com
jsaltzman@saxenawhite.com

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White, III (JW-9598)
Lester R. Hooker
Dianne M. Anderson
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
danderson@saxenawhite.com

*Lead Counsel for the Class*

**KLAUSNER KAUFMAN JENSEN & LEVINSON**
Robert D. Klausner
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com

*Additional Counsel for Lead Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 12, 2019, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all

registered users.

*/s/ Steven B. Singer*
Steven B. Singer