**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IN RE PERRIGO COMPANY PLC SECURITIES LITIGATION | ) ) ) | Case No.: 1:19-cv-00070-DLC |

**SECOND AMENDED CLASS ACTION COMPLAINT**
<u>**FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**</u>

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ..................................................................... 1

II.    INTRODUCTION ................................................................................. 2

III.   JURISDICTION AND VENUE ................................................................ 8

IV.    THE PARTIES ..................................................................................... 8

       A.    Lead Plaintiffs ........................................................................... 8

       B.    Defendants ................................................................................. 9

V.     OVERVIEW OF THE FRAUD .............................................................. 10

       A.    Background of Perrigo, Elan, and Tysabri ................................. 10

       B.    Perrigo Buys Elan in an Irish "Tax Inversion" to Avoid US Corporate
             Taxes ...................................................................................... 11

       C.    Under Irish Law and Revenue Guidance, Elan and Perrigo's Tax
             Treatment of Tysabri Was Blatantly Wrong ............................... 12

       D.    Perrigo Sells Its Tysabri Royalty Stream, and Irish Revenue Audits
             Perrigo and its Tysabri Transactions .......................................... 13

       E.    Irish Revenue Informs Perrigo That it Owes $2 Billion in Taxes—and
             Perrigo Willfully Fails to Disclose That Information to Investors ... 18

       F.    Perrigo Fails to Disclose the Substance of the Audit Findings Letter or the
             $2 Billion Assessment, Instead Telling Investors That Ireland's Tax
             Assessment "Cannot Be Quantified At This Stage" ..................... 21

       G.    The Truth Is Revealed ................................................................ 24

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
       AND OMISSIONS ............................................................................. 30

VII.   DEFENDANTS VIOLATED GAAP AND ACCOUNTING PROVISIONS ..... 35

       A.    General GAAP and Accounting Provisions ................................. 35

       B.    GAAP Provisions Regarding Loss Contingencies ........................ 37

       C.    GAAP Provisions Regarding Tax Positions ................................ 39

i

D.      GAAP Provisions Regarding Subsequent Events ....................................................41

VIII.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ............................. 43

IX.     LOSS CAUSATION ............................................................................................. 53

X.      PRESUMPTION OF RELIANCE ........................................................................ 55

XI.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE
        BESPEAKS CAUTION DOCTRINE ................................................................... 56

XII.    CLASS ACTION ALLEGATIONS ...................................................................... 57

XIII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT .......................................... 59

        COUNT I ................................................................................................................59

        COUNT II ...............................................................................................................61

XIV.    PRAYER FOR RELIEF ..................................................................................... 63

XV.     JURY DEMAND ................................................................................................. 63

## I.     NATURE OF THE ACTION

1.     Lead Plaintiffs the City of Boca Raton General Employees' Pension Plan ("Boca Raton GE") and Palm Bay Police and Firefighters' Pension Fund ("Palm Bay P&F") (together, "Lead Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following upon personal knowledge as to themselves and their acts, and upon information and belief as to all other matters, based upon the ongoing investigation of their counsel.  Many of the facts related to Lead Plaintiffs' allegations are known only by Defendants, or are exclusively within Defendants' custody or control.  Lead Counsel's investigation included, among other things, review and analysis of: (i) Perrigo's public filings with the Securities and Exchange Commission (the "SEC"); (ii) in-depth research reports by securities and financial analysts; (iii) transcripts of Perrigo's conference calls with analysts and investors; (iv) presentations, press releases, news and media reports regarding the Company; (v) the October 30, 2018 "Audit Findings" letter (the "Audit Findings Letter") sent by the Irish Office of the Revenue Commissioners ("Irish Revenue") to Perrigo Pharma International, a subsidiary of Defendant Perrigo Company LLC ("Perrigo" or "the Company"); (vi) review of Irish tax law and U.S. Generally Accepted Accounting Principles ("GAAP"); and (vii) data reflecting the stock price of Perrigo's common stock.  Lead Plaintiffs believe that substantial additional evidentiary support for their allegations will be developed after a reasonable opportunity for discovery.

2.     Lead Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against Defendants Perrigo Company PLC ("Perrigo" or the "Company"), its Chief Executive Officer ("CEO") Murray S. Kessler ("Kessler"), its former CEO Uwe Roehrhoff ("Roehrhoff") and its former Chief Financial Officer ("CFO") Ronald L. Winowiecki ("Winowiecki" and, together with Kessler and

1

Roehrhoff, the "Individual Defendants, and, together with Perrigo, "Defendants"), and Section 20(a) of the Exchange Act against the Individual Defendants, on behalf of all investors who purchased or otherwise acquired common stock of Perrigo between March 1, 2018 and December 20, 2018, inclusive (the "Class Period").

II.   **INTRODUCTION**

3.      Perrigo is a pharmaceutical company that is operationally based in the U.S. and domiciled for tax purposes in Ireland.  This case concerns Perrigo's willful failure to timely disclose its exposure to a staggering $2 billion tax liability—the largest such tax assessment in Irish history, and a catastrophic result for a Company with just $400 million in cash on hand.

4.      In December 2013, Perrigo, which maintained its corporate headquarters in Michigan, acquired Irish pharmaceutical company Elan Corporation Plc ("Elan") for the sole purpose of establishing its tax domicile in Ireland, in order to avoid U.S. taxes and take advantage of Ireland's extremely low 12.5% corporate income tax rate.  Just months prior to Perrigo's acquisition of Elan in 2013, Elan had sold off its sole remaining core asset—a 50% stake in its multiple sclerosis flagship drug Tysabri—for $3.25 billion plus contingent royalty payments.  Significantly, Tysabri represented 100% of Elan's revenues at that time—such that, after its disposition, Elan no longer had any remaining commercialized products in Ireland and had virtually ceased its business operations there.  Indeed, as one press report described, Elan's sale of Tysabri left that company "a shell, flush with cash and in search of a purpose."

5.      That purpose came to fruition when Perrigo purchased Elan in search of a better tax rate.  There was one key problem with the Company's plan: for years, Perrigo incorrectly treated the proceeds from the sale of Tysabri and the resulting royalty income as ordinary income, or "trading income," which was taxed at the lower 12.5% rate, rather than as a capital

gain, which was subject to a 33% tax rate.  This incorrect tax treatment clearly violated Irish tax law and lasted from 2013 (when Perrigo purchased Elan) through 2017, when Perrigo sold off its remaining rights in the Tysabri royalty stream.  Indeed, as Irish Revenue (the Irish counterpart to the IRS) would ultimately determine, the Tysabri asset sale was <u>not</u> part of Elan's ordinary trade, but was an extraordinary and major disposition of Elan's remaining core revenue-generating capital asset—meaning that all proceeds from both the 2013 and 2017 Tysabri transactions should have been taxed at the much higher 33% capital gains tax rate, rather than the 12.5% rate that Perrigo applied.  As Irish Revenue concluded, in total, Perrigo improperly applied a 12.5% tax rate to **over $6 billion** in Tysabri transactions (including the resulting royalties).

6.      In November 2017, Irish Revenue commenced an in-depth audit of Perrigo's tax treatment of the Tysabri transactions—its first audit of Perrigo's tax filings since the Company acquired Elan. Significantly, the initial audit letters Irish Revenue sent to Perrigo at that time stated that the audit was triggered by a discrepancy between Elan's tax classification of the Tysabri sale and the tax treatment that Elan applied to the transaction.  Specifically, Elan had classified the Tysabri proceeds as a "[n]et gain on divestment of business" in its 2013 financial statements—an accounting classification used for the sale of a long-held capital asset, to which the 33% capital gains rate would apply—yet had applied a "Case I" tax treatment (*i.e.*, the 12.5% "trading income" rate) to those proceeds in Elan's 2013 tax return.

7.      Two months later, on January 29, 2018, Irish Revenue conducted its "initial audit meeting" with Perrigo's senior executives.  In order to determine Perrigo's potential tax liability, Irish Revenue had to calculate the "net chargeable gain" that would be subject to the 33% capital gains tax.  To determine that net chargeable gain, Irish Revenue had to calculate the total chargeable gain Perrigo had recognized from the Tysabri transactions, minus any applicable

3

deductions. The Audit Findings Letter—which Defendants have filed with this Court—conclusively demonstrates that, at the January 29, 2018 meeting, Irish Revenue's audit was so far advanced that it had already determined, to the penny, certain deductions it would allow Perrigo to offset, or deduct, from the chargeable gain. For example, the Audit Findings Letter shows that, by the end of January 2018, Irish Revenue had determined that it would allow Perrigo to take a $363 million deduction for Tysabri development costs. Tellingly, that $363 million deduction was the exact same deduction that was set forth in Irish Revenue's final calculation of Perrigo's tax liability in October 2018. The fact that Irish Revenue had, as of January 2018, already calculated the precise deductions it would allow Perrigo to take establishes that, at that time, Perrigo knew that Irish Revenue was taking the position that the Tysabri transaction was a "chargeable gain" subject to a 33% capital gains tax rate. Indeed, the only reason why Irish Revenue would be calculating deductions would be if Irish Revenue had already taken the position that a "chargeable gain" had occurred, and Irish Revenue had to calculate the "net chargeable gain" to determine the tax liability.

8.     Despite these facts, Perrigo did not even disclose the existence of the audit to investors until March 1, 2018. Even then, it did so only in passing, in a single sentence disclosing only that "[t]he Ireland Tax Authority is currently auditing our years ended December 31, 2012 and December 31, 2013." This was a blatant violation of GAAP. Specifically, Accounting Standards Codification ("ASC")[1] 450 requires public companies to disclose the nature and estimated amount of contingent losses that are "reasonably possible," which is defined to mean "more than remote." There is no question that, by March 1, 2018, Perigo knew that the likelihood it would be assessed additional taxes by Irish Revenue was far "more than

---

[1] The Accounting Standards Codification is maintained by the Financial Accounting Standards Board ("FASB") and serves as the single source of United States GAAP.

remote."  Indeed, by that time, Perrigo <u>knew</u> that (i) Irish Revenue's audit directly concerned Elan and Perrigo's tax treatment of the Tysabri transactions, which, collectively, amounted to over $6 billion; and (ii) that the specific issue under examination was whether the much higher 33% capital gains rate should have been applied to those sizeable transactions—which would result in Perrigo owing nearly $2 billion in back taxes.  Nevertheless, Perrigo did not disclose any of these highly material facts to investors.

9.      Irish Revenue's audit concluded in the fall of 2018, and, on October 30, 2018, Irish Revenue delivered to Perrigo and its most senior officers the Audit Findings Letter that fully and unequivocally disclosed to Perrigo the results of the audit—which were devastating and unquestionably material to the Company and its investors.  The Audit Findings Letter, which consisted of seven single-spaced pages, set forth in detail Irish Revenue's conclusion that Perrigo had improperly availed itself of the 12.5% tax rate in connection with the Tysabri transactions, when in fact those transactions should have been assessed at the significantly higher capital gains tax rate of 33% —a position the letter stated Irish Revenue had "<u>arrived at following an extensive review</u>" over the course of a full year.  Applying that much higher percentage to the over $6 billion in Tysabri transactions, <u>the Audit Findings Letter precisely calculated the exact amount of "tax payable":  €1,636,047,646, or nearly $2 billion</u>.

10.     Significantly, the Audit Findings Letter completely and conclusively rejected <u>every single one</u> of the arguments Perrigo had made over the preceding year in an effort to support its tax treatment of the Tysabri transactions.  Tellingly, this included Perrigo's principal argument that it had relied on Elan's prior "meetings" with Irish Revenue "at various times over the years" in assuming its tax treatment was correct.  Indeed, as the Audit Findings Letter made clear, Perrigo could produce no documentary (or other) evidence to support its assertions.  In

fact, Perrigo could cite to only *two meetings* which occurred many years before the Tysabri transactions in 2004 and 2009, which Irish Revenue determined (based on its own internal records) "[did] not contain any details that relate to the subject of [this] audit." The Audit Findings Letter also concluded that despite Perrigo's claim that Elan had made three prior disposals of IP applying the 12.5% tax rate, like the Tysabri sale, these IP disposals were extraordinary one-off sales that were not part of Elan's "trade"—which did not even include the selling of IP—to which the 33% capital gains rate should have been applied.

11.    Significantly, the $2 billion tax liability alone—before any interest or penalties—amounted to *five times* Perrigo's available cash, completely eclipsed its third quarter sales of $1.3 billion, and equaled nearly 40% of the Company's annual revenues and nearly 30% of its market capitalization—in short, the liability could prove devastating for Perrigo's financial prospects.  Despite the obvious import of this liability, Perrigo did not disclose Irish Revenue's "Audit Findings" to investors.  Instead, in Perrigo's November 8, 2018 Form 10-Q for the third quarter of 2018, Perrigo disclosed only that it had received an "audit finding letter" from Irish Revenue on October 30, 2018, and falsely claimed that, because Perrigo disagreed with Irish Revenue's determination, any resulting tax assessment "cannot be quantified at this stage," and only "could be material."  In fact, Defendants knew that the exact opposite was true:  Perrigo's tax liability not only *could* be quantified but *had already been precisely quantified to the penny* by Irish Revenue in the Audit Findings Letter—and that amount was *undeniably material*.

12.    Remarkably, Perrigo still did not disclose the massive $2 billion tax liability when, less than a month later, on November 29, 2018, Perrigo received from Irish Revenue a final Notice of Amended Assessment ("NoA") for €1,636,047,646 in back taxes owed—the

exact same amount listed in the Audit Findings Letter.  Perrigo failed to timely disclose this highly material adverse fact, waiting over three weeks before belatedly revealing the truth.

13.     It was not until December 20, 2018, after the market closed, that Perrigo shocked investors by disclosing, in a Form 8-K, that it had received the nearly $2 billion tax assessment from Irish Revenue.  Perrigo also revealed, for the first time, that it had known that Irish Revenue assessed Tysabri at the 33% capital gains tax rate when it received the Audit Findings Letter nearly two months earlier on October 30, 2018, and thus also had known that Irish Revenue's assessment was highly material to the Company.

14.     In response to Defendants' stunning revelations, Perrigo's stock price collapsed. The stock fell by $15.33 per share, from a close of $52.36 on the previous trading day to a close of $37.03—a staggering 30% drop that wiped out nearly $2.1 billion in market capitalization in just one day.

15.     Significantly, in the wake of Defendants' December 20, 2018 disclosure, analysts excoriated Defendants for their prior misleading statements regarding Irish Revenue's audit and their failure to timely disclose the obviously material impact of Irish Revenue's findings.  For example, Morgan Stanley "question[ed] management transparency" with regard to the Company's delay in disclosing its massive new tax liability. Similarly, Wells Fargo noted that, regardless of Perrigo's disagreement with and intent to appeal Irish Revenue's findings, the assessment was "sizeable" and "investors will be skeptical of why it had not been disclosed earlier."  Similarly, IBI Brokerage stated that "the delay in full disclosure has damaged investor confidence in Perrigo" that "couldn't have come at a worse time."

III.     **JURISDICTION AND VENUE**

16.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.  In addition, Defendants' common stock is traded on the New York Stock Exchange ("NYSE").

18.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

IV.     **THE PARTIES**

     A.     **Lead Plaintiffs**

19.     Lead Plaintiff Boca Raton GE is a public pension system organized for the benefit of current and retired public employees of the City of Boca Raton, Florida.  As of September 30, 2017, it had approximately $220 million in pension assets under management.  As set forth in its certification (*see* Exh. 1), Boca Raton GE purchased Perrigo common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  On Friday, March 22, 2019, the Court appointed Boca Raton GE as a Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  ECF No. 35.

8

20.     Lead Plaintiff Palm Bay P&F is a public pension system organized for the benefit of current and retired employees of the police and fire departments of the City of Palm Bay, Florida.   As of December 31, 2018, it had approximately $178 million in assets under management.   As set forth in its certification (*see* Exh. 2) Palm Bay P&F purchased Perrigo common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.   On Friday, March 22, 2019, the Court appointed Palm Bay P&F as a Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).   ECF No. 35.

**B.     Defendants**

21.     Defendant Perrigo is a global pharmaceutical company that is headquartered in the Republic of Ireland for tax purposes, and is operationally headquartered in Allegan, Michigan.   Perrigo's common stock trades on the NYSE under the ticker symbol PRGO.

22.     Defendant Kessler has been the CEO and a member of Perrigo's Board of Directors since October 8, 2018.

23.     Defendant Roehrhoff served as the CEO of Perrigo from January 8, 2018 until he resigned in October 2018—after just ten months on the job—to be replaced by Defendant Kessler.

24.     Defendant Winowiecki became Perrigo's Acting CFO in February 2017 and its CFO on February 20, 2018.   Winowiecki joined Perrigo in 2008 and served in various other financial and accounting roles for the Company prior to becoming Acting CFO, including as Corporate Comptroller and Senior Vice President, Business Finance.   Winowiecki resigned as CFO on March 20, 2019.

25.     During the Class Period, Defendants Roehrhoff, Kessler and Winowiecki made materially false and misleading statements and omissions in its SEC filings.   Defendants

Roehrhoff and Winowiecki reviewed, approved, signed and certified Perrigo's filings with the SEC including Perrigo's annual report for 2017 filed on Form 10-K on March 1, 2018, (the 2017 10-K), its quarterly report for the first quarter of 2018 filed on Form 10-Q on May 8, 2018 (the "1Q 2018 10-Q"), and its quarterly report for the second quarter of 2018 filed on Form 10-Q on August 9, 2018 (the "2Q 2018 10-Q").   Defendants Kessler and Winowiecki also reviewed, approved, signed, and certified Perrigo's filings with the SEC, including its quarterly report for the third quarter of 2018 filed on Form 10-Q on November 8, 2018 (the "3Q 2018 10-Q").

## V.    OVERVIEW OF THE FRAUD

### A.    Background of Perrigo, Elan, and Tysabri

26.    Prior to its 2013 merger with Elan, Perrigo was a United States corporation, and although Perrigo is now domiciled in Ireland for tax purposes, it continues to generate roughly 65% of its net sales in the United States and less than 1% of its net sales in Ireland.  Indeed, in 2018, Perrigo maintained 45 facilities in the United States, compared to just one in Ireland, and 40 in all other countries combined.

27.    Until its merger with Perrigo in 2013, Elan Corp. was an Irish pharmaceutical company, with its flagship drug being the multiple sclerosis drug Tysabri.

28.    Elan co-developed Tysabri with Biogen Idec Inc. ("Biogen") and first brought the drug to market in 2004.  Subsequently, Elan maintained a 50% stake in a partnership with Biogen for the development, marketing and commercialization of Tysabri.  In 2012, Tysabri reached $1.6 billion in global sales and was considered the most effective treatment for multiple sclerosis.

29.    Elan, however, was plagued by a decade of accounting scandals, financial troubles, and failed drugs, and, by 2012, Tysabri was Elan's only remaining successfully

commercialized drug, constituting the entirety of Elan's business.  Indeed, as Elan's 2012 Form 20-F explained: "Sales of our only marketed product Tysabri represented approximately 100% of our total continuing and discontinued revenues during 2012."

30.     On February 6, 2013, Elan announced that it was selling its entire stake in Tysabri to its partner, Biogen, for an up-front cash payment of $3.25 billion upon closing, plus contingent royalty payments (12% of global net sales of Tysabri for the first twelve months, and, thereafter, 18% of annual global net sales of Tysabri up to $2 billion, and 25% on annual global net sales exceeding $2 billion).  The sale closed in April 2013.

31.     Significantly, after this sale, Elan would no longer play any role in the marketing and promotion of Tysabri, nor, indeed, in any other business activities surrounding the drug—all of which would be taken over by Biogen.  Moreover, Elan would become an entity with little business activity of any kind, and virtually no operations in Ireland, effectively rendering it a shell company that owned a royalty stream and a store of cash.

**B.      Perrigo Buys Elan in an Irish "Tax Inversion" to Avoid US Corporate Taxes**

32.     With Elan stripped of all of its productive assets, and with only the Tysabri royalty stream remaining, Elan had poised itself to be a perfect takeover target for companies seeking to domicile themselves in Ireland for tax purposes, in order to take advantage of Ireland's unusually low corporate tax rate of 12.5% on ordinary business income (known as "trading income" under Irish tax law).  Thus, in 2013, through a then-popular strategy sometimes referred to as a "tax inversion," Perrigo purchased the Irish-domiciled Elan for a mix of cash and stock worth a total of $8.6 billion and effectively merged into Elan, enabling it to take advantage of an Irish tax domicile and avoid U.S. taxes while maintaining Perrigo's U.S. operational

headquarters.[2] As *The Wall Street Journal* explained: "<u>The biggest appeal of buying Dublin-based Elan is the comparatively low Irish corporate tax rate of 12.5%</u>."

33.     In addition to obtaining an Irish tax domicile, Perrigo also received the rights to Elan's Tysabri royalty stream as well as the cash still on Elan's balance sheet from the initial payment.   Perrigo would not, however, play any active role in Tysabri's manufacture, distribution, marketing, promotion, development, licensing, or any other business activity.   Like Elan, Perrigo would merely continue to collect royalties on Tysabri, while only Biogen would play an active role in the Tysabri business.

### C.     Under Irish Law and Revenue Guidance, Elan and Perrigo's Tax Treatment of Tysabri Was Blatantly Wrong

34.     Ireland is generally seen as a favorable tax jurisdiction for corporations, with "trading income"—*i.e.* ordinary income from the routine profit-generating operations of a business—taxed at a low 12.5% under Section 21 of the Irish Taxes Consolidation Act of 1997 (the "Irish Taxes Act").   However, one exception to this is Ireland's corporate capital gains tax (Section 28(3) of the Irish Taxes Act), which generally applies to the disposition of capital assets and imposes a tax at a much higher rate of 33%.

35.     From the moment of its purchase of Elan, Perrigo treated the contingent royalty payments it received as part of the sale of Tysabri for Irish tax purposes as trading income, in order to avail itself of the 12.5% income tax rate.   Under Irish tax law, however, "trading income" applies only to the purchase and sale of "trading assets" that are intended for sale at a profit in the course of a company's regular business activities.   Applying the "trading income" tax also specifically "presupposes activity" in Ireland—*i.e.*, employees in Ireland who are actively marketing and developing the IP in question.   Here, once Elan sold its Tysabri rights to

---

[2] The Perrigo-Elan merger was announced July 29, 2013 and closed December 18, 2013.

Biogen in 2013, neither Elan nor Perrigo engaged in any activity whatsoever in connection with Tysabri in Ireland or elsewhere.

36.     Indeed, following Elan's sale of its Tysabri rights, which was a core capital asset that accounted for 100% of Elan's revenues prior to sale, Elan no longer had any commercialized drugs or any "trade" at all in Ireland.  Moreover, after the sale, Elan and then Perrigo did not have any active role in Tysabri's revenue-generating activities.  Instead, Elan and then Perrigo only had the right to passively receive a portion of the royalty stream—there was no "activity" surrounding Tysabri whatsoever, let alone activity "controlled in Ireland."

37.     Significantly, as Irish Revenue ultimately conclusively determined, income from Elan's one-off major disposition of Tysabri—its flagship drug and its only revenue-producing asset—was clearly not part of the ordinary "trade" of Elan and therefore did not qualify as "trading income" for tax purposes at the favorable 12.5% trading income tax rate.

**D.     Perrigo Sells Its Tysabri Royalty Stream, and Irish Revenue Audits Perrigo and its Tysabri Transactions**

38.     On February 27, 2017, Perrigo sold its remaining interest in the Tysabri royalty stream to Royalty Pharma in exchange for $2.2 billion in cash plus up to $650 million in two additional milestone payments.  Perrigo first reported this transaction to Irish Revenue in or about September 2017, when it filed, along with its 2016 tax returns, its Directors Report and Consolidated Financial Statements, which disclosed Perrigo's sale of its rights to the Tysabri royalty stream.

39.     Just two months after reporting the Tysabri royalty stream transaction to Irish Revenue, in November 2017, Irish Revenue began an audit of the Tysabri transactions.  This was Irish Revenue's first audit of Perrigo in its history as an Irish company, and the first audit of either Perrigo or Elan since Elan had sold its stake in Tysabri.

40.    Significantly, Irish Revenue's initial audit letters to Perrigo on November 20 and 29, 2017 described the scope and nature of the audit in detail, expressly informing the Company that that the precise issue under examination was whether Perrigo had correctly applied the lower 12.5% tax rate to the billions of dollars in proceeds from the sale of Tysabri to Biogen in 2013 as "trading income."   In support of this inquiry, the letters flagged a significant discrepancy between how Elan had characterized the proceeds from the sale of Tysabri in its financial statements and how it had characterized them in its tax returns: specifically, Elan had classified the Tysabri proceeds as a "[n]et gain on divestment of business" in its 2013 financial statements—an accounting classification used for the sale of a long-held capital asset, to which the 33% capital gains rate would apply—yet had applied a "Case I" tax treatment (*i.e.*, the 12.5% "trading income" rate) to those proceeds in Elan's 2013 tax return.

41.    Approximately two months later on January 29, 2018, Irish Revenue convened an "initial audit meeting" between Irish Revenue and Perrigo's most senior executives.   According to the Audit Findings Letter, in order to determine Perrigo's tax liability, Irish Revenue had to calculate the "net chargeable gain" on the Tysabri transactions that would be subject to the 33% capital gains tax.   That calculation in turn required Irish Revenue to calculate the total chargeable gain Perrigo had realized from the Tysabri transactions, minus any applicable deductions. According to the Audit Findings Letter, as of the January 29, 2018 meeting, Irish Revenue's audit was so far advanced that it had already determined—to the penny—certain deductions it would allow Perrigo to offset, or deduct, from the chargeable gain.   For example, according to the Audit Findings Letter, during the January 2018 initial audit meeting, Irish Revenue calculated a $363 million deduction that it would allow Perrigo to take for Tysabri development costs.   Tellingly, that $363 million was the exact same deduction that was set forth in Irish

Revenue's final calculation of Perrigo's tax liability in October 2018.  The fact that Irish Revenue had, as of January 2018, already calculated the precise deductions it would allow Perrigo to take establishes that, at that time, Perrigo <u>knew</u> that Irish Revenue was taking the position that the Tysabri transaction was a "chargeable gain" subject to a 33% tax rate.  Indeed, had Irish Revenue believed Perrigo's tax treatment of Tysabri to be correct, it would have had no reason whatsoever to have been calculating the offsets it would allow Perrigo to take—the only reason to make that determination would be if Irish Revenue had taken the position that there was a "chargeable gain" that <u>needed to be offset</u>.

42.     Moreover, as Irish Revenue would ultimately conclude, the principal argument that Perrigo would advance in support of its tax treatment was essentially made up out of whole cloth.  Specifically, in response to the audit inquiry, Perrigo's principal argument in favor of its 12.5% tax treatment was that Elan "had met and discussed its trading activities with [Irish] Revenue at various times over the years," and during these prior meetings, Irish Revenue had purportedly sanctioned Elan's treatment of similar disposals of IP assets at the lower 12.5% rate.  This contention was blatantly misleading.  In fact, Perrigo could produce no evidence of these purported meetings with Irish Revenue whatsoever—whether in the form of emails, letters or otherwise.  Indeed, as Irish Revenue would later determine, when pressed, Perrigo could point to only two prior meetings between Elan and Irish Revenue that took place in 2004 and 2009, nine and four years prior to the Tysabri transactions, respectively.  Moreover, according to Irish Revenue's own internal documentation and follow-up emails regarding these meetings from the individuals who attended them, they did not even relate to the issue under audit.

43.     Thus, by January 2018, Defendants knew that Irish Revenue had, at a minimum, specifically identified Perrigo's incorrect tax treatment of Tysabri, creating a strong risk that

Irish Revenue would apply the higher 33% tax rate to the $6 billion worth of Tysabri transactions—a tax liability that was undeniably material—and further, that Perrigo had no evidence to support its primary defense: namely, Perrigo's claim that Irish Revenue had previously sanctioned similar tax treatments of IP sales by Elan.

44.     Under GAAP provisions pertaining to the disclosure of loss contingencies—and, specifically, ASC 450—once Perrigo knew that Irish Revenue was even considering taking a position that the 33% capital gains rate should have been applied to the Tysabri transactions and that it therefore owed nearly $2 billion in back taxes, Perrigo was required, *at a minimum*, to disclose this massive potential tax liability to investors.  Indeed, ASC 450 states that companies are required to disclose "contingent liabilities" that are "reasonably possible," which is defined to mean that the chances of the loss occurring are "more than remote."  Specifically, companies must disclose: (i) the nature of the contingent liability; and (ii) an estimate of the potential loss or range of loss.  In other words, under GAAP, as of January 2018 Perrigo was required to disclose, at a minimum, that (i) Irish Revenue had commenced an audit to determine whether the Company inappropriately applied the favorable 12.5% tax rate to the over $6 billion Tysabri transactions instead of the significantly higher 33% capital gains tax rate; and that (ii) in the event of an adverse determination on that issue by Irish Revenue, the Company could be assessed to owe as much as $2 billion in back taxes.

45.     However, Perrigo did not disclose any of this information.  Instead, Perrigo did not breathe a word of Irish Revenue's audit to investors until March 1, 2018—the first day of the Class Period—and even then misleadingly downplayed its significance by disclosing only the existence of the audit and nothing else.  Specifically, on that day, Perrigo filed its Form 10-K for the year ended December 31, 2017 (the "2017 10-K").  Buried in the 2017 10-K—within a list of

numerous routine audits in other jurisdictions—was a single sentence stating simply that Irish Revenue had begun an audit of Perrigo for the tax years 2012 and 2013:

> We have ongoing audits in multiple other jurisdictions the resolution of which remains uncertain. These jurisdictions include, but are not limited to, the U.S., Israel, Ireland and other jurisdictions in Europe. In addition to the matters discussed above, the IRS is currently auditing our fiscal years ended June 29, 2013, June 28, 2014, and June 27, 2015. The Israel Tax Authority is currently auditing our fiscal years ended June 29, 2013 and June 28, 2014 (which covers the period of the Elan transaction). The Ireland Tax Authority is currently auditing our years ended December 31, 2012 and December 31, 2013.

46.     In the ensuing months, Perrigo undertook extensive efforts in a desperate attempt to establish a valid basis for its application of the 12.5% trading income rate to the over $6 billion Tysabri transactions.  These efforts included in-person meetings and correspondence with Irish Revenue, in addition to the submission of "several documents," including agreements concerning the Tysabri transactions and financial statements of Perrigo and Elan, references to tax guidance and Irish case law that purportedly supported Perrigo's position, and detailed information about Elan's prior disposals of IP made over the past twenty years.

47.     On September 27, 2018—by which time Perrigo had submitted all documentary evidence it had in support of its tax position to Irish Revenue in an effort to avoid the $2 billion tax liability—Perrigo wrote Irish Revenue a final letter setting forth its last effort to provide a basis for its taxation of the Tysabri transactions at the favorable 12.5% "trading income" rate. Significantly, in the letter, Perrigo's primary argument in favor of its application of the 12.5% tax rate remained that Elan had "met and discussed its trading activities with [Irish] Revenue at various times over the years," and Irish Revenue had purportedly sanctioned Elan's application of the 12.5% rate to prior similar IP disposals during those meetings.  However, Perrigo could only cite the same two meetings with Irish Revenue referenced above—which took place many

years before the Tysabri transactions in 2004 and 2009—and could provide no documentary support of the content of those meetings whatsoever.

> **E.**   **Irish Revenue Informs Perrigo That it Owes $2 Billion in Taxes—and Perrigo Willfully Fails to Disclose That Information to Investors**

48.   In October 2018, Irish Revenue concluded its audit, and, on October 30, 2018, Irish Revenue issued to Perrigo a letter reporting its conclusive findings that was aptly entitled "<u>Audit Findings</u>."  That Audit Findings Letter described the conclusive results of Irish Revenue's year-long audit.  According to Defendants' own later admissions, the contents of the letter were devastating.  The Audit Findings Letter set forth in exacting detail, over the course of seven single-spaced pages, Irish Revenue's determination that the Tysabri transactions constituted a "chargeable event" that should have been taxed at the capital gains rate of 33%, rather than the ordinary income rate of 12.5%.  The letter made clear that this "position has been arrived at "<u>following an extensive review</u>" that included, among other things, analysis of: (i) documentation provided by the Company; (ii) correspondence from the Company; (iii) relevant case law cited by the Company; (iv) tax guidance; (v) agreements regarding Tysabri and its sale; and (vi) financial statements from Elan and Perrigo.

49.   Significantly, the Audit Findings Letter concluded by applying the higher 33% rate to the billions of dollars in proceeds from the Tysabri transactions and calculating <u>the exact amount of back taxes owed:  **€1,636,047,646** (or roughly $2 billion)</u>.  The Audit Findings Letter not only <u>precisely quantified</u> this amount, but provided a highly detailed, multi-page explanation of each step of the calculation, in addition to a line-by-line breakout of the net chargeable gain to be taxed and an itemization of deductible costs—including the $363 million in Elan's share of development costs for Tysabri that was first calculated at the "initial audit meeting" back in January 2018.

18

50.     The Audit Findings Letter also painstakingly and conclusively demonstrated why every single one of Perrigo's arguments in favor of its 12.5% tax treatment of the Tysabri transactions was not only wrong, but completely baseless.

51.     With respect to Perrigo's principal argument in this regard—that it had "met and discussed its trading activities with Revenue at various times over the years," claiming, in other words, that Perrigo relied on prior meetings with Irish Revenue in assuming its tax treatment was correct—the Audit Findings Letter stated there was no evidence that any such meetings had ever occurred.  It pointed out that the only such meetings Perrigo was able to cite were "meetings in 2004 and 2009," *i.e.*, two meetings nine and four years prior to the sale of Tysabri.  The Audit Findings Letter further determined that, according to Irish Revenue's own internal documentation and follow up emails from the individuals at Irish Revenue who had actually attended those meetings, "[i]t is not apparent how [these meetings] would support the treatment of IP" that Perrigo argued for because Irish Revenue's internal documents regarding those meetings "do not contain any details that relate to the subject of [this] audit."

52.     Perrigo also argued that Elan's regular "trade" included the buying and selling of IP, meaning that the sale of Tysabri was part of this "trade" and therefore subject to the 12.5% "trading income" tax rate.  In support of this argument, Perrigo provided three examples of "acquisitions and disposals of intellectual property made by the Company since the initiation of its trade" 20 years ago.  Irish Revenue again resoundingly rejected this argument, showing that each of the IP disposals Perrigo cited—which amounted to only three instances over the course of two decades—was clearly a one-off or extraordinary event over the life of Elan that had nothing to do with its day-to-day business operations, just like the Tysabri sale.  Specifically, Irish Revenue determined that, in these three instances, IP was disposed of (i) as part of a special

19

"recovery plan" in 2002-2004; (ii) "[f]ollowing an assessment of 'strategic alternatives' in 2009"; and (iii) "[a]s part of the disposal of the Elan Drug Technologies business in 2011." Irish Revenue therefore concluded that these IP sales should also not have been taxed at the favorable 12.5% trading income rate.

53.     Accordingly, Irish Revenue unequivocally determined that "the sale of IP did not form part of [Elan's] trade" at all, and that Perrigo and its predecessor Elan instead clearly "carried on a trade of the purchase, development and exploitation of the rights to pharmaceutical products and the sale of pharmaceutical products."

54.     The Audit Findings Letter also found that Perrigo's claim that the Tysabri sale was part of Elan's ordinary trade was belied by Elan's longtime accounting treatment of Tysabri as an "intangible asset to be amortised over an eleven-year period"—*i.e.*, as a fixed capital asset to be exploited for profit rather than IP to be sold off as part of regular trading operations— which the Audit Findings Letter determined should be given "considerable weight."  Indeed, the Audit Findings Letter pointed out that, even once Elan arranged for the sale of Tysabri to its partner Biogen, it treated Tysabri as an "asset held for sale under IFRS 5"—which applies to "*non-current assets* held for sale," *i.e.*, long-term capital assets—and further accounted for the disposition of Tysabri as a "discontinued operation," which "represents [disposition of] a separate major line of business" and not an ordinary trading asset.

55.     Further, the Audit Findings Letter determined that nothing in the history of Elan's exploitation of Tysabri suggested that it had developed the drug with any intention of selling the IP off.  In fact, the opposite was true.  Elan had entered into the "Elan Biogen Tysabri collaboration agreement of 15 August 2000 with the intention of developing, manufacturing and commercializing Tysabri and generating profit from the sale of Tysabri product" over the long

term—*not* for the purpose of selling off the Tysabri IP as a trading asset.   Underscoring this point, the collaboration agreement with Biogen "placed restrictions on [Perrigo's] ability to dispose of its remaining share of the IP" to any party other than Biogen.

56.     Finally, the Audit Findings Letter determined that the Irish case law Perrigo had cited in support of its position that the 12.5% tax rate applied to the Tysabri transactions "does not align with the facts of this case."

57.     Thus, immediately upon Defendants' receipt of the Audit Findings Letter, Defendants unequivocally knew that they were faced with a nearly $2 billion tax liability— which had been precisely quantified by Irish Revenue to the dollar—and that each of the Company's defenses that it had attempted to raise in support of its tax position over the course of the prior year had been fully considered and completely rejected by Irish Revenue.   Defendants also knew that this $2 billion tax liability was indisputably highly material, as it constituted nearly five times the amount of cash the Company had on its balance sheet, 40% of the Company's annual revenues, and nearly 30% of its market capitalization.

**F.     Perrigo Fails to Disclose the Substance of the Audit Findings Letter or the $2 Billion Assessment, Instead Telling Investors That Ireland's Tax Assessment "Cannot Be Quantified At This Stage"**

58.     Remarkably, even after it received Irish Revenue's detailed and clearly highly material Audit Findings Letter—which included a precise assessment of roughly $2 billion in owed back taxes—Defendants did not disclose this highly material information to investors. Instead, in its 3Q 2018 10-Q filed on November 8, 2018, Perrigo merely disclosed that it had received the Audit Findings Letter, but minimized the significance of the letter, just as it had done with the audit.   In fact, despite Irish Revenue's clear and exacting imposition of the €1,636,047,646 (or nearly $2 billion) tax liability in the Audit Findings Letter, the 3Q 2018 10-

Q's description of the Audit Findings Letter misleadingly claimed that the financial impact of Irish Revenue's audit "<u>cannot be quantified at this stage</u>," that the "amount of any future assessment <u>could</u> be material," and that no final determination had been made:

> On October 31, 2018, we received an audit finding[s] letter from the Irish Office of the Revenue Commissioners ("Irish Revenue") for the years under audit 2012-2013. The audit finding[s] letter relates to Elan's taxation of the 2013 sale of the Tysabri® intellectual property and other assets related to Tysabri® to Biogen Idec from Elan. The consideration paid by Biogen to Elan took the form of an upfront payment and future contingent royalty payments. We disagree with the Irish Revenue position as asserted in the audit finding[s] letter and intend to contest it, and therefore <u>the amount of adjustments, if any, that may ultimately be asserted by the Irish Revenue cannot be quantified at this stage. The amount of any future assessment could be material.</u>

59.     Defendants knew the exact opposite was true:  the tax liability they faced was not only "quantifiable" but *had already been precisely quantified to the dollar in the Audit Findings Letter*—and that liability, amounting to nearly $2 billion, was unquestionably highly material. Nor did Defendants' assertion in the 3Q 2018 10-Q that they "disagree[d] with the Irish Revenue position" relieve them of their disclosure obligations.  Indeed, Irish Revenue's assessment of nearly $2 billion in back taxes was potentially devastating to a Company with only $400 million in available cash, $5 billion in annual revenues and a $7 billion market capitalization. Furthermore, as Defendants knew, <u>Irish Revenue had already fully considered and completely rejected every single one of Perrigo's arguments in favor of the 12.5% tax treatment</u>, and had also shown each of those arguments to be completely baseless.

60.     Moreover, Defendants' failure to disclose this $2 billion tax liability—which had already been precisely quantified and which was on its face a highly material, Company-implicating amount—constituted a blatant violation of GAAP.  Indeed, as discussed in greater detail below at Section VII, <u>multiple GAAP provisions specifically required Perrigo to disclose</u>

and record this liability following the receipt of the Audit Findings Letter—regardless of whether or not Defendants disagreed with Irish Revenue's findings or intended to appeal them.

61.     Compounding Defendants' misconduct, on November 29, 2018, Perrigo received from Irish Revenue a final Notice of Amended Assessment ("NoA") assessing corporate tax liability against Perrigo in the amount of €1,636,047,646, or nearly $2 billion—in other words, the exact same amount assessed in the Audit Findings Letter.  Tellingly, Perrigo still did not disclose this highly material information to investors, and in fact would not do so for over three more weeks.

62.     Moreover, the NoA was effectively a bill for taxes owed that merely formalized the final amount already assessed in the Audit Findings Letter.  Indeed, the NoA began with a short, one-page letter stating that Perrigo's "assessment to Corporation Tax for the accounting period 1/01/2013 to 31/12/2013 has been amended."   The letter then listed the "balance payable"—which, again, was the exact same amount that was calculated in the Audit Findings Letter:

> The balance payable is as follows:
>
> Period of Assessment 01/01/2013 TO 31/12/2013
>
> **Total**                    **€1,636,047,645.88**
>
> **Rounded Total**        **€1,636,047,645.00**

63.     The subsequent two pages consisted of a breakdown of the tax payable calculation—a summary that was virtually identical to the much more detailed calculation that had already appeared in the Audit Findings Letter—and ended with a clear demand for immediate payment:  "This tax should be paid immediately to the Collector-General."

G.      **The Truth Is Revealed**

64.      Not until December 20, 2018 did Perrigo reveal the truth to investors—a belated disclosure coming nearly two months after Perrigo received the Audit Findings Letter, eleven months after the January 2018 audit meeting with Irish Revenue, and over a year after receiving Irish Revenue's initial audit letters in November 2017.  Specifically, on December 20, 2018, after the market closed, Perrigo filed a Form 8-K with the SEC disclosing, for the first time, the massive and devastating impact of Irish Revenue's audit findings for the Company (the "8-K"). Perrigo revealed in the 8-K that, contrary to its prior statements that the audit results "could be material," in fact, Irish Revenue had assessed the Company with a staggering $1.9 billion (1.6 billion euros) in taxes owed on the Tysabri transactions, not including interest and penalties:

> The NoA is dated November 29, 2018, and <u>assesses an Irish corporation tax liability against Elan Pharma in the amount of €1,636 million, not including interest or any applicable penalties</u>.

65.      Moreover, in direct contradiction to its prior representations that it could not "quantify" the potential impact of Irish Revenue's audit findings on the Company, Perrigo now admitted that it had received notice in the October 30, 2018 Audit Findings Letter that the Company had improperly applied a 12.5% trading income tax rate, instead of the legally appropriate 33% capital gains tax rate, to the over $6 billion Tysabri transactions.  Specifically, the December 20, 2018 Form 8-K disclosed:

> <u>On October 30, 2018</u>, two months before the expiry of the applicable five year statutory limitation period, <u>Irish Revenue issued an audit findings letter to Elan Pharma asserting the claim (a) that IP sales transactions by Elan Pharma, including the sale of Tysabri, were not part of the trade of Elan Pharma and therefore should have been treated as chargeable gains subject to an effective 33% tax rate, rather than the 12.5% tax rate applicable to trading income, and (b) that all amounts received in respect to both the Tysabri transaction and the related transaction entered into with RPI Finance Trust in 2017 should be taxed in Elan Pharma's 2013 tax year</u>.

66.     Thus, <u>investors learned that Perrigo unquestionably could have quantified the</u> <u>back taxes it owed based on the information in the October 30, 2018 Audit Findings Letter</u>— which, as Defendants now admitted, informed them that the appropriate tax rate for the over $6 billion Tysabri transactions was 33% rather than 12.5%.  However, Defendants <u>still</u> misleadingly failed to mention in the 8-K that the Audit Findings Letter not only informed Defendants of the higher percentage tax that would be applied to the Tysabri transactions, <u>but of the exact dollar</u> <u>amount of back taxes owed</u>.  Nor did this disclosure reveal the Audit Findings Letter's additional details of Irish Revenue's meticulous and extended audit process, which, as discussed above, unquestionably put Defendants on notice of Perrigo's massive tax liability.

67.     Defendants further stated in the 8-K that they believed Irish Revenue's assessment—which, again, was the result of an "extensive review" spanning a full year—was wrong, and that they would seek judicial review of the NoA.  However, the support that Defendants provided for their position was telling:  as before, they claimed that because Elan had made prior IP disposals over the past 20 years that it had treated as "trading income" for tax purposes, the Company had a justifiable expectation that the Tysabri transaction would be treated the same by Irish Revenue.  Significantly, Defendants failed to mention to investors that <u>Irish</u> <u>Revenue had already conclusively rejected this exact argument (among others) in the Audit</u> <u>Findings Letter</u>, showing that Perrigo could cite *no evidence whatsoever* of either prior dealings with Irish Revenue in which it had sanctioned the 12.5% tax treatment in similar circumstances or of precedent IP disposals that constituted part of Elan's ordinary trade.

68.     Perrigo's December 20, 2018 8-K was also striking for what it did *not* say— specifically, while Perrigo stated, in cursory fashion, that it "strongly disagreed" with Irish Revenue, Perrigo did *not* claim to have relied on its auditors or tax advisors in its tax treatment

of the Tysabri transactions, and has never claimed since—in any SEC filing, court filing, or otherwise—that it has gotten a formal opinion from its auditor or any tax advisor stating that Perrigo's position on the taxation of Tysabri was correct.

69.    As a result of these shocking disclosures, on December 21, 2018, Perrigo's stock price fell precipitously, plummeting $15.33 per share from a close of $52.36 on the previous trading day to a close of $37.03—a staggering 30% drop that wiped out nearly $2.1 billion in market capitalization in a single trading day.

70.    The Irish Times remarked that Irish Revenue's assessment against Perrigo constituted "the biggest tax demand in Irish history and the largest to arise from the Revenue's own investigations."

71.    Analysts reacted to Defendants' stunning admissions in the December 20, 2018 8-K with incredulity and skepticism, specifically with regard to Defendants' prior misleading disclosures.  Indeed, one analyst called Defendants' mention of the Audit Findings Letter on November 8, 2018 a "token" disclosure, while others excoriated Defendants for their inexplicable decision to wait over three weeks to disclose the highly material information in the November 29, 2018 NoA (not to mention nearly two months to disclose the substance of the Audit Findings Letter, which it has continued to underplay even months after that disclosure). For example, a Morgan Stanley research report called the disclosure of the Company's massive $2 billion tax liability a "negative surprise" and questioned why it had not been disclosed earlier, a failure that would cause investors to "question management transparency," emphasizing that Irish Revenue had first issued its audit findings on October 30, 2018.

72.    A Wells Fargo research report found it "concerning" that "the [NoA] letter from the tax commission to Perrigo is dated November 29, 2018, but Perrigo did not file an 8-k for

approximately three weeks" and stated that, when its analysts "met with the new CEO last week…this topic was not raised."   Moreover, Wells Fargo warned that "a $1.9 billion tax bill plus penalties and interest would be challenging for a company with only approximately $440 million in cash and approximately $3.0 billion of long-term debt."

73.     Wells Fargo further noted that, although Perrigo disagreed with Irish Revenue's findings and intended to appeal them, the assessment was "sizeable" and "had a specific value attached to it in November that we are only hearing about in late December."   Without a better explanation, Wells Fargo said, "investors will be skeptical of why it had not been disclosed earlier."   Further, Wells Fargo expressed skepticism of the success of an appeal, noting that "given the tax authority makes the rules, it seems reasonable to think they may have the upper hand in this argument."   Notably, Defendants' recent filing of the full Audit Findings Letter with this Court has revealed that the assessment "had a specific value attached to it" *at latest* in October 30, 2018—even earlier than previously thought, and that "specific values" were under discussion and being precisely calculated no later than January 2018.

74.     A note from IBI Brokerage also pointed out that "the delay in full disclosure has damaged investor confidence in Perrigo and with a new CEO having taken over just a few weeks ago, it couldn't have come at a worse time."

75.     On February 27, 2019, Jefferies published an analyst report stating that, according to an "Irish tax expert" that had spoken with Jefferies, there was a significant risk that "beyond the $1.9B in back taxes, additional interest (already>$600M) could be levied" against Perrigo by Irish Revenue, and that "on top of this, penalties could be levied between a 3% general penalty and 100% penalty" if Defendants were "determined to have intentionally misled Irish Revenue,"

creating a "worst-case scenario" in which Perrigo would owe $3.9 billion—an amount equal to 80% of the Company's market capitalization as of December 21, 2018.

76.    Perrigo attempted to dodge its clear disclosure duties by claiming that it "strongly disagreed" with Irish Revenue and intended to appeal the NoA.  However, the mere fact that Perrigo disliked the audit results did not allow it to violate both GAAP and Section 10(b) of the Exchange Act by misleading investors about its massive contingent liability.  Perrigo had full and detailed notice of its potential tax liability early in the year-long audit process, as of January 2018, and was required to disclose this information as a contingent liability regardless of its opinions on the merits of that claim.  Moreover, the October 30, 2018 Audit Findings Letter and subsequent NoA represented a final determination of tax liability by Irish Revenue—including a down-to-the-penny calculation of that liability and a detailed refutation of every single one of Perrigo's defenses based on an "extensive review."  The mere fact that Perrigo sought relief from this determination did not make it any less material to investors, nor did it change Perrigo's clear disclosure and accounting obligations under GAAP.

**H.    Post Class Period Events Confirm that Perrigo's Positions on Income Tax Liability and Income Tax Liability Disclosure Lacked a Good Faith Basis**

77.    Mere months after the revelation of Defendants' fraud, on March 20, 2019, Defendant Winowiecki announced that he would resign as Perrigo's CFO.

78.    Just one month later, on April 29, 2019, Perrigo announced that it faced yet *another* massive and potentially crippling tax liability—this time an $850 million assessment from the IRS due to past improper treatment of royalties paid from an Irish subsidiary to a US subsidiary relating to Tysabri.  Specifically, Perrigo filed a Form 8-K with the SEC stating:

> On April 26, 2019, Perrigo Company plc ("Perrigo" or the "Company") received a revised Notice of Proposed Adjustment (the "NOPA") from the U.S. Internal Revenue Service ("IRS") Examination team auditing Athena Neurosciences, Inc.

("Athena"), for the tax years ending December 31, 2011 - 2013. Athena was acquired as a U.S. subsidiary by Elan Corporation, plc ("Elan") in 1996 and Perrigo acquired Elan through the December 2013 business combination between Perrigo's predecessor and Elan. As described below, the NOPA…<u>proposes a payment of $843 million, which represents additional tax and a 40% penalty</u>. This amount excludes consideration of offsetting tax attributes and potentially material interest.

79.    However, as market participants noted, Perrigo's disclosure of the $850 million NoPA underscored that Irish Revenue's assessment against Perrigo was not a fluke or the result of a mere disagreement with tax authorities. Once again, as with Irish Revenue, Perrigo stated, in wholly conclusory fashion, that it "strongly disagree[d]" with the IRS assessment. However, the fact that two tax authorities had now assessed Perrigo with billions of dollars in back taxes called into serious question the validity of the bases for Perrigo's tax positions. As an April 30, 2019 Wells Fargo note emphasized:

> [the $850 million IRS] assessment is on top of $1.9 billion that the Irish tax authority is seeking related to underpayment of taxes related to its Tysabri royalty disclosed in late December 2018.
>
> We think investors should consider this U.S. IRS disclosure and the Irish tax assessment carefully and cautiously – that is, in our experience, sometimes many investors and companies with a large assessment from one tax authority explain it away as a disagreement, but to us, <u>when two tax authorities are seeking nearly $3 billion in taxes, we would suggest assuming that this isn't some sort of complete misunderstanding of the rules and tax laws and one or both are likely to extract some sizable concessions from the company</u>.

80.    Tellingly, in the Company's public statements, Perrigo's most senior officers have <u>continued</u> to deliberately misrepresent the contents of the Audit Findings Letter (which was not publicly available until Defendants filed it as an exhibit to their motion to dismiss the First Amended Complaint, and has not otherwise been disseminated to the public). For example, at the May 14, 2019, Goldman Sachs Global Staples Forum, Defendant Kessler falsely claimed that, in making its determination, Irish Revenue had not "spelled out their rationale," that the

Audit Findings Letter was merely "a couple of pages," and that the process had been "rushed through in a few weeks":

> It's hard for me to comment too far on the validity of the case because they really haven't—Irish government really has not spelled out their rationale. It's very unusual. I mean I've seen these many times. From the Irish or other countries, it's a long process. You go back and forth, they lay out this. This was like rushed through in a few weeks, and what was given to us was a couple of pages, which is barely describing.

81.     The content of the Audit Findings Letter directly contradicts these statements. Indeed, the Audit Findings Letter spans seven single-spaced pages, outlines Irish Revenue's rationale for its position in detail—including its complete consideration and rejection of every single one of Perrigo's arguments to the contrary—and makes clear that the audit process involved an "extensive review" that included back-and-forth correspondence, documents, analysis of case law and tax guidance, and in-person meetings over the course of a full year, and was not "rushed through in a few weeks."

## VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

82.     Defendants made materially false and misleading statements or omitted to state material facts during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, including in Perrigo's public filings made with the SEC.  Indeed, in their public statements disclosing Irish Revenue's audit, Defendants failed to disclose that the audit could result in the Company being found to owe a 33% capital gains tax on the over $6 billion Tysabri transactions  Moreover, once Irish Revenue's findings regarding the $2 billion tax liability were clearly and precisely set forth in the October 30, 2018 Audit Findings Letter, Defendants fraudulently claimed that any risk of a material adverse tax assessment could not be quantified and only "could be material."

83.     Defendants' statements were false.  As the Audit Findings Letter makes clear, when Perrigo first received the November 20 and 29, 2017 letters from Irish Revenue commencing its audit of the Tysabri transactions, the letters made immediately apparent that Irish Revenue was assessing whether the Tysabri transactions should have been taxed at the higher 33% capital gains rate—resulting in Perrigo owing nearly $2 billion in back taxes.  Then at the "initial audit meeting" with Irish Revenue on January 29, 2018, Irish Revenue discussed in detail the exact dollar amount of certain deductions it would allow against the over $6 billion chargeable gain from the Tysabri transactions—indicating that it had taken the position that the Company owed  33% capital gains tax on the Tysabri transactions.  Despite this, when the Company first disclosed Irish Revenue's audit in its 2017 Form 10-K filed on March 1, 2018, the first day of the Class Period, it misleadingly omitted any mention at all of the highly material subject matter of the audit and that, in the event of an adverse determination, Perrigo would owe nearly $2 billion in back taxes.

84.     When the Company received the October 30, 2018 Audit Findings Letter stating that Irish Revenue had conclusively determined that the Tysabri transactions should have been taxed at the higher capital gains rate of 33%, Defendants immediately knew that Perrigo would owe exactly €1,636,047,646, or nearly $2 billion, in unpaid back taxes—an assessment that was not only unquestionably highly material, but potentially devastating to the Company's financial position.  Yet, significantly, Perrigo did not disclose this highly material and clearly estimable liability to the market until nearly two months after receiving the letter.

85.     Defendants' material misstatements and omissions thus created in the market an unrealistically positive assessment of Perrigo's business, operational status, financial position, and future growth prospects.

31

86.     On March 1, 2018, the first day of the Class Period, Defendants Roehrhoff and Winowiecki caused the Company to file its Form 10-K with the SEC for the fiscal year ending December 31, 2017 ("2017 Form 10-K"), and issued its press release in connection with its full-year earnings the same day.  The 2017 Form 10-K contained certifications signed by Defendants Roehrhoff and Winowiecki.

87.     The 2017 Form 10-K disclosed, for the first time, that the "Irish Tax Authority," or Irish Revenue, was currently auditing Perrigo's financials for the years ended December 31, 2012 and December 31, 2013, and that the outcome of the audit was "uncertain."  This disclosure was buried in a list of numerous other ordinary course audits in various jurisdictions, and included no details at all about the subject matter of the audit or the impact of any adverse assessment against the Company:

> We have ongoing audits in multiple other jurisdictions the resolution of which remains uncertain.  These jurisdictions include, but are not limited to, the U.S., Israel, Ireland and other jurisdictions in Europe.  In addition to the matters discussed above, the IRS is currently auditing our fiscal years ended June 29, 2013, June 28, 2014, and June 27, 2015.  The Israel Tax Authority is currently auditing our fiscal years ended June 29, 2013 and June 28, 2014 (which covers the period of the Elan transaction).  <u>The Ireland Tax Authority is currently auditing our years ended December 31, 2012 and December 31, 2013</u>.

88.     The statements in paragraph 87 above were materially false and misleading and omitted to state material facts when made.  In particular, and as discussed further below, ASC 450 under GAAP requires issuers to disclose the nature and estimated amount of a contingent loss when there is at least a "reasonable possibility" that the loss may have been incurred, *i.e.*, if "the chance of the future event or events occurring is more than remote but less than likely."  It was therefore false and misleading for Defendants to disclose the mere existence of Irish Revenue's audit without providing any further information regarding the potential and highly material $2 billion tax liability that could result from an adverse determination by Irish Revenue

32

as a result of the audit.   Indeed, according to the Audit Findings Letter, months earlier on November 20 and 29, 2017, Irish Revenue had informed Perrigo by letter of the precise subject-matter of its audit—*i.e.*, whether the much higher 33% capital gains tax rate should have been applied to the over $6 billion in proceeds from the Tysabri transactions instead of the 12.5% trading income rate.   This was followed by an in-person "initial audit meeting" between Perrigo and Irish Revenue on January 29, 2018, during which Irish Revenue went as far as to present precise calculations of deductions it would allow Perrigo to take against the $6 billion chargeable gain for the Tysabri transactions—indicating that Irish Revenue had taken the position that Perrigo owed the 33% capital gains tax on those transactions, amounting to nearly $2 billion in back taxes owed before interest or penalties.   This was an unquestionably material amount, as it comprised 40% of Perrigo's annual revenues and 30% of its overall market capitalization.

89.   Defendants repeated these same misstatements and GAAP violations in (i) the March 23, 2018 definitive proxy statement filed on Schedule 14A with the SEC; (ii) the May 8, 2018 Form 10-Q for Q1 2018 filed with the SEC, signed by Defendants Kessler and Winowiecki; and (iii) the August 9, 2018 Form 10-Q for 2Q 2018 filed with the SEC, signed by Defendants Kessler and Winowiecki.   These statements continued to be materially false and misleading for the reasons described in paragraph 88 above.

90.   On November 8, 2018, the Company filed with the SEC its 3Q 2018 10-Q, which was signed by Defendants Kessler and Winowiecki, and issued its third quarter earnings press release the same day.

91.   The 3Q 2018 10-Q disclosed that on October 30, 2018, Perrigo had "received an audit finding letter from [Irish Revenue]" relating to "Elan's taxation of the 2013 sale of Tysabri intellectual property and other assets related to Tysabri to Biogen Idec from Elan."   While the

Form 10-Q asserted that Perrigo "disagree[d] with the Irish Revenue position as asserted in the audit finding letter," significantly, it did not provide any details to investors about what Irish Revenue's position was on the matter or about the massive nearly $2 billion tax liability Irish Revenue had conclusively assessed against the Company as a result of its year-long audit.

92.     The 3Q 2018 10-Q further claimed that the "the amount of adjustments, if any, that may ultimately be asserted by the Irish Revenue cannot be quantified at this stage," and warned that "[t]he amount of any future assessment" only "could be material":

> On October 3[0], 2018, we received an audit finding letter from [Irish Revenue] for the years under audit 2012-2013.  The audit finding letter relates to Elan's taxation of the 2013 sale of the Tysabri intellectual property and other assets related to Tysabri to Biogen Idec from Elan.  The consideration paid by Biogen to Elan took the form of an upfront payment and future contingent royalty payments. We disagree with the [Irish Revenue] position as asserted in the audit finding letter and intend to contest it, and therefore the amount of adjustments, if any, that may ultimately be asserted by [Irish Revenue] cannot be quantified at this stage. The amount of any future assessment could be material.

93.     The statements in paragraphs 91-92 above were materially false and misleading and omitted to state material facts when made. In particular, it was false and misleading for Defendants to aver that the "amount of adjustments . . .ultimately [] asserted by [Irish Revenue]" as a result of its audit of the Tysabri transactions "cannot be quantified at this stage," and that any "future" assessment only "could be material."  In truth, Irish Revenue's October 30, 2018 Audit Findings Letter to Perrigo explicitly informed Defendants that Irish Revenue had conclusively determined—after what the letter referred to as an "extensive review"—that Perrigo owed precisely €1,636,047,646 (or nearly $2 billion) in back taxes for the Tysabri transactions. The Audit Findings Letter also detailed that Irish Revenue had reached this result because Elan's 2013 sale of its flagship drug Tysabri was not a sale in the ordinary trade of Elan subject to the lower 12.5% "trading income" tax rate, but was clearly an extraordinary disposition of Elan's long-held core capital asset that should have been taxed at the significantly higher 33% capital

34

gains tax rate. Thus, the "amount of adjustments" assessed by Irish Revenue could easily be quantified by Defendants, and in fact was precisely quantified—down to the exact dollar amount—in the Audit Findings Letter. Moreover, while Perrigo claimed it "disagreed" with Irish Revenue's assessment, the Audit Findings Letter made clear that Irish Revenue had fully considered—and completely rejected—each of Perrigo's arguments in support of its 12.5% tax treatment of the Tysabri transactions. It was therefore crystal clear to Defendants that Perrigo owed nearly $2 billion in unpaid back taxes immediately upon their receipt of this letter, and that none of Defendants' arguments to the contrary were viable.

94.     Irish Revenue's findings were also unquestionably "material" to Perrigo, as the nearly $2 billion tax liability amounted to over five times Perrigo's available cash of $400 million, fully eclipsed Perrigo's third quarter sales of $1.3 billion, and equaled nearly 40% of Perrigo's approximately $5 billion in annual revenues in 2017 and nearly 30% of its $7 billion in market capitalization.

## VII.   DEFENDANTS VIOLATED GAAP AND ACCOUNTING PROVISIONS

### A.     General GAAP and Accounting Provisions

95.     GAAP are those principles recognized by the accounting profession and the SEC as the uniform rules, conventions, and procedures necessary to define accepted accounting practices at a particular time, against which financial presentations should be measured. GAAP are the official accounting standards and have been codified and are primarily promulgated by the Financial Accounting Standards Board ("FASB"). These standards have been adopted by the SEC, which requires the financial statements of filers to adhere to such. The FASB's mission is "to establish and improve standards of financial accounting and reporting that foster financial

reporting by nongovernmental entities that provides decision-useful information to investors and other users of financial reports."

96.     In 2009, the FASB announced the launch of its Accounting Standards Codification ("ASC" or the "Codification"), declaring it to be "the single source of authoritative nongovernmental U.S. generally accepted accounting principles."  The Codification, effective as of September 2009, organizes the many existing pronouncements that constituted U.S. GAAP at the time into a consistent, searchable format organized by Topics.  The FASB has also established its Statement of Financial Accounting Concept No. 8 "Conceptual Framework for Financial Reporting" ("Concept Statement 8") (superseding the previous FASB Accounting Concept Nos. 1 & 2) that sets forth, among other things, accounting principles and assumptions that guide recognition, de-recognition, and disclosure, as well as the classification and presentation of information in financial statements.

97.     Footnote disclosures are an essential element of financial statements that are purportedly prepared in accordance with GAAP.  Information disclosed in footnotes "amplifies or explains information recognized in the financial statements."  Concept Statement 8.

98.     The GAAP provisions violated by Defendants, and discussed in detail below, were not new or untested provisions of GAAP and did not involve complex accounting issues. To the contrary, these provisions clearly imposed upon Defendants a duty to (i) disclose the contingent $2 billion tax liability in Perrigo's 2017 Form 10-K filed on March 1, 2018 as a result of Irish Revenue's position that the 33% capital gains tax rate should have been applied to the Tysabri transactions; and (ii) disclose and record in Perrigo's 3Q 2018 10-Q the €1,636,047,646 (or nearly $2 billion) tax liability assessed in the October 30, 2018 Audit Findings Letter.

Defendants' failure to do so violated GAAP and accounting provisions governing contingent losses, subsequent events, and tax positions.

**B.      GAAP Provisions Regarding Loss Contingencies**

99.     Defendants' failure to disclose the potential $2 billion tax liability when they publicly announced the Irish Revenue audit in the 2017 Form 10-K filed on March 1, 2018—and when they later announced their receipt of Irish Revenue's October 30, 2018 Audit Findings Letter in the November 8, 2019 Form 10-Q—clearly violated GAAP provisions governing loss contingencies. Specifically, ASC 450-20, *Loss Contingencies*, provides the guidance for the recognition and disclosure of loss contingencies, including actual or possible claims and assessments.[3]  A loss contingency is described as "[a]n existing condition or situation involving uncertainty as to possible loss to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur."  ASC 450-20-20.

100.     Significantly, ASC 450 requires that the disclosure of a contingency shall be made when there is at least a *reasonable possibility* that a loss may have been incurred. According to ASC 450, an event is "reasonably possible" if "the chance of the future events or events occurring is more than remote but less than likely."  ASC 450-20-20.  ASC 450 also requires disclosure of a contingency involving an unasserted claim or assessment when there is a manifestation by a potential claimant of an awareness of a possible claim or assessment.  ASC 450-20-50-6.  If there is a reasonable possibility that an entity will incur a contingent liability and the amount of loss (or range of loss) is estimable, ASC 450 mandates that the entity disclose:

---

[3] Subsequent to the Codification, FASB Statement of Financial Accounting Standards No. 5 ("FAS 5"), *Accounting for Contingencies*, is included in ASC subtopic 450-20, *Loss Contingencies*.

(a) the nature of the contingency and (b) an estimate of the loss or range of loss, or state that such an estimate cannot be made and why.  ASC 450-20-50-4.

101.    Perrigo violated ASC 450 with respect to its disclosure of the Irish Revenue audit in the Form 2017 10-K, filed on March 1, 2018, because by the time of that financial statement Defendants had information indicating that it was at least "reasonably possible" that the Company would incur a highly material $2 billion tax liability.  Specifically, as set forth above, several months prior on November 20 and 29, 2017, Irish Revenue had informed Perrigo of the precise subject matter of its audit—to determine whether the Company should have taxed the over $6 billion Tysabri transactions at the much higher 33% capital gains rate instead of the ordinary "trading income" rate of 12.5%.  Moreover, during the "initial audit meeting" on January 29, 2018, Irish Revenue and Perrigo discussed the potential tax liability in detail, calculating the exact dollar amount of deductions Irish Revenue would allow against the chargeable gain from the Tysabri transactions—indicating that Irish Revenue had taken the position that the over $6 billion Tysabri transactions should have been taxed at the higher 33% capital gains rate.  Defendants therefore knew, prior to the March 1, 2018 disclosure, that Irish Revenue would issue an assessment for approximately $2 billion in back taxes owed if it determined that the 33% capital gains tax rate applied.

102.    Additionally, there is no question that Perrigo received information before the November 8, 2018 3Q 10-Q was issued that indicated that it was reasonably possible that a liability had been incurred as of the date of that financial statement.  By then, Defendants had received the October 30, 2018 Audit Findings Letter containing the detailed results of Irish Revenue's "extensive" year-long investigation of Elan and Perrigo's tax treatment of the Tysabri transactions.  Significantly, that letter precisely quantified Irish Revenue's assessment of back

taxes owed as €1,636,047,646, or nearly $2 billion (the exact same amount that would later appear in Irish Revenue's November 29, 2018 NoA)—a massive tax liability that implicated the very financial survival of the Company.  Moreover, while Perrigo claimed the tax liability could not be quantified because it "disagreed" with Irish Revenue's assessment, the Audit Findings Letter had already fully considered and conclusively refuted every single argument Perrigo had raised in favor of the 12.5% tax treatment during the course of the "extensive review" Irish Revenue had already undertaken.  It therefore cannot be credibly argued that the amount of the loss could not be reasonably estimated.

103.    Moreover, Defendants' "disagreement" with Irish Revenue in no way relieved them of their obligation to disclose their contingent tax liability, as it did not change the fact that it was, at a minimum, reasonably possible that Defendants would face an assessment for additional owed back taxes.  Contingent liabilities are, by definition, potential liabilities that may occur, depending on the outcome of an uncertain future event.  Indeed, had Defendants *agreed* with Irish Revenue, Perrigo's tax liability would no longer be a mere "contingent liability," but an actual, certain liability.  If Defendants could avoid their obligation to disclose their contingent liability merely by "strongly disagreeing" with Irish Revenue, ASC 450 would be rendered a nullity.

104.    These loss contingencies were thus at minimum reasonably possible and estimable, which triggered a requirement under ASC 450 that Perrigo disclose the nature of the contingencies and provide the estimate or range of the loss.

C.    **GAAP Provisions Regarding Tax Positions**

105.    Moreover, based on information that was readily available to the Company at the time, not only should Perrigo have disclosed to investors the amount of the $2 billion tax

liability, the Company should have recognized and recorded the liability in its financial statements in its Q3 2018 10-Q filed with the SEC on November 8, 2018. Specifically, under ASC 740, an "entity shall initially recognize the financial statement effects of a tax position when it is more likely than not, based on the technical merits, that the position will be sustained upon examination. The term *more likely than not* means a likelihood of more than 50 percent." ASC 740-10-25-6. ASC 740 further provides that the "determination of whether or not a tax position has met the more-likely-than-not recognition threshold shall consider the facts, circumstances, and information available at the reporting date." In making this required assessment, "[i]t shall be presumed that the tax position will be examined by the relevant taxing authority that has full knowledge of all relevant information," and "[t]echnical merits of a tax position derive from sources of authorities in the tax law (legislation and statutes, legislative intent, regulations, rulings, and case law) and their applicability to the facts and circumstances of the tax position." ASC 740-10-25-7.

106.    There is no question that the $2 billion tax imposition in the Audit Findings Letter met the "more likely than not" threshold requiring Perrigo to recognize the financial statement effects of this tax position. The Audit Findings Letter did not represent a theoretical position that could have been imposed as a result of a possible future audit. To the contrary, the Audit Findings Letter was a specific, written determination by Irish Revenue that represented the culmination of a year-long, in-depth audit of the Company's improper tax treatment of the Tysabri transactions and royalty revenue—an undertaking that expressly involved an "extensive review" consisting of the exchange of documents, analysis of case law and tax guidance, correspondence, and in-person discussions regarding Perrigo's basis for its Tysabri-related revenue tax treatment. Furthermore, the Audit Findings Letter specifically calculated a final tax

liability of €1,636,047,646 (or nearly $2 billion).  Regardless of whether or not Perrigo intended

to dispute these findings—a fruitless endeavor in light of the Audit Findings Letter's clear full

consideration and rejection of every single one of Perrigo's arguments against the $2 billion

assessment as lacking any basis—Irish Revenue's informed position was clear:  Perrigo had

violated Irish tax law and was facing a tax liability approaching $2 billion.  Under ASC 740,

Perrigo was thus obligated to recognize the financial effects of Irish Revenue's determination.

        **D.**      **GAAP Provisions Regarding Subsequent Events**

     107.    Perrigo was also obligated to disclose the €1,636,047,646 liability imposition in

the Audit Findings Letter as a subsequent event under ASC 855-10.  GAAP defines "subsequent

events" as events or transactions that occur after the balance sheet date but before financial

statements are issued or are available to be issued.  There are two types of subsequent events.

The first type of subsequent events are events or transactions that provide additional evidence

about conditions that existed at the balance sheet date.  ASC 855-10.  The second type of

subsequent events provide evidence about conditions that did not exist at the balance sheet date

but arose subsequent to that date.  *Id*.  Subsequent events that provide additional evidence about

conditions that existed at the balance sheet date should be recognized in the financial statements.

     108.    First, it is indisputable that the Audit Findings Letter provided additional evidence

about conditions that existed at Perrigo at the time of the balance sheet date (*i.e.*, that, as of

September 29, 2018, a loss was at minimum reasonably possible).  Indeed, by the end of the third

quarter of 2018, the Tysabri transactions had been consummated years earlier; Perrigo had

assessed the tax treatment of the Tysabri transactions including for the year Tysabri was

originally sold to Biogen; Perrigo had already recognized the revenue on the Tysabri royalty

payments for multiple years; and the Company had been under an "extensive" Irish Revenue

audit for a year—where Perrigo knew that the tax rates being reviewed were either the application of the 12.5% trading income tax rate or the 33% capital gains tax rate. The Audit Findings Letter thus provided additional evidence that Perrigo's tax treatment of the Tysabri-related revenue violated Irish tax law, imposing upon the Company a massive tax liability, which Irish Revenue determined was precisely €1,636,047,646, or nearly $2 billion. The Audit Findings Letter also provided a detailed account of Irish Revenue's rationale for its position, including its reasons for rejecting every single one of Perrigo's arguments that served as the Company's basis for its 12.5% tax treatment for the Tysabri transactions.

109.   Second, even if the tax liability represented in the Audit Findings Letter did not relate to a condition that existed at the balance sheet date, which it clearly did, ASC 855-10 provides that even unrecognized subsequent events must be disclosed if they are of such a nature that omitting them would cause the financial statements to be misleading. For these events, the nature of the event and an estimate of its financial effect, or a statement that an estimate cannot be made, must be disclosed.

110.   There is no question that omitting the information in the Audit Findings Letter caused Perrigo's financial statements to be materially misleading, and that the nature of the event and an estimate of its financial effect must have been disclosed. Indeed, the $2 billion tax liability that was specifically disclosed in the Audit Findings Letter from a tax authority that had just completed an "extensive" year-long audit—an amount that clearly was estimable, because it was precisely quantified to the exact dollar amount by Irish Revenue, and clearly material, because it was five times Perrigo's $400 million in cash at hand at the time and 40% of its annual revenues—was indisputably a material development that should have been disclosed to investors. In fact, when the contents of the letter were belatedly disclosed on December 20, 2018, analysts

excoriated the Company's management for a lack of transparency in their failure to promptly disclose the Audit Findings Letter.

## VIII.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

111.   Numerous facts raise a strong inference that Defendants knew or were severely reckless in disregarding the true facts concerning Perrigo's false and misleading statements. These facts include, in addition to the allegations set forth above, the following.

112.   *Despite being expressly informed by Irish Revenue of the precise subject of Irish Revenue's audit in November 2017—and despite in-person discussions with Irish Revenue in January 2018 indicating Irish Revenue had taken the position that the 33% capital gains tax was owed on the $6 billion Tysabri transactions—Defendants did not even disclose the existence of the Irish Revenue audit until March 1, 2018, and provided no detail whatsoever about the subject matter of the audit or massive size of the contingent liability.*   The Audit Findings Letter makes clear that Defendants knew the subject matter of the audit as of November 2017—and specifically, that it concerned whether the over $6 billion Tysabri transactions, which were taxed at the lower 12.5% trading income rate, should have been taxed at the significantly higher 33% capital gains rate.   Moreover, the Audit Findings Letter details how, on January 29, 2018, Irish Revenue held the "initial audit meeting" with Perrigo in which it discussed in detail the exact, to-the-dollar calculation of specific deductions it would allow Perrigo to take against its chargeable gain from the Tysabri transactions.   The mere fact that these discussions took place demonstrates that Irish Revenue was already, by January 29, 2018, taking the position that Perrigo's Tysabri transactions should have been treated as a chargeable gain, incurring the capital gains tax rate of 33%.   Despite this, in the Company's 2017 Form 10-K filed on March 1, 2018—months after the audit had begun—Defendants disclosed only that "[t]he Ireland Tax Authority is currently

auditing our years ended December 31, 2012 and December 31, 2013," giving no indication whatsoever of the subject matter and scope of the audit or the magnitude of the contingent liability. Defendants' belated disclosure of the Irish Revenue audit, and their failure to provide any detail whatsoever about its significant subject matter or the highly material amount at stake (in violation of GAAP), is highly probative of their scienter.

113.    *Defendants' direct receipt of Irish Revenue's October 30, 2018 Audit Findings Letter—and their failure to disclose the material details of its contents, including the magnitude of Irish Revenue's assessment, which, despite Defendants' false representations, was precisely quantified to be €1,636,047,646, an amount that did not change—is highly probative of their scienter.*  In Perrigo's November 8, 2018 Form 10-Q, the Company disclosed that it had received an "audit findings letter" from Irish Revenue "relat[ing] to Elan's taxation of the 2013 sale of the Tysabri intellectual property."  This letter was directly issued to senior management, including to Defendants Kessler and Winowiecki.  Significantly, despite knowing the full contents of the October 30, 2018 letter—which Defendants would only disclose to investors nearly two months later at the end of the Class Period—Defendants did not disclose in its November 8, 2018 Form 10-Q that the letter stated (i) that Irish Revenue had conclusively determined that Elan's taxation of the 2013 Tysabri sale—and Perrigo's follow-on 2017 sale of its remaining rights to the Tysabri royalty stream—were incorrectly taxed at the ordinary trading income rate of 12.5% instead of the significantly higher 33% capital gains rate; and (ii) that, applying the higher capital gains rate, Irish Revenue had precisely calculated that Perrigo owed €1,636,047,646, or nearly $2 billion, in back taxes—greatly exceeding its available cash, eclipsing its third quarter sales, and amounting to nearly 40% of its annual revenues.  Defendants' deliberate concealment of this highly material information—which Defendants unquestionably knew, being direct recipients of

the October 30, 2018 Audit Findings Letter, and having later publicly acknowledged their complete knowledge of its material contents in the December 20, 2018 8-K—is a fact that strongly supports scienter.

114.    *Despite directly receiving the Notice of Amended Assessment from Irish Revenue on November 29, 2018—which explicitly stated that Perrigo owed €1,636,047,646, or nearly $2 billion in back taxes for the Tysabri transactions—Defendants did not disclose this highly material adverse tax assessment to investors until over three weeks later on December 20, 2018.* In the Company's December 20, 2018 8-K, Defendants admitted that Perrigo had received the NoA from Irish Revenue <u>over three weeks earlier</u> on November 29, 2018, and that it assessed "an Irish corporation tax liability against Elan Pharma in the amount of €1,636 million" or nearly $2 billion, "not including any interest or penalties"—the exact same amount listed in the Audit Findings Letter.   As set forth above, this assessment was obviously highly material to the Company, amounting to nearly 40% of its annual revenues, and dwarfing the amount of cash the Company had on hand at the time ($400 million).

115.    Yet, significantly, Defendants provided no explanation to investors for why they failed to disclose the contents of the NoA for weeks, other than to claim that the NoA came "out of nowhere"—despite several facts indicating that, to the contrary, Irish Revenue had issued the assessment only after a lengthy, year-long back-and-forth process with the Company in which the Company presented its position and provided supporting documents, Irish Revenue repeatedly rejected the Company's contrary position and provided a detailed point-by-point rebuttal stating its basis for doing so in the Audit Findings Letter, and clearly indicated that its original tax assessment of €1,636,047,646 was final.   Indeed, while after issuing the Audit Findings Letter Irish Revenue met with the Company and allowed it to provide two additional

written submissions in support of its position, tellingly, Irish Revenue did not budge from its original conclusive assessment that was first formally issued to the Company almost two months prior in the October 30, 2018 Audit Findings Letter.

116.    Defendants' failure to timely communicate the material contents of the NoA to investors was met by incredulity and skepticism from analysts.  For example, a Morgan Stanley report stated that investors could "question management transparency" considering the Company's weeks-long delay in disclosing its massive new tax liability.  A Wells Fargo report agreed, stating that "investors will be skeptical of why [the NoA] had not been disclosed earlier." The report further commented that it was "concerning" that "the letter from the tax commission to Perrigo is dated November 29, 2018, but Perrigo did not file an 8-k for approximately three weeks," and added that, when Wells Fargo analysts "met with the new CEO last week[,]...this topic was not raised."  An RBC report likewise questioned: "Why disclose[] this now when notice was received more than 3 weeks ago?"  The report added:  "[T]here is some clear and understandable frustration from investors around timing."  Finally, an IBI Brokerage report similarly questioned why Defendants did not disclose the NoA sooner, stating that the Company had only included a "token disclosure" of the Audit Findings Letter that was received more than a week before the filing of Perrigo's Form 10-Q for the third quarter, and commenting that "the delay in full disclosure has damaged investor confidence in Perrigo."

117.    *In the October 30, 2018 Audit Findings Letter, Irish Revenue fully considered— and completely rejected—every single argument Perrigo proffered in favor of its tax treatment of the Tysabri transactions at the 12.5% rate as being without merit, and found Perrigo's principal argument regarding Elan's prior "meetings" with Irish Revenue on the issue to be completely baseless.*  In the October 30, 2018 Audit Findings Letter, Irish Revenue listed each of Perrigo's

46

proffered arguments in favor of its tax treatment of the Tysabri transactions at 12.5%—and completely rejected every single one of them.  Significantly, this included Perrigo's principal argument that its tax treatment was appropriate because Elan "ha[d] met and discussed its trading activities with [Irish] Revenue at various times over the years," and Irish Revenue purportedly sanctioned Elan's application of the 12.5% tax rate to its prior IP disposals during those discussions.  However, significantly, Perrigo could produce no documentary evidence to support those assertions whatsoever—whether in the form of letters, emails, or otherwise—and <u>Irish Revenue ultimately conclusively determined that such discussions had never occurred</u>.

118.    Indeed, when pressed, Perrigo could cite to only two meetings many years before the Tysabri transactions in 2004 and 2009 that, according to Irish Revenue's own internal documentation prepared by individuals who attended those meetings, <u>did "not contain any details that relate to the subject of the audit</u>."  Irish Revenue further determined that Elan's prior IP sales cited by Perrigo (which Irish Revenue had never audited)—amounting to only three instances over the course of two decades—were <u>not</u> part of Elan's ordinary trade because, like Tysabri, they occurred in connection with major events over the life of the company.  They therefore should also have been treated as capital gains and taxed at the 33% rate.  Indeed, <u>Irish Revenue found that "[t]he sale of IP did not form part of [Elan's] trade" at all</u>.  Irish Revenue's complete rejection of every single one of Perrigo's arguments in favor of its 12.5% tax treatment of the Tysabri transactions—and Perrigo's insistence in its public statements that it had viable arguments to dispute Irish Revenue's "wrong" assessment despite the fact that Irish Revenue had already told the Company that these arguments were utterly without basis—is highly probative of Defendants' scienter.

119.    *The manner in which the improper tax treatment came to light supports scienter*.
Significantly, Defendants' fraud was not voluntarily reported, nor was its erroneous tax treatment
of the Tysabri sales corrected as a result of routine internal auditing.    To the contrary,
Defendants' fraud was revealed to investors only after Irish Revenue issued an Audit Findings
Letter to Perrigo in October 2018, followed by an official NoA in November 2018, both of which
stated that the Tysabri transactions should have been treated as capital gains at the tax rate of
33% as opposed to the statutory trading income tax rate of 12.5% because the transactions were
not part of the ordinary trade of Elan—concluding that the Company owed €1,636,047,646, or
nearly $2 billion, in back taxes.  However, tellingly, even after receiving Irish Revenue's Audit
Findings Letter and the NoA assessing $2 billion in taxes against the Company, Defendants still
did not come clean, but rather left investors in the dark for several weeks.   The fact that
Defendants belatedly and reluctantly disclosed the truth about their erroneous tax treatment of
the Tysabri transactions and the resulting $2 billion in back tax liability only after Irish Revenue
issued an Audit Findings Letter and a final NoA is highly probative of Defendants' scienter.

120.    *The highly material amount of the $2 billion tax assessment supports scienter.*  As
set forth above, Irish Revenue's $2 billion tax assessment against the Company—which was the
largest assessment of its kind in Irish history—was highly material to the Company, and was
critical information for investors to know, as confirmed by the precipitous 30% stock price drop
upon its ultimate revelation.  Indeed, the $2 billion tax liability dwarfed the Company's available
cash of $400 million, completely eclipsed its third quarter sales of $1.3 billion, and comprised
nearly 40% of its $5 billion in annual revenues and approximately 30% of its market
capitalization.  The highly material nature of the $2 billion tax assessment, which would have

and did motivate Defendants to conceal this significant liability from the market, supports Defendants' scienter.

121.    *Defendants' violations of GAAP are highly probative of scienter.*  As outlined further above at Section VII, by failing to disclose and recognize Perrigo's roughly $2 billion in tax liability after it received the Audit Findings Letter, Defendants clearly violated several GAAP provisions, further supporting scienter.  First, Defendants violated ASC 450-20, *Loss Contingencies*, by (i) failing to disclose when Perrigo first announced Irish Revenue's audit in the Company's 2017 Form 10-K that the potential liability in the event of an adverse determination, which was at least "reasonably possible" at the time, was highly material and amounted to nearly $2 billion; and (ii) failing to disclose in the November 8, 2018 10-Q that the Audit Findings Letter explicitly and precisely quantified that tax liability as €1,636,047,646, an amount that was unquestionably material to the Company .  Moreover, Defendants *at a minimum* violated ASC 855-10—which requires disclosure of events that occurred after the balance sheet date but before the date of a quarterly or annual financial statement is filed.  Under ASC 855-10, Perrigo was required not only to disclose that it had received the Audit Findings Letter, but also to provide a financial estimate of its impact on the Company, which was precisely quantified in that letter to be €1,636,047,646.  Finally, Defendants violated ASC 740, which obligated Perrigo to "recognize the financial statement effects of a tax position when it is more likely than not, based on the technical merits, that the position will be sustained upon examination."  These multiple GAAP violations further support scienter.

122.    *The nature and duration of Irish Revenue's audit of Perrigo is probative of scienter.*  Irish Revenue sent Perrigo letters on November 20 and 29, 2017 that specifically outlined the nature and subject matter of its audit, putting Defendants on notice that Irish

Revenue was calling into question the tax treatment of the Tysabri transactions, and specifically whether they should have been taxed at the much higher capital gains rate of 33%.  Perrigo was therefore under "extensive review" by Irish Revenue on this precise subject matter for a full year, which involved an in-depth back-and-forth process with the Company that included the rejection of each of the Company's arguments in favor of its taxation of the Tysabri transactions at 12.5%.  As such, Defendants were well aware that Irish Revenue was likely to reassess Perrigo's treatment of Tysabri well before the issuance of the Audit Findings Letter.  The long duration of Irish Revenue's audit and the "extensive" nature of its review are highly probative of Defendants' scienter.

123.     *Defendant Kessler's misrepresentations about the Audit Findings Letter are probative of scienter*.  On May 3, 2019, Defendants filed the Audit Findings Letter and NoA as exhibits to their Motion to Dismiss the Amended Complaint in this matter.  *See* Dct. Nos. 52-15 and 52-16.  Prior to that date, Defendants had never publicly disclosed the full contents of the Audit Findings Letter and NoA, and had continued to mislead the public about their contents.  Indeed, even in the December 20, 2018 8-K, Perrigo merely disclosed that the Audit Findings Letter included only the *tax rate* Defendants should not have paid, misleadingly omitting that it was a highly detailed seven-page letter that calculated the *exact amount* of tax owed, as well as providing a detailed calculation and rationale for that amount and refuting in detail all of Defendants' defenses.  To this date, Defendants *still* have not made a full public disclosure of the Audit Findings Letter other than as an exhibit to a filing in this Court, which was not reported on by any press outlets or analysts.

124.     Indeed, as recently as May 14, 2019, Defendant Kessler *continued* to misrepresent the Audit Findings Letter, referring to the year-long process leading up to it as "rushed through

in a few weeks," falsely claiming that Irish Revenue had not "spelled out their rationale," and claiming that the detailed seven-page letter was merely "a couple of pages."  Defendants' willful ongoing misrepresentations of the facts surrounding Irish Revenue's audit and the Audit Findings Letter demonstrate a clear intent to deceive the public and strongly supporting scienter.

125.   *Perrigo's other massive tax underpayments support an inference of scienter.* Perrigo's incorrect tax treatment of its Tysabri transactions in Ireland was not an isolated incident.  For example, on April 29, 2019, Perrigo disclosed that the IRS had assessed the Company with a staggering <u>$850 million in back taxes, penalties and interest</u> due to past improper treatment of royalties paid from an Irish subsidiary to a US subsidiary relating to Tysabri.  Perrigo's pattern of extreme dereliction both with respect to its tax obligations and with respect to its tax disclosure obligations is probative of scienter.

126.   *Perrigo's direct involvement in the Tysabri transactions and in determining their tax treatment of Tysabri are probative of scienter.*  Elan first sold its interest in Tysabri to Biogen a few months before Perrigo bought Elan.  However, it was Perrigo, not Elan, who filed the first tax return covering the Tysabri sale, because both the Tysabri sale and Perrigo's purchase of Elan closed in 2013, and tax returns for the 2013 tax year were not filed until 2014, when Perrigo had already taken over Elan.  Thus, the tax treatment of Tysabri was not an Elan legacy issue that Perrigo merely inherited; rather, it was Perrigo that made the determination to treat the billions of dollars in payments received for Tysabri as ordinary income for tax purposes at the 12.5% rate, rather than 33%.  Moreover, Perrigo was in full control of the sale of the remaining Tysabri royalty rights in 2017 and the tax treatment of the payments for those rights at 12.5%.  Thus, Perrigo was solely responsible for the improper tax treatment of Tysabri from the outset.  These facts are probative of scienter.

127.   *Defendant Winowiecki's suspiciously timed March 20, 2019 resignation is probative of scienter.*   Defendant Winowiecki abruptly resigned from his position as CFO of the Company only three months after Defendants revealed the truth about the massive $2 billon tax liability assessed against the Company by Irish Revenue.   The fact that Defendant Winowiecki—who, as CFO of the Company, would have been directly responsible for the Company's income tax reporting—resigned so soon after Defendants' revelation of the $2 billion tax liability is highly probative of his scienter.

128.   *Defendant Kessler's purchase of Perrigo stock on November 9, 2018 does not negate his scienter because he was required to purchase those shares as the CEO of the Company.*   In their filings with this Court, Defendants argued that Defendant Kessler's purchase of 15,683 Perrigo shares (amounting to approximately $1 million) on November 9, 2018 negated his scienter.   However, Defendant Kessler only became CEO of Perrigo on October 8, 2018, and he was required to purchase those shares pursuant to the Company's "Executive Stock Ownership Guidelines" because he was under a mandate to do so as CEO of the Company. Specifically, according to those guidelines, which were set forth in the Company's public filings, Defendant Kessler was "required to attain certain target levels of stock ownership" that equaled "6 times [his] base salary," with 50% of those stock holdings consisting of shares purchased on the open market, acquired through the exercise of stock options or held through the Company's profit sharing plan, or vested restricted shares (and the other 50% consisting of unvested restricted shares).   In 2018, Defendant Kessler's base salary was $1.2 million, requiring him to hold a total of at least $7.2 million worth of Perrigo shares—meaning that he was required to hold $3.6 million worth of shares, or 50% of that amount, in one of the forms listed above. Defendant Kessler's November 9, 2018 purchase of 15,683 Perrigo shares (his only purchase

during the Class Period) was therefore clearly made in an effort to fulfill this requirement, but in fact fell far short of it—under the Company's guidelines, Defendant Kessler was required to purchase and hold at least $2.2 million more shares. Indeed, according to the Company's public filings, during the Class Period, Defendant Kessler held no Perrigo shares other than the 15,683 he had purchased on November 9, 2018.

## IX.   LOSS CAUSATION

129.   Throughout the Class Period, the price of Perrigo common stock was artificially inflated as a result of Defendants' materially false and misleading statements identified above. Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of Perrigo common stock, by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Perrigo common stock fell precipitously as the prior artificial inflation dissipated. As a result of their purchases of Perrigo common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

130.   By issuing materially false and misleading financial statements, among other adverse facts detailed herein, Defendants presented a misleading picture of Perrigo's business. Defendants' false and misleading statements had the intended effect and caused Perrigo common stock to trade at artificially inflated levels throughout the Class Period, with shares of Perrigo common stock closed as high as $65.58 per share on November 12, 2018. On December 20, 2018, the last trading day before Defendants' fraud began to be revealed, Perrigo common stock traded at $52.36 per share, the last closing price prior to indication of issues with Irish Revenue.

131.     Defendants' after-market disclosures on December 20, 2018 revealed to the market the false and misleading nature of Defendants' statements and omissions.  On that day, as described above, Perrigo finally disclosed its enormous tax liability in a Form 8-K filing, and further explicitly acknowledged that it had known by no later than October 30, 2018, when it received the Irish Revenue audit finding letter, that Irish Revenue had determined it owed almost $2 billion in back taxes.

132.     In response to Defendants' disclosures, the price of Perrigo common stock precipitously declined.  The Company's share price plummeted by nearly 30%, falling from $52.36 on December 20, 2018 to $37.03 on December 21, 2018, a drop of $15.33 per share, wiping out nearly $2.1 billion in market capitalization in one day, on unusually heavy trading volume.

133.     Analysts were stunned by the Company's admissions and negatively reacted to Perrigo's financial fallout caused by its staggering $2 billion tax liability. For example, Morgan Stanley lamented the "negative surprise" and said that investors could "question management transparency" considering the Company's delay in disclosing its massive new tax liability. Wells Fargo noted that, regardless of Perrigo's disagreement with and intent to appeal Irish Revenue's findings, the assessment was "sizeable" and "had a specific value attached to it in November that we are only hearing about in late December."  Without a better explanation, Wells Fargo said, "investors will be skeptical of why it had not been disclosed earlier."

134.     As shown above, the drastic and continuing decline in Perrigo's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the decline in the Company's stock price negates any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by

changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## X.   PRESUMPTION OF RELIANCE

135.   At all relevant times, the market for Perrigo's common stock was efficient for the following reasons, among others:

      a.   Perrigo's common stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

      b.   As a regulated issuer, Perrigo filed periodic reports with the SEC and the New York Stock Exchange;

      c.   Perrigo regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      d.   Perrigo was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

136.   As a result of the foregoing, the market for Perrigo's common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Perrigo's common stock.  All purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of Perrigo stock at artificially inflated prices, and a presumption of reliance applies.

137.   A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Perrigo's

business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

138.   The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.   None of the statements complained of herein was a forward-looking statement.   Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Perrigo's present business and operations, its present financial condition, and its internal controls, among others.

139.   To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.   As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Perrigo's material adverse tax assessment by Irish Revenue, among others. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Perrigo were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

140.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements

because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Perrigo who knew that the statement was false when made.

## XII.   CLASS ACTION ALLEGATIONS

141.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased, or otherwise acquired, the common stock of Perrigo between March 1, 2018 and December 20, 2018, inclusive (the "Class"), and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of Perrigo at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

142.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Perrigo common stock was actively traded on the New York Stock Exchange.  As of November 2, 2018, there were over 135.856 million shares of Perrigo common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members of the proposed Class. Class members who purchased Perrigo common stock may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

143.     Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as complained of herein.

144.     Lead Plaintiffs will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

145.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

        a.     whether the federal securities laws were violated by Defendants' acts, as alleged herein;

        b.     whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

        c.     whether Defendants acted with scienter; and

        d.     the proper way to measure damages.

146.     A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act,**
**and SEC Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

147.   Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

148.   This Count is asserted on behalf of all members of the Class against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

149.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they recklessly disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

150.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and other investors similarly situated in connection with their purchases of Perrigo common stock during the Class Period.

151.   Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the

other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Perrigo common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the other members of the Class, regarding, among other things, Perrigo's business and operations; (b) artificially inflate and maintain the market price of Perrigo common stock; and (c) cause Lead Plaintiffs and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

152.   Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

153.   As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Perrigo common stock, were either known to the Defendants, or were so obvious that the Defendants should have been aware of them.

154.   Lead Plaintiffs and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Perrigo common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiffs and the other members of the Class would not have purchased Perrigo common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

155.     As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Perrigo common stock during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act
### (Against Defendants Roehrhoff, Kessler and Winowiecki)

156.     Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

157.     This Count is asserted on behalf of all members of the Class against Defendants Roehrhoff, Kessler and Winowiecki for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

158.     During their tenures as officers and/or directors of Perrigo, each of these Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act.  *See* ¶¶22-24.  By reason of their positions of control and authority as officers and/or directors of Perrigo, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Perrigo during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

159.     In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Roehrhoff, Kessler, and Winowiecki had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal

compliance, and in its accounting and reporting functions.  Defendants Roehrhoff, Kessler, and Winowiecki signed the Company's SEC filings during the Class Period, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by Perrigo during the Class Period.  Defendants Roehrhoff, Kessler, and Winowiecki were also directly involved in providing false information, and Defendants Roehrhoff, Kessler, and Winowiecki certified and approved the false statements disseminated by Perrigo during the Class Period.  As a result of the foregoing, Defendants Roehrhoff, Kessler and Winowiecki together and individually, were controlling persons of Perrigo within the meaning of Section 20(a) of the Exchange Act.

160.    As set forth above, Perrigo violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

161.    By virtue of their positions as controlling persons of Perrigo, and as a result of their own aforementioned conduct, Defendants Roehrhoff, Kessler, and Winowiecki are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs, and the other members of the Class, who purchased or otherwise acquired Perrigo common stock.  As detailed above in ¶¶22-24, Sections V and VI, during the respective times these Defendants served as officers and/or directors of Perrigo, each of these Defendants was culpable for the material misstatements and omissions made by the Company.

162.    As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or other acquisition of Perrigo common stock.

## XIV.   **PRAYER FOR RELIEF**

163.    WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

a.    Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.    Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiffs and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c.    Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.    Such other and further relief as the Court may deem just and proper.

## XV.   **JURY DEMAND**

Lead Plaintiffs hereby demand a trial by jury.

Dated: May 31, 2019

Respectfully submitted,

**SAXENA WHITE P.A.**

By: */s/ Steven B. Singer*
Steven B. Singer
Kyla Grant
Joshua H. Saltzman
10 Bank Street, 8th Floor
White Plains, NY 10606
Tel:  (914) 437-8551
Fax:  (888) 216-2220
ssinger@saxenawhite.com
kgrant@saxenawhite.com
jsaltzman@saxenawhite.com

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White, III
Lester R. Hooker
150 East Palmetto Park Road, Suite 600

Boca Raton, FL 33432
Telephone:  (561) 394-3399
Facsimile:   (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
danderson@saxenawhite.com

***Lead Counsel for the Class***

**KLAUSNER KAUFMAN JENSEN &
LEVINSON**
Robert D. Klausner
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com

***Additional Counsel for Lead Plaintiffs***

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 31, 2019, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all

registered users.


*/s/ Steven B. Singer*
Steven B. Singer