UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
                                      :
                                      :
IN RE PERRIGO COMPANY PLC SECURITIES  :
LITIGATION                            :          19cv70 (DLC)
                                      :
                                      :      OPINION AND ORDER
------------------------------------- X

APPEARANCES

For the plaintiffs:
Saxena White P.A.
Steven B. Singer
Kyla Grant
Joshua H. Saltzman
10 Bank Street, Suite 882
White Plains, NY 10606

Maya Saxena
Joseph E. White, III
Lester R. Hooker
Dianne M. Pitre
7777 Glades Road, Suite 300
Boca Raton, FL 33434

Klausner Kaufman Jensen & Levinson
Robert D. Klausner
7080 Northwest 4th Street
Plantation, FL 33317

For defendant Perrigo Company PLC:
Fried, Frank, Harris, Shriver & Jacobson LLP
Samuel P. Groner
One New York Plaza
New York, NY 10004

James D. Wareham
James E. Anklam
801 17th Street, NW
Washington, DC 20006

For defendant Murray S. Kessler:
Simpson Thacher & Bartlett LLP
Joseph M. McLaughlin

Shannon K. McGovern
425 Lexington Avenue
New York, NY 10017

For defendant Uwe Roehrhoff:
McDermott Will & Emery LLP
Andrew B. Kratenstein
340 Madison Avenue
New York, NY 10173

For defendant Ronald L. Winowiecki:
Dechert LLP
Hector Gonzalez
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036

Angelia Liu
35 West Wacker Drive
Suite 3400
Chicago, IL 60601

DENISE COTE, District Judge:

Investors in Perrigo Company PLC ("Perrigo") have brought a federal securities class action against the company, its CEO Murray S. Kessler, its former CEO Uwe Roehrhoff, and its former CFO Ronald L. Winowiecki. They allege that Perrigo's March 1, 2018 Form 10-K and November 8, 2018 Form 10-Q failed adequately to disclose that Irish tax authorities had determined that Perrigo owed nearly $2 billion in back taxes. The defendants have moved to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons that follow, defendants' motion to dismiss the claim arising from the Form

10-K filing is granted, as is the motion to dismiss all claims against defendant Roehrhoff.

**Background**

The following facts are drawn from the Second Amended Complaint ("SAC") and documents relied upon by the SAC. For the purposes of deciding this motion, plaintiffs' factual allegations are accepted as true and all reasonable inferences are drawn in plaintiffs' favor.

I.  Perrigo's Treatment of $6 Billion in Tysabri Proceeds as Trading Income

In December 2013, Perrigo's predecessor entity purchased the Ireland-based Elan Corporation PLC ("Elan"), allowing Perrigo to establish its tax domicile in Ireland. Shortly before the acquisition, Elan had sold its stake in the multiple sclerosis drug Tysabri to Biogen Idec. Inc. ("Biogen"), for an up-front payment of over $3.2 billion, plus contingent royalty payments. In its tax returns, Perrigo treated over $6.0 billion in proceeds from the Tysabri sale as "trading income," subject to a $12.5% tax rate under Irish law. Capital gains, by contrast, are subject to a 33.0% tax rate.

In November 2017, the Irish Office of the Revenue Commissioners ("Irish Revenue") -- the Irish equivalent of the Internal Revenue Service -- commenced an audit of Perrigo's 2012

3

and 2013 taxes. A November 20, 2017 notification that Irish Revenue sent to Perrigo described the scope of the audit as "Corporation Tax (Primary area of review: intellectual property; treatment and disposal)."

A November 29, 2017 message from Irish Revenue "detail[ed] the areas [the auditors] would like to review on the opening day of the audit." The message put Perrigo on notice of Irish Revenue's interest in the sale of Tysabri to Biogen and the treatment of the proceeds of that sale. As relevant here, the November 29 message made the following requests:

> [M]y colleagues . . . have been carrying out a review of the 2012 CT [Corporation Tax] period. During the course of this review, it was established that [Perrigo] claimed deductions under Case I [trading income] for amortisation of Intellectual property. A brief note was forwarded by you outlining the reasoning behind the treatment of this amortisation as an income expense. On the day of the meeting we would like this to be expanded upon. We would like you to detail the <u>accounting standards that are used to treat IP when capitalized, amortised and when ultimately sold</u>.
>
> You stated in your note that [Perrigo] is engaged in the "the [sic] purchase, development, and exploitation of the rights to pharmaceutical products, the sale of pharmaceutical products", you listed several IP acquisitions throughout the years. We would like you to provide us with a detailed history of the company showing its acquisitions and disposals of IP throughout the years. We would also like you to show us how the business operates in seeking to acquire, develop, exploit and dispose of said IP.
>
> We would like you to <u>expand upon the history of [Perrigo's] ownership of the Tysabri IP</u>; its initial

development, the acquisition of the original licences,
expenses including development incurred by [Perrigo]
on the IP.

We would like you to provide a copy of the original
Tysabri collaboration agreement (and any amendments
made throughout its life cycle) in place between
[Perrigo] and Biogen before the disposal of
[Perrigo's] share.

We would like you to provide us with an analysis of
the various income streams of [Perrigo] which
contribute to the top line Revenue figure in the
Income statement in 2012 and 2013 (including product
revenue from discontinued operations).  In particular
we are interested in the various income streams
attributable to the exploitation of Tysabri in the
years preceding the Biogen agreement and following its
disposal.

We would like to have an initial discussion where you
provide an overview of the Tysabri agreement/sale that
was made with Biogen in April, 2013.

(emphasis added).

II.  March 1, 2018 Form 10-K

Perrigo's March 1, 2018 Form 10-K included the following

disclosure:  "We have ongoing audits in multiple other

jurisdictions the resolution of which remains uncertain. . . .

The Ireland Tax Authority is currently auditing our years ended

December 31, 2012 and December 31, 2013."  This same statement

was repeated in Perrigo's May 8, 2018 Form 10-Q and its August

9, 2018 Form 10-Q.[1]

---

[1] Perrigo's March 23, 2018 definitive proxy statement filed on
Schedule 14A with the SEC also referenced the March 2018 10-K.
Plaintiffs allege that this constitutes another repetition of
the statements in the March 2018 10-K.

III. The Audit Findings Letter

On October 30, 2018, Irish Revenue sent a letter describing the findings of its audit (the "Audit Findings Letter") to Perrigo.  The Letter began, "Please find below our findings arising from the audit . . . .  We invite you now to inform us of your view on the findings.  If you disagree with the findings, please outline the basis for your position by 20 November 2018."  The Letter went on to note that the Tysabri transaction had been "treated as a Case I receipt" -- that is, as trading income subject to the 12.5% tax rate -- on Perrigo's 2013 tax return.  The Letter summarized Perrigo's arguments in favor of treating the proceeds as trading income and Irish Revenue's reasons for rejecting those arguments, concluding that Perrigo "should have applied a capital treatment to its IP and to the Tysabri IP in particular."  The Letter described this in various places as a "revised treatment" or "proposed treatment."

The Letter provided detailed calculations of how the capital treatment would change Perrigo's tax filings and found that Perrigo had a tax liability of approximately €1.6 billion, or $1.9 billion.  One calculation included in the Letter was the portion of the Tysabri development costs that Perrigo could subtract from the sale proceeds for the purpose of determining the "chargeable gain" taxable at the 33.0% rate.  Of particular

importance to plaintiffs' allegations, the Letter said that this
calculation had been "outlined . . . at the initial audit
meeting of 29 January 2018."[2]  The Letter concluded by again
noting that if Perrigo disagreed with the findings, it should
inform Irish Revenue and provide the basis for its position.  At
the time it received the Audit Findings Letter, Perrigo had
approximately $400 million in cash on hand and $4.8 billion in
annual revenues.

IV.  November 8, 2018 Form 10-Q

Perrigo's November 8, 2018 Form 10-Q included the following
disclosure:

> On October 31, 2018, we received an audit finding
> letter from [Irish Revenue] for the years under audit
> 2012-2013.  The audit finding letter relates to Elan's
> taxation of the 2013 sale of the Tysabri® intellectual
> property and other assets related to Tysabri® to Biogen
> Idec from Elan.  The consideration paid by Biogen to
> Elan took the form of an upfront payment and future
> contingent royalty payments.  We disagree with the
> Irish Revenue position as asserted in the audit
> finding letter and intend to contest it, and therefore
> the amount of any adjustments, if any, that may
> ultimately be asserted by the Irish Revenue cannot be
> quantified at this stage.  The amount of any future
> assessment could be material.

---

[2] Defendants argue that the Audit Findings Letter, fairly read,
shows only that a Perrigo employee described the company's
expenditures for Tysabri development costs.  While defendants
might have the better of this argument on a motion for summary
judgment, here the Court cannot consider evidence extrinsic to
the SAC and must draw all reasonable inferences in favor of the
plaintiffs.

V.   Approximately $2 Billion Tax Assessment

On November 29, 2018, Irish Revenue sent Perrigo a "Notice of Amended Assessment," which indicated that under the amended assessment Perrigo had a "balance payable" of €1.6 billion -- the same figure calculated in the Audit Findings Letter.  On December 20, 2018, Perrigo filed a Form 8-K disclosing its receipt of the Notice of Amended Assessment, including the €1.6 billion tax liability.  The 8-K also described the background of the Tysabri sale and the content of the Audit Findings Letter. The 8-K asserted that Perrigo "strongly disagree[d]" with Irish Revenue's assessment and would "pursue all available administrative and judicial avenues" available to appeal the assessment.  On the next trading day, Perrigo's stock price fell from $52.36 to $37.03, representing a total decrease in value of $2.1 billion.

VI.  Procedural History

The original complaint in this action was filed on January 3, 2019.  On March 26, the City of Boca Raton General Employees' Pension Plan and Palm Bay Police and Firefighters' Pension Fund were appointed as lead plaintiffs, in accordance with the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3).  The lead plaintiffs filed an amended complaint on April 12, 2019.  On May 3, the defendants moved to dismiss.  On

May 10, the plaintiffs filed a letter seeking leave to further amend their complaint, which the Court granted. The plaintiffs had been warned in a March 26 Case Management Order that any further opportunities to amend would be unlikely. The SAC was filed on May 31. It alleges (1) that the defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, and (2) that defendants Kessler, Roehrhoff, and Winowiecki violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). On June 28, the defendants renewed their motion to dismiss the SAC.

## Discussion

When deciding a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., a court must accept the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Loginovskaya v. Batratchenko, 764 F.3d 266, 269-70 (2d Cir. 2014). A claim is sufficiently plausible to withstand a motion to dismiss when the "factual content" of the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted). In the context of a securities class action, a court may consider not only the complaint itself, but also "any written instrument attached to the complaint, statements or

documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." Id. (citation omitted)).

I.   Applicable Law

A.   Securities Fraud

A complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) by "stating with particularity the circumstances constituting fraud." Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 304 (2d Cir. 2015). SEC Rule 10b-5 renders it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b); see also 15 U.S.C. § 78j(b). "To avoid dismissal under . . . Rule 10b-5, a complaint must plausibly allege: (1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." Singh v. Cigna Corp., 918 F.3d 57, 62 (2d Cir. 2019) (citation omitted).

"An alleged misrepresentation is material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." Id. at 63 (citation omitted). "The statement must also be misleading, evaluated not only by literal truth, but by context and manner of presentation." Id. (citation omitted). "Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor, may properly be considered a material misrepresentation." Kleinman v. Elan Corp., PLC, 706 F.3d 145, 153 (2d Cir. 2013) (citation omitted).

"Silence, absent a duty to disclose, is not misleading under Rule 10b–5." Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988). "[T]o support a finding of liability, Rule 10b–5 expressly requires an actual statement, one that is either 'untrue' outright or 'misleading' by virtue of what it omits to state." In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 239 (2d Cir. 2016). "[A] complete failure to make a statement -- in other words, a 'pure omission,' -- is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." Id. (citation omitted). "Disclosure of an item of information is not required simply because it may be relevant or of interest to a reasonable

investor." Kleinman, 706 F.3d at 152-53 (citation omitted).

But a duty to disclose "may arise when there is . . . a statute

or regulation requiring disclosure, or a corporate statement

that would otherwise be inaccurate, incomplete, or misleading."

Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir.

2015) (citation omitted).

For a plaintiff to sufficiently allege a misleading

statement of opinion,

> the investor must identify particular (and material)
> facts going to the basis for the issuer's opinion --
> facts about the inquiry the issuer did or did not
> conduct or the knowledge it did or did not have --
> whose omission makes the opinion statement at issue
> misleading to a reasonable person reading the
> statement fairly and in context.

Tongue, 816 F.3d at 209 (citation omitted). "[A] reasonable

investor . . . expects not just that the issuer believes the

opinion (however irrationally), but that it fairly aligns with

the information in the issuer's possession" at the time the

statement is made. Id. at 210 (citation omitted). Reasonable

investors understand, however, "that opinions sometimes rest on

a weighing of competing facts" and thus "a statement of opinion

is not necessarily misleading when an issuer knows, but fails to

disclose, some fact cutting the other way." Id. at 210.

To adequately plead scienter, the PSLRA requires plaintiffs

to "state with particularity facts giving rise to a strong

12

inference that the defendant acted with the required state of
mind." Blanford, 794 F.3d at 305 (quoting 15 U.S.C. § 78u-
4(b)(2)(A)).  In evaluating the sufficiency of scienter
allegations, courts must "tak[e] into account plausible opposing
inferences and consider[] plausible, nonculpable explanations
for the defendant's conduct, as well as inferences favoring the
plaintiff." Id. (citation omitted).  The mental state required
for liability is either an "intent to deceive, manipulate, or
defraud," or "recklessness." Id. (citation omitted).  "In the
securities fraud context, recklessness must be conduct that is
highly unreasonable, representing an extreme departure from the
standards of ordinary care, not merely a heightened form of
negligence." In re Advanced Battery Techs., Inc., 781 F.3d 638,
644 (2d Cir. 2015) (citation omitted).

        "The requisite scienter can be established by alleging
facts to show either (1) that defendants had the motive and
opportunity to commit fraud, or (2) strong circumstantial
evidence of conscious misbehavior or recklessness." ECA, Local
134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.,
553 F.3d 187, 198 (2d Cir. 2009).  The "motive and opportunity"
prong requires plaintiffs to "allege that [the defendant
company] or its officers benefitted in some concrete and
personal way from the purported fraud." Id. (citation omitted).

                            13

"[T]he 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit."  Id.  "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  Id.

Alternatively, plaintiffs may allege "facts to show strong circumstantial evidence of conscious misbehavior or recklessness" by the defendants.  Indiana Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 96 (2d Cir. 2016) (citation omitted).

> Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

Blanford, 794 F.3d at 306 (citation omitted).  "Corporate officials need not be clairvoyant" to avoid a finding of recklessness; "they are only responsible for revealing those material facts reasonably available to them."  Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000).  "[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects."

14

Id.  When plaintiffs have not pleaded motive on the part of corporate officers, "the strength of the circumstantial allegations must be correspondingly greater."  ECA, 553 F.3d at 199.

B.  Generally Accepted Accounting Principles ("GAAP")

Under SEC rules, "financial statements which are not prepared in accordance with GAAP are presumptively misleading or inaccurate."  SAIC, 818 F.3d at 93 (quoting 17 C.F.R. § 210.4-01(a)(1)) (alterations omitted).  But "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim.  Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient."  Id. (citation omitted).  As in cases that do not involve alleged GAAP violations, to proceed on a recklessness theory of scienter, plaintiffs must plead facts that support a strong inference that the defendant made "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  ECA, 553 F.3d at 198 (citation omitted); see also SAIC, 818 F.3d at 96.  Applying this standard, failure to make a GAAP-required disclosure may give rise to a strong inference of scienter if the defendant "acted with at least a reckless

15

disregard of a known or obvious duty to disclose." SAIC, 818
F.3d at 96.

The Accounting Standards Codification ("ASC") is the
"source of authoritative generally accepted accounting
principles" published by the Financial Accounting Standards
Board ("FASB").[3]  Plaintiffs allege that Perrigo's financial
statements violated three ASC provisions: ASC 450, ASC 740, and
ASC 855.  Of these, ASC 450 is of most relevance to the parties'
arguments.

### 1.  ASC 450

ASC 450 addresses loss contingencies.  A loss contingency
is defined as an "existing condition, situation, or set of
circumstances involving uncertainty as to possible loss to an
entity that will ultimately be resolved when one or more future
events occur or fail to occur."  ASC 450-20-20.  ASC 450
contains provisions addressing when the loss contingency must be
accrued and when, if not accrued, it must nonetheless be
disclosed.

---

[3] Financial Accounting Standards Board, Accounting Standards
Codification: About the Codification 4 (Dec. 2014), https://
asc.fasb.org/imageRoot/71/58741171.pdf; see also SAIC, 818 F.3d
at 93 (relying on FASB standards as a source of GAAP); Bolt v.
Merrimack Pharm., Inc., 503 F.3d 913, 917 n.6 (9th Cir. 2007)
(describing FASB standards as the "highest level" of GAAP
authority).

The accrual guidance hinges on whether the contingent loss is probable and reasonably estimable.  It provides:

> An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met:
>
>> a. Information available before the financial statements are issued . . . indicates that it is <u>probable that</u> an asset had been impaired or <u>a liability had been incurred</u> at the date of the financial statements. . . .  It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>>
>> b. The amount of <u>loss can be reasonably estimated</u>.

ASC 450-20-25-2 (emphasis added).

When no accrual is made, either because the loss is not "probable" or because the amount of loss cannot be "reasonably estimated," the loss contingency nonetheless must be disclosed "if there is at least a reasonable possibility that a loss . . . may have been incurred."  ASC 450-20-50-3.  "Reasonably possible" means that the chance of occurrence is "more than remote but less than likely."  ASC 450-20-20.

Even when there is a reasonable possibility of a loss, however, disclosure need not always be made.  Disclosure is not required for a reasonably possible loss when it is "a loss contingency involving an unasserted claim or assessment if there has been <u>no manifestation by a potential claimant of an</u>

<u>awareness</u> of a possible claim or assessment unless both" (a) "[i]t is considered probable that a claim will be asserted" and (b) "[t]here is a reasonable possibility that the outcome will be unfavorable." ASC 450-20-50-6 (emphasis added).

When disclosure is required, it must include both the "nature of the contingency" and an "estimate of the possible loss or range of loss or a statement that such an estimate cannot be made." ASC 450-20-50-4. ASC 450 also contains an "illustration" that provides "implementation guidance" for the rules above:

> An entity may be litigating a dispute with another party. In preparation for the trial, it may determine that, based on recent developments involving one aspect of the litigation, it is probable that it will have to pay $2 million to settle the litigation. Another aspect of the litigation may, however, be open to considerable interpretation, and depending on the interpretation by the court the entity may have to pay an additional $8 million over and above the $2 million.

ASC 450-20-55-18; <u>see also</u> ASC 450-20-50-3, -55-1. In such a scenario, the entity must accrue a loss of $2 million "if that is considered a reasonable estimate of the loss." ASC 450-20-55-19. And it must disclose "the additional exposure to loss if there is a reasonable possibility that the additional amounts will be paid." ASC 450-20-55-21.

2.   ASC 740

ASC 740 addresses accounting for income taxes.  Of
relevance here, it provides:

> An entity shall initially recognize the financial
> statement effects of a tax position when it is more
> likely than not, based on the technical merits, that
> the position will be sustained upon examination.  The
> term <u>more likely than not means a likelihood of more
> than 50 percent</u>; the terms examined and upon
> examination also include resolution of the related
> appeals or litigation processes, if any. . . .  The
> level of evidence that is necessary and appropriate to
> support an entity's assessment of the technical merits
> of a tax position is a matter of judgment that depends
> on all available information.

ASC 740-10-25-6 (emphasis added and omitted).

3.   ASC 855

ASC 855 addresses the accounting consequences of
"subsequent events."  An entity required to file financial
statements with the SEC must evaluate subsequent events that
occur through the date that the financial statements are issued.
ASC 855-10-25-1A.  If such events "provide additional evidence
about conditions that existed at the date of the balance sheet,"
then the entity must recognize the effects of those events in
its financial statements.  ASC 855-10-25-1.

II.  Statements Prior to Receipt of the Audit Findings Letter

For each of the Rule 10b-5 claims, defendants have not
challenged the adequacy of plaintiffs' allegations as to the
statements' connection with the purchase or sale of a security,

reliance, economic loss, or loss causation.  The disputed issues

for each alleged violation of Rule 10b-5 are therefore whether

the plaintiffs have adequately pleaded that defendants (1) made

a material misrepresentation or omission (2) with scienter.  See

Singh, 918 F.3d at 62 (stating the elements of a Rule 10b-5

claim).

With respect to Perrigo's March 2018 10-K, plaintiffs have

adequately alleged a violation of GAAP.[4]  Plaintiffs have not

sufficiently pleaded, however, the defendants' scienter for

Perrigo's statements or omissions in that filing or in any of

the filings made prior to receipt of the Audit Findings Letter

on October 30, 2018.

A.   Material Misrepresentation or Omission

Perrigo's March 2018 10-K disclosed the existence of an

ongoing audit by Irish Revenue for the years 2012 and 2013.  It

did not, however, describe any particular focus of the audit or

estimate any liability from an adverse audit finding.

Plaintiffs argue that by the time of Perrigo's March 2018 10-K

the possibility of a loss from the Irish Revenue audit was "more

than remote."  Accordingly, they contend, the defendants had an

obligation under ASC 450-20-50 to disclose the subject matter of

---

[4] Plaintiffs make identical allegations concerning Perrigo's
March 23, 2018 definitive proxy statement, May 8, 2018 Form 10-
Q, and August 9, 2018 Form 10-Q.

the audit and to make an estimate of the magnitude of the potential liability if the 33.0% rate were applied to the Tysabri proceeds.

ASC 450 requires disclosure of a loss contingency where there "is at least a reasonable possibility that a loss . . . may have been incurred."  ASC 450-20-50-3.  The SAC plausibly alleges that as of November 29, 2017, there was a more than remote possibility that Perrigo had incurred a loss associated with its tax treatment of the proceeds from the Tysabri sale. It was on that date that Irish Revenue sent Perrigo a message with a detailed description of its areas of interest in the audit of Perrigo's 2012 and 2013 taxes.  These details, as quoted above, focused on the Tysabri sale and the accounting standards on which Perrigo had relied to classify the proceeds of that sale.  Therefore, the plaintiffs have pleaded that, in failing to disclose a loss contingency in its March 2018 10-K, Perrigo violated the disclosure obligation contained in ASC 450-20-50.

In resisting a finding that GAAP required it to disclose the loss contingency in the March 2018 10-K, Perrigo appears to rely on the exception to disclosure that exists where there is "no manifestation by a potential claimant of an awareness of a possible claim or assessment."  ASC 450-20-50-6.  Defendants

apparently dispute that Irish Revenue had, at any time prior to the delivery of the Audit Findings Letter in October 2018, manifested an awareness of a "possible claim or assessment."[5] The defendants argue that, since the message did not make a determination that Perrigo actually owed taxes or include a calculation of such tax liability, this message did not constitute a manifestation of an awareness of a claim.

The SAC has adequately alleged that Irish Revenue's November 29, 2017 message was a manifestation of its awareness that it possessed a "possible" claim against Perrigo. Nothing in ASC 450-20-50 suggests that a potential claimant must have taken a firm position on liability or reduced its "possible" claim to a final calculation.[6] Indeed, GAAP's disclosure

_____

[5] The defendants essentially admit in their moving papers, at footnote 16, that Irish Revenue had manifested an awareness of its claim before Perrigo filed the March 2018 10-K. They argue there, however, that ASC 450-20 did not require a disclosure because Perrigo had no reasonable estimate of a possible future assessment. Not so. Perrigo had the ability at that time to estimate a possible range of loss. See ASC 450-20-50-4. It also had the duty to disclose the nature of the contingency. Id.

[6] The defendants protest that imposing the duty to disclose the nature of Irish Revenue's audit would require companies "to guess at all the possible findings that could come out of audits and investigations and then to disclose those guesses." Not so. Determining whether a notice of audit or investigation manifests awareness of a potential claim -- and, in turn, whether it is reasonably possible that a liability has been incurred -- is a fact-specific inquiry that requires the exercise of judgment. The more expressly targeted an audit is on a particular tax

obligations for loss contingencies are triggered by awareness of a reasonably possible loss and by manifestation of awareness of a possible claim. Disclosure may not await final determinations.

The Second Circuit's decision in SAIC, which applied the predecessor to ASC 450, is illustrative. 818 F.3d at 93-94.[7] The Second Circuit found the plaintiffs had adequately alleged that the defrauded municipality had "manifested an awareness of a possible, sizeable claim against SAIC" when the Mayor publicly announced a full review of all payment the city had made to SAIC, among other things. Id. at 94.

B. Scienter

The plaintiffs allege that the defendants were reckless or engaged in conscious misbehavior when they failed to disclose the nature of the tax liability and an estimate of a possible

---

deficiency, the easier it will be to find that the notice of audit constitutes a manifestation of awareness by a taxing authority of a possible assessment or claim.

[7] Other illustrative decisions include Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC, 277 F. Supp. 3d 500, 515 (S.D.N.Y. 2017) (a series of detailed subpoenas); RPM Int'l, Inc., 282 F. Supp. 3d at 21 (a pending qui tam action); In re Silver Wheaton Corp. Sec. Litig., No. CV15-5146-CAS(JEMX), 2016 WL 3226004, at *9, 11 (C.D. Cal. June 6, 2016) (an auditor's statement that the company owed taxes). But see In re Lions Gate Entm't Corp. Sec. Litig., 165 F. Supp. 3d 1, 21 (S.D.N.Y. 2016) (finding no duty to disclose an SEC investigation that had not produced "pending or threatened litigation").

loss in the March 2018 10-K.[8]  The plaintiffs have not plausibly

alleged that defendants' conduct was "highly unreasonable,

representing an extreme departure from the standards of ordinary

care."  In re Advanced Battery Techs., Inc., 781 F.3d at 644.

As the Second Circuit has admonished, "allegations of GAAP

violations or accounting irregularities, standing alone, are

insufficient to state a securities fraud claim."  SAIC, 818 F.3d

at 93.  This is nowhere more true than where the application of

GAAP to a particular set of circumstances requires the exercise

of judgment, as it does here.  See Fait, 655 F.3d at 111; ASC

450-20-55-15 ("If the judgment is that assertion [of a then-

unasserted claim] is not probable, no accrual or disclosure

would be required.").

Plaintiffs principally rely on the existence of the GAAP

violation and the magnitude of the possible tax deficiency to

plead the "strong inference" of scienter required by the PSLRA.

This is not sufficient.  Plaintiffs must plead facts supporting

a strong inference of recklessness and this they have not done.

As the Court of Appeals observed in another context, "Assuming

arguendo that plaintiffs are correct about what defendants

should have been doing, this does not create a strong inference

---

[8] Plaintiffs have not asserted that the defendants acted with a
motive and opportunity to violate the securities laws.

that the . . . defendants were reckless . . . ." <u>City of</u>
<u>Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG</u>, 752 F.3d
173, 187 (2d Cir. 2014).

Plaintiffs argue that the weakness of defendants' tax
position, as a matter of Irish law, supports an inference of
scienter.  The SAC repeatedly alleges that Perrigo lacked any
valid basis to treat the proceeds of the Tysabri transaction as
trading income under Irish tax law.  A court is not required to
accept "legal conclusions couched as factual allegations."
<u>Nielsen v. Rabin</u>, 746 F.3d 58, 62 (2d Cir. 2014).[9]  In fact,
Irish Revenue has observed that "[t]he activities of companies
whose sole activity is the management and exploitation of
intellectual property can sometimes be difficult to evaluate in
terms of whether there is a trade being conducted."[10]

---

[9] Plaintiffs have not cited any Irish legal authority showing
that Perrigo's tax position was so infirm that it was reckless
for the company not to disclose the subject matter of the audit.
In the principal case upon which the plaintiffs rely, the court
found that scienter was adequately pleaded in part because the
Canada Revenue Agency had "in a 'broadly similar' case that was
highly publicized" imposed tax assessments for the same reasons
that it was auditing the defendant.  <u>In re Silver Wheaton Corp.</u>
<u>Sec. Litig.</u>, 2016 WL 3226004, at *10.

[10] Irish Revenue, <u>Tax and Duty Manual: What Constitutes a Trade</u> 4
(Sept. 2019), https://www.revenue.ie/en/tax-professionals/tdm/
income-tax-capital-gains-tax-corporation-tax/part-02/02-02-
06.pdf.

Plaintiffs' arguments based on ASC 740 are unpersuasive for similar reasons. ASC 740 explicitly relies on the exercise of judgment. It requires recognition of a tax position "when it is more likely than not, based on the technical merits, that the position will be sustained" through the resolution of the litigation process. ASC 740-10-25-6. There is no strong inference pleaded in the SAC that Perrigo was reckless in failing to realize as of the filing of the March 2018 10-K that its tax position would not be sustained.

Plaintiffs' arguments based on ASC 855 fail as well. That provision applies only to events that occur after the balance sheet date but before the date the financial statements are issued. ASC 855-10-25-1 to -1A. The balance sheet date for Perrigo's March 2018 10-K was December 31, 2017. The only relevant subsequent event was the January 2018 audit meeting, and there is no strong inference that defendants were reckless in failing to recognize the import of that meeting for the accuracy of Perrigo's financial statements.

III. Statements After Receipt of the Audit Findings Letter

A.   Material Misrepresentation or Omission

Irish Revenue's issuance of the Audit Findings Letter radically altered the landscape. Once Perrigo received the Audit Findings Letter on October 30, 2018, Perrigo disclosed in

its November 8, 2018 Form 10-Q both (1) that the Irish Revenue audit related to its 2013 sale of Tysabri and (2) that a future assessment based on its tax treatment of the proceeds from the sale "could be material."  The SAC adequately pleads that this disclosure was materially incomplete and violated GAAP by failing to disclose that the Letter had calculated Perrigo's "Tax payable" as over €1.6 billion.

ASC 450 requires disclosure of not only the nature of the loss contingency but also an "estimate of the possible loss or range of loss or a statement that such an estimate cannot be made."  ASC 450-20-50-4.  Perrigo acknowledges that it had a disclosure duty after it received the Audit Findings Letter, conceding that the Letter manifested an awareness by Irish Revenue of its claim against Perrigo.  ASC 450 explains that, in such circumstances, if there is a "reasonable possibility" that a loss will be incurred, the estimate of the amount of that loss must be disclosed.  See ASC 450-20-55-18 to -21, -31.

Defendants argue that Perrigo's disclosures complied with ASC 450 because they included a statement that an estimate could not be made.  Perrigo's November 2018 10-Q included the following language:  "We disagree with the Irish Revenue position as asserted in the audit finding letter and intend to contest it, and therefore the amount of adjustments, if any,

27

that may ultimately be asserted by the Irish Revenue cannot be quantified at this stage."

Perrigo's position ignores the guidance in ASC 450 about when loss estimates "cannot be made." In particular, ASC 450-20-55-18 offers an illustration in which an entity (1) considers it "probable" that it will have to pay $2 million to settle litigation and (2) determines that another aspect of the litigation is "open to considerable interpretation, and depending on the interpretation by the court the entity may have to pay an additional $8 million over and above the $2 million." In this scenario, the entity must accrue a $2 million loss and disclose the additional exposure to a loss of $8 million if there is "a reasonable possibility" that the additional amount will be paid. ASC 450-20-55-19, -21.

This illustration makes clear that Perrigo had a duty to quantify its exposure after it received the Audit Findings Letter, even if it "disagreed" with Irish Revenue's position and intended to contest it. Presumably the entity in the illustration likewise intended to contest the additional $8 million in possible losses; and yet it was not freed from a duty to quantify and disclose that exposure to loss.

Defendants' interpretation would severely undermine the disclosure obligations in ASC 450. If the defendants' position

were adopted, whenever a reporting entity intends to contest the amount at issue, it could avoid quantifying and reporting its exposure by saying that it disagreed with the claimant's position and there was, as of yet, no final determination on the amount of any deficiency.  Instead, the illustration clarifies that when an issue is "open to considerable interpretation," an entity nonetheless must estimate the possible loss where such an estimate can be made and disclose that exposure to loss if the issue is resolved adversely.[11]  There is no restriction, of course, on the entity's right to inform investors that it intends to contest its liability vigorously, if such a statement is truthful.

Defendants attempt to move the goalposts.  They argue that it was entirely accurate to state that the "amount of adjustments . . . that may ultimately be asserted" could not be quantified.  They argue that it would require them to speculate on whether they would ultimately owe any taxes.  But loss contingencies by definition are uncertain as to their ultimate

---

[11] The only limitations are that the amount of exposure need not be disclosed if no estimate can be made or if there is not a "reasonable possibility that the additional amounts will be paid."  ASC 450-20-55-21.  An event is reasonably possible if the chance of occurrence is "more than remote."  ASC 450-20-20. Defendants do not argue that there was only a remote or less than remote possibility that Irish Revenue would seek to collect the amount it claimed in the Audit Findings Letter.

outcome; what Perrigo was required to disclose was a reasonable estimate of the possible loss.  <u>See</u> ASC 450-20-50-4.  There is no question that after receipt of the Audit Findings Letter such a figure was reasonably calculable.  Irish Revenue provided the number to Perrigo.

Defendants next argue that because ASC 450 requires entities to make a "judgment" about whether the amount of potential loss can be reasonably estimated, plaintiffs cannot plead a GAAP violation unless they establish that Perrigo's "subjective judgment in this regard was false."  <u>See</u> <u>Omnicare,</u> <u>Inc. v. Laborers District Council Construction Industry Pension</u> <u>Fund</u>, 575 U.S. 175, 186-90 (2015).  Here, no exercise of judgment was required as to the upper end of the loss range.  The Audit Findings Letter found that Perrigo's tax liability was €1.6 billion.  This established as a matter of fact, rather than opinion, an upper bound on the range of possible loss that was reasonably estimable.  No additional pleading to satisfy <u>Omnicare</u> was required.

In a similar vein, the defendants argue that Perrigo's disclosure that "[t]he amount of any future assessment could be material" is a forward-looking statement that falls within the

PSLRA safe harbor for such statements.[12]  A party's current, good faith estimate of the range of loss that there is a reasonable possibility it has already incurred is not a forward-looking statement.

B.  Scienter

Defendants also argue that plaintiffs have not adequately pleaded scienter.  The relevant standard is the same as that applied to defendants' statements prior to receipt of the Audit Findings Letter -- whether Perrigo "acted with at least a reckless disregard of a known or obvious duty to disclose."[13] SAIC, 818 F.3d at 96.  Applying that standard to this subsequent period produces the opposite result.  Once in receipt of the Audit Findings Letter, the duty to disclose under ASC 450 was indeed "obvious."  Under the circumstances alleged by plaintiffs, there is a strong inference that Perrigo's failure to do so was "highly unreasonable, representing an extreme

---

[12] The PSLRA's safe harbor provides that "a defendant is not liable if (1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading."  In re Vivendi, S.A. Sec. Litig., 838 F.3d at 245 (citation omitted).

[13] Again, the plaintiffs have not attempted to plead the defendants' motive and opportunity to commit fraud.  Therefore, while the individual defendants' securities trading may be highly probative at trial, it does not affect the determination here regarding the adequacy of the pleading of scienter.

departure from the standards of ordinary care." <u>In re Advanced</u>
<u>Battery Techs., Inc.</u>, 781 F.3d at 644.

In particular, the Letter came after an extensive audit,
set forth detailed "findings," explained Irish Revenue's
"position," and provided reasons for rejecting Perrigo's
arguments.  The Letter then provided detailed calculations,
resulting in a "Tax payable" of €1.6 billion.  It is undisputed
that this amount was material to Perrigo.  Under these
circumstances, the plaintiffs have adequately pleaded that it
was reckless not to recognize the obligation to disclose the
upper range of tax liability.

Defendants place great weight on the fact that the Audit
Findings Letter described the capital treatment of Tysabri
proceeds as "proposed" and invited Perrigo to raise any
disagreements with Irish Revenue.  But GAAP accounting does not
require companies to disclose only their actual or probable
losses -- in fact, those sorts of losses must be <u>accrued</u> in a
company's financial statements.  <u>See</u> ASC 450-20-25-2.  The Audit
Findings Letter presented a reasonably possible loss that
required disclosure.  The possibility of an assessment was
clearly more than a remote possibility.

Finally, the defendants assert that the magnitude of the
figure in the Audit Findings Letter cannot support an inference

of scienter.  The cases cited by defendants, however, stand for the proposition that "the magnitude of the alleged fraud <u>alone</u> is not enough" to support an inference of scienter.  <u>In re UBS</u> <u>AG Sec. Litig.</u>, No. 07cv11225 (RJS), 2012 WL 4471265, at *19 (S.D.N.Y. Sept. 28, 2012) (citation omitted).  The magnitude of a loss remains a "relevant factor" in assessing scienter.  <u>Id.</u> (citation omitted); <u>see also</u> <u>SAIC</u>, 818 F.3d at 96 (finding scienter in part because the defendant knew the "extent of" a potential liability and the risk that it would lose a "significant number" of contracts).  Here, the size of the potential tax liability -- nearly 40% of Perrigo's annual revenues -- is but one of the several factors listed above that support an inference of scienter.

IV.  Claims Against the Individual Defendants

The individual defendants seek dismissal of the claims against them for failure to adequately plead scienter. Plaintiffs have alleged that the Audit Findings Letter was "directly issued" to Perrigo's "senior management," including defendants Kessler and Winowiecki.  Likewise, Kessler and Winowiecki signed the November 2018 10-Q.  For the reasons discussed above, the allegations that Kessler and Winowiecki received the Audit Findings Letter and signed the November 2018 10-Q, which contained the statement that Perrigo's potential

loss from the audit could not be quantified, are sufficient to create a strong inference of scienter.  Plaintiffs have made no such allegations against defendant Roehrhoff, who left Perrigo in October 2018, and the claims against him are therefore dismissed.

### Conclusion

Defendants' June 28, 2019 motion to dismiss is granted in part.  Plaintiffs may proceed on their claims that Perrigo's November 8, 2018 10-Q was misleading.  The claims against defendant Roehrhoff and those arising from Perrigo's statements made prior to the November 2018 10-Q are dismissed.


Dated:     New York, New York
           January 23, 2020


                        _____
                              DENISE COTE
                     United States District Judge