UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
                                     :        19cv70 (DLC)
IN RE PERRIGO COMPANY PLC SECURITIES :
LITIGATION                           :        OPINION AND ORDER
                                     :
-------------------------------------X

APPEARANCES:

For the plaintiffs:
Saxena White P.A.
Steven B. Singer
Kyla Grant
Joshua H. Saltzman
10 Bank Street, Suite 882
White Plains, NY 10606

Maya Saxena
Joseph E. White, III
Lester R. Hooker
7777 Glades Road, Suite 300
Boca Raton, FL 33434

Klausner Kaufman Jensen & Levinson
Robert D. Klausner
7080 Northwest 4th Street
Plantation, FL 33317

For defendant Perrigo Company PLC:
Fried, Frank, Harris, Shriver & Jacobson LLP
Samuel P. Groner
Samuel M. Light
One New York Plaza
New York, NY 10004

James D. Wareham
James E. Anklam
Katherine St. Romain
801 17th Street, NW
Washington, DC 20006

For defendant Murray S. Kessler:
Simpson Thacher & Bartlett LLP
Amy Dawson
Joseph M. McLaughlin

Shannon K. McGovern
425 Lexington Avenue
New York, NY 10017

For defendant Ronald Winowiecki:
Dechert LLP
Hector Gonzalez
1095 Avenue of the Americas
New York, NY 10036

Angelia Liu
35 West Wacker Drive
Suite 3400
Chicago, IL 60601

Carla Graff
Jeffrey Masters
Cira Centre 2929 Arch Street
Philadelphia, PA 19104

Tharuni Jayaraman
1900 K Street N.W.
Washington, DC 20006

DENISE COTE, District Judge:

    Investors in Perrigo Company PLC ("Perrigo") bring this
class action against Perrigo, its CEO Murray S. Kessler, and its
former CFO Ronald L. Winowiecki for securities fraud.  The
parties have cross-moved for summary judgment.  For the reasons
that follow, the plaintiffs' motion for summary judgment on the
issues of falsity and materiality is granted.

<h2 style="text-align:center"><strong><u>Background</u></strong></h2>

    The following facts are undisputed or taken in the light
most favorable to the non-moving party.  In December 2013,
Perrigo purchased the Ireland-based company Elan Corporation PLC
("Elan"), which allowed Perrigo to establish its tax domicile in

Ireland.  Shortly before the acquisition, Elan had sold its
stake in the multiple sclerosis drug Tysabri to Biogen Idec Inc.
("Biogen") for an up-front payment of over $3.2 billion, plus
contingent royalty payments.  In its tax returns, Perrigo
treated over $6.0 billion in proceeds from the Tysabri sale as
"trading income," subject to a $12.5% tax rate under Irish law.
Capital gains, by contrast, are subject to a 33.0% tax rate.

I.   Irish Office of Revenue Commissioners' Initial Inquiry

On October 19, 2016, Irish Office of Revenue Commissioners
("Irish Revenue") informed Perrigo that it was reviewing its
December 2012 tax computation for the Elan transaction and, in
particular, certain amortization deductions Perrigo had taken
against intellectual property ("IP") assets.  On November 10,
Irish Revenue asked Perrigo to

> provide further details/support as to why the
> amortization charge in relation to intangible assets .
> . . has not been added back in the company's tax
> computation.  On what basis is it considered to be an
> expense that i[s] revenue rather than capital in
> nature?  Capital expenditure is not deductible as a
> trading expense.  In your reply, please reference
> relevant case law/legislation in support of the
> position the company has taken.

Around this time, Perrigo was preparing to sell off its
remaining rights to the Tysabri royalty stream, the proceeds of
which Perrigo intended to treat as subject to the 12.5% trading
income rate.  Perrigo's VP of Tax immediately understood the
implications of Irish Revenue's November 10 inquiry.  On

November 11, he expressed his concern to Perrigo's International
Director of Tax and International Tax Manager that the Irish
Revenue inquiry "could turn the tables on a 33% tax rate vs
12.5%."

II.   The Formal Audit

On November 20, 2017, Irish Revenue informed Perrigo that
it had commenced a formal audit of its treatment and disposal of
IP during 2012 and 2013.  On November 29, Irish Revenue sent
Perrigo an outline of items that "detail[ed] the areas [the
auditors] would like to review on the opening day of the audit."
As relevant here, the November 29 message made the following
requests:

> [M]y colleagues . . . have been carrying out a review
> of the 2012 CT [Corporation Tax] period.  During the
> course of this review, it was established that
> [Perrigo] claimed deductions under Case I [trading
> income] for amortisation of Intellectual property.  A
> brief note was forwarded by you outlining the
> reasoning behind the treatment of this amortisation as
> an income expense.  On the day of the meeting we would
> like this to be expanded upon.  We would like you to
> detail the <u>accounting standards that are used to treat</u>
> <u>IP when capitalized, amortised and when ultimately</u>
> <u>sold</u>.
>
> You stated in your note that [Perrigo] is engaged in
> the "the [sic] purchase, development, and exploitation
> of the rights to pharmaceutical products, the sale of
> pharmaceutical products", you listed several IP
> acquisitions throughout the years.  We would like you
> to provide us with a detailed history of the company
> showing its acquisitions and disposals of IP
> throughout the years.  We would also like you to show
> us how the business operates in seeking to acquire,
> develop, exploit and dispose of said IP.

> We would like you to <u>expand upon the history of
> [Perrigo's] ownership of the Tysabri IP</u>; its initial
> development, the acquisition of the original licences
> [sic], expenses including development incurred by
> [Perrigo] on the IP.
>
> We would like you to provide a copy of the original
> Tysabri collaboration agreement (and any amendments
> made throughout its life cycle) in place between
> [Perrigo] and Biogen before the disposal of
> [Perrigo's] share.
>
> We would like you to provide us with an analysis of
> the various income streams of [Perrigo] which
> contribute to the top line Revenue figure in the
> Income statement in 2012 and 2013 (including product
> revenue from discontinued operations). In particular
> <u>we are interested in the various income streams
> attributable to the exploitation of Tysabri</u> in the
> years preceding the Biogen agreement and following its
> disposal.
>
> We would like to have an initial discussion where you
> provide <u>an overview of the Tysabri agreement/sale that
> was made with Biogen in April, 2013</u>.

(Emphasis added.) The initial audit meeting occurred on January 29, 2018.

On August 13, Irish Revenue informed Perrigo that it had "carried out a review of the documentation that [Perrigo] provided to [Irish Revenue] following the initial audit meeting" and had "not arrived at a definitive position in relation to [Perrigo's] treatment of Intellectual Property." Irish Revenue sought "any further available documentation or analysis" supporting Perrigo's treatment of IP as trading income. Perrigo submitted a written response on September 27.

III. The Audit Findings Letter

On October 30, 2018, Irish Revenue sent the findings of its audit (the "Audit Findings Letter" or the "Letter") to Perrigo. The Letter began, "Please find below our findings arising from the audit. . . . We invite you now to inform us of your view on the findings.  If you disagree with the findings, please outline the basis for your position by 20 November 2018."  The Letter went on to note that the Tysabri transaction had been "treated as a Case I receipt" -- that is, as trading income subject to the 12.5% tax rate -- on Perrigo's 2013 tax return.  The Letter summarized Perrigo's arguments in favor of treating the proceeds as trading income and Irish Revenue's reasons for rejecting those arguments, concluding that Perrigo "should have applied a capital treatment to its IP and to the Tysabri IP in particular."  The Letter described this in various places as a "revised treatment" or "proposed treatment."

The Letter provided detailed calculations of how capital treatment would change Perrigo's tax filings and found that Perrigo had a tax liability of €1,636,047,646.00, or approximately $1.9 billion.  One calculation included in the Letter was the portion of the Tysabri development costs that Perrigo could subtract from the sale proceeds for the purpose of determining the "chargeable gain" taxable at the 33.0% rate. The Letter noted that, "[a]s outlined by [Perrigo's then

International Director of Tax] at the initial audit meeting of
29 January 2018, [Perrigo] and Biogen shared development costs
on Tysabri of $851m between 15 August 2000 to the end of 2006,"
and "no significant work was carried out on Tysabri post 2006."
The Letter concluded by again noting that if Perrigo disagreed
with the findings, it should inform Irish Revenue and provide
the basis for its position.

At the time it received the Audit Findings Letter, Perrigo
had approximately $400 million in cash on hand and $4.8 billion
in annual revenues.  The €1.6 billion figure in the letter
amounted to 40% of Perrigo's revenues for 2018, over four times
the amount of Perrigo's available cash as of September 29, 2018,
and approximately one-third of Perrigo's total Shareholders'
equity as of September 30, 2018.

IV.  November 8, 2018 Form 10-Q

The claims in this lawsuit now hinge on the adequacy of
Perrigo's disclosure of Irish Revenue's Audit Findings Letter in
its November 8, 2018 Form 10-Q (the "November 2018 Form 10-Q").
The November 2018 Form 10-Q included the following disclosure:

> On October 31, 2018, we received an audit finding
> letter from [Irish Revenue] for the years under audit
> 2012-2013.  The audit finding letter relates to Elan's
> taxation of the 2013 sale of the Tysabri intellectual
> property and other assets related to Tysabri to Biogen
> Idec from Elan.  The consideration paid by Biogen to
> Elan took the form of an upfront payment and future
> contingent royalty payments.  We disagree with the
> Irish Revenue position as asserted in the audit

finding letter and intend to contest it, and therefore
        the amount of adjustments, if any, that may ultimately
        be asserted by the Irish Revenue cannot be quantified
        at this stage.  The amount of any future assessment
        could be material.

(Emphasis added.)

        V.  The Notice of Amended Assessment

     On November 29, 2018, Irish Revenue sent Perrigo a "Notice

of Amended Assessment," which indicated that under the amended

assessment Perrigo had a "balance payable" of €1,636,047,645.88

-- the same amount disclosed in the Audit Findings Letter.  On

December 20, Perrigo filed a Form 8-K disclosing its receipt of

the Notice of Amended Assessment from Irish Revenue and the €1.6

billion tax liability.  The Form 8-K also described the

background of the Tysabri sale and the content of the Audit

Findings Letter.  The Form 8-K asserted that Perrigo "strongly

disagree[d]" with Irish Revenue's assessment and would "pursue

all available administrative and judicial avenues" available to

appeal the assessment.

     Perrigo's stock price closed at $52.36 on December 20.  On

December 21, Perrigo's stock price opened at $44.14 and closed

at $37.03.

        VI.  Procedural History

     The original complaint in this action was filed on January

3, 2019.  On March 26, the City of Boca Raton General Employees'

Pension Plan and Palm Bay Police and Firefighters' Pension Fund

were appointed as lead plaintiffs.  See The Private Securities
Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3).  The
lead plaintiffs filed an amended complaint on April 12, and a
second amended complaint ("SAC") on May 31.  The SAC alleged
violations of § 10(b) and § 20(a) of the Securities Exchange Act
of 1934, 15 U.S.C. § 78j(b); 15 U.S.C. § 78t(a), and SEC Rule
10b-5, 17 C.F.R. § 240.10b-5.

An Opinion of January 23, 2020 granted in part the
defendants' motion to dismiss.  See In re Perrigo Co. PLC Sec.
Litig., 435 F. Supp. 3d 571 (S.D.N.Y. 2020).  The plaintiffs'
claims arising from Perrigo's statements made prior to the
filing of the November 2018 Form 10-Q were dismissed, as were
the claims against one of the individual defendants.  The
plaintiffs' claim that the November 2018 Form 10-Q was
misleading was allowed to proceed.

A class was certified in September.  See In re Perrigo Co.
PLC Sec. Litig., 493 F. Supp. 3d 291 (S.D.N.Y. 2020).  The class
action notice was distributed on January 19, 2021.  Discovery
was completed on March 5.

On March 31, the plaintiffs filed a partial motion for
summary judgment on the elements of falsity, materiality, and
loss causation, and the defendants filed motions for summary
judgment.  The parties also cross-moved to exclude each parties'
accounting experts, and the defendants moved to exclude the

9

plaintiffs' loss causation expert.  The motions became fully

submitted on May 25.

An Opinion of July 11, 2021 granted the plaintiffs' motion

to exclude the defendants' accounting expert and denied the

defendants' cross-motion to exclude the plaintiffs' accounting

expert.  See In re Perrigo Co. PLC Sec. Litig., No. 19CV70

(DLC), 2021 WL 2935027 (S.D.N.Y. July 11, 2021) (the "July

Opinion").  The July Opinion held that Accounting Standards

Codification ("ASC") 450 governs the adequacy of the disclosures

in the November 2018 Form 10-Q.  An Order of July 13 denied the

parties' motions for summary judgment with respect to loss

causation and denied the defendants' motion to exclude the

plaintiffs' loss causation expert.

## Discussion

A motion for summary judgment may not be granted unless all

of the submissions taken together "show[ ] that there is no

genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  "An issue of fact is genuine if the evidence is such

that a reasonable jury could return a verdict for the nonmoving

party.  A fact is material if it might affect the outcome of the

suit under the governing law."  Frost v. New York City Police

Dep't, 980 F.3d 231, 242 (2d Cir. 2020) (citation omitted).  In

making this determination, the court "constru[es] the evidence

in the light most favorable to the nonmoving party and draw[s] all reasonable inferences and resolv[es] all ambiguities in its favor." Jaffer v. Hirji, 887 F.3d 111, 114 (2d Cir. 2018) (citation omitted). When deciding cross-motions for summary judgment, the court must construe the evidence in each case in the light most favorable to the non-moving party. Wandering Dago, Inc. v. Destito, 879 F.3d 20, 30 (2d Cir. 2018).

"Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Robinson v. Concentra Health Servs., Inc., 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). "[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response . . . must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted). Rather, only a dispute of material fact precludes the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

SEC Rule 10b-5 renders it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b); see also 15 U.S.C. § 78j(b). To succeed on a claim brought under § 10b and Rule 10b-5, a plaintiff must show (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. Singh v. Cigna Corp., 918 F.3d 57, 62 (2d Cir. 2019). The plaintiffs move for summary judgment on the issues of falsity and materiality, and the defendants move for summary judgment on falsity and scienter.

I.  Falsity

"[T]o support a finding of liability, Rule 10b-5 expressly requires an actual statement, one that is either 'untrue' outright or 'misleading' by virtue of what it omits to state." In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 239 (2d Cir. 2016). Whether a statement is misleading must be "evaluated not only by literal truth, but by context and manner of presentation." Singh, 918 F.3d at 63 (citation omitted). "Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor, may properly be considered a material misrepresentation." Kleinman

v. Elan Corp., PLC, 706 F.3d 145, 153 (2d Cir. 2013) (citation omitted).

"[A]n omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." In re Synchrony Fin. Sec. Litig., 988 F.3d 157, 167 (2d Cir. 2021) (citation omitted). "Disclosure of an item of information is not required simply because it may be relevant or of interest to a reasonable investor." Kleinman, 706 F.3d at 152-53 (citation omitted). But a duty to disclose "may arise when there is . . . a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading." Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir. 2015) (citation omitted).

Under SEC rules, "financial statements which are not prepared in accordance with [generally accepted accounting principles ("GAAP")] are presumptively misleading or inaccurate." Indiana Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 93 (2d Cir. 2016) (quoting 17 C.F.R. § 210.4-01(a)(1)). The ASC, published by the Financial Accounting Standards Board ("FASB"), is the "source of authoritative" GAAP.[1] As noted, the

---

[1] Financial Accounting Standards Board, Accounting Standards Codification: About the Codification 4 (Dec. 2014), https://asc.fasb.org/imageRoot/71/58741171.pdf.

July Opinion held that ASC 450 governs the defendants'
disclosure obligations in the November 2018 Form 10-Q.  See July
Opinion, 2021 WL 2935027.

ASC 450 provides guidance for the recognition and
disclosure of a loss contingency.  ASC 450-20-05-1.  A loss
contingency is defined as an "existing condition, situation, or
set of circumstances involving uncertainty as to possible loss
to an entity that will ultimately be resolved when one or more
future events occur or fail to occur."  ASC 450-20-20.
Recognition of a loss contingency depends on whether the loss is
"probable" and whether the "amount of loss can be reasonably
estimated."  ASC 450-20-25-2.  Even if one or both of these
conditions are not met, the loss contingency nonetheless must be
disclosed "if there is at least a reasonable possibility that a
loss . . . may have been incurred."  ASC 450-20-50-3.
"Reasonably possible" means that the chance of occurrence is
"more than remote but less than likely."[2]  ASC-450-20-20.[3]  See
SAIC, 818 F.3d at 93.

---

[2] "Remote" means the chance of occurrence is "slight."  ASC-450-
20-20.

[3] Disclosure is not required for a reasonably possible loss when
it is "a loss contingency involving an unasserted claim or
assessment if there has been no manifestation by a potential
claimant of an awareness of a possible claim or assessment
unless both" (a) "[i]t is considered probable that a claim will
be asserted" and (b) "[t]here is a reasonable possibility that
the outcome will be unfavorable."  ASC 450-20-50-6.  Here, it is

When disclosure of a loss contingency is required, the disclosures must include both the "nature of the contingency" and "an estimate of the possible loss or range of loss or a statement that such an estimate cannot be made." ASC-450-20-50-4. ASC-450 contains an "illustration" that provides "implementation guidance" for the rules above:

> An entity may be litigating a dispute with another party. In preparation for the trial, it may determine that, based on recent developments involving one aspect of the litigation, it is probable that it will have to pay $2 million to settle the litigation. Another aspect of the litigation may, however, be open to considerable interpretation, and depending on the interpretation by the court the entity may have to pay an additional $8 million over and above the $2 million.

ASC 450-20-55-18; see also ASC 450-20-50-3, -55-1. In such a scenario, the entity must recognize a loss of $2 million "if that is considered a reasonable estimate of the loss" and must disclose "the additional exposure to loss if there is a reasonable possibility that the additional amounts will be paid." ASC 450-20-55-19, -21.

A. The Exclusion of the €1.6 Billion Figure from the November 2018 Form 10-Q

The plaintiffs contend that Perrigo's exclusion of the €1.6 billion figure set out in the Audit Findings Letter from the

---

undisputed that Irish Revenue manifested an awareness of a claim.

November 2018 Form 10-Q did not comply with ASC 450 and is therefore presumptively misleading.  They are correct.

First, once it received the Audit Findings Letter, Perrigo had a duty to disclose the loss contingency if the chance of occurrence was "more than remote but less than likely."  ASC-450-20-20.  The plaintiffs have demonstrated that the chance the loss contingency would be incurred was, at the very least, more than remote.  Irish Revenue notified Perrigo in November 2016 -- nearly two years before the issuance of the Audit Findings Letter -- that it was reviewing Perrigo's treatment of the sale of its IP for the years 2012 and 2013.  After some back and forth between Perrigo and Irish Revenue, Irish Revenue informed Perrigo on November 20, 2017 -- almost a year before it issued the Audit Findings Letter -- that it had commenced a formal audit of the treatment and disposal of IP during 2012 and 2013. Irish Revenue continued to provide details about the audit to Perrigo after this notification.  Finally, the Audit Findings Letter itself provided a detailed analysis of Irish Revenue's audit and findings.  It addressed Perrigo's arguments, set out Irish Revenue's arguments, and included in-depth calculations of Perrigo's tax liability that resulted in the €1.6 billion figure.  Even if Perrigo could not be <u>certain</u> it would incur that loss after receiving the Audit Findings Letter, the

probability was "more than remote."  As a result, Perrigo had an obligation to disclose its loss contingency under ASC 450.

Once Perrigo had a duty to disclose under ASC 450, it was required to include both the "nature of the contingency" and "an estimate of the possible loss or range of loss or a statement that such an estimate cannot be made."  ASC-450-20-50-4.  As the illustration in ASC 450-20-55-18 makes clear, Perrigo had a duty to quantify its exposure after it received the Audit Findings Letter even if it "disagreed" with Irish Revenue's position and intended to contest it.  Presumably the entity in the illustration likewise intended to contest the additional $8 million in possible losses, and yet it was not freed from a duty to quantify and disclose that exposure to loss.

There is no reasonable question of fact that, after receipt of the Audit Findings Letter, an estimate of Perrigo's "possible loss" was reasonably calculable.  Irish Revenue provided the number to Perrigo.  Perrigo had a duty to disclose under GAAP, and its failure to include the €1.6 billion figure from the Audit Findings Letter in its November 2018 Form 10-Q violated GAAP.  As a result, the omission of the €1.6 billion is "presumptively misleading or inaccurate."

The defendants do not argue that the disclosure in the November 2018 Form 10-Q complied with ASC 450.  Instead, they argue that ASC 740 governs their disclosure requirements.

17

Accordingly, summary judgment is granted to the plaintiffs on the issue of falsity.

B. Perrigo's Statement that the Amount of Any Adjustments that May be Asserted by Irish Revenue "Cannot be Quantified at this Stage"

Confirming Perrigo's failure to comply with its duties under the securities laws, the November 2018 Form 10-Q contained another related misleading statement.  The November 2018 Form 10-Q states:

> We disagree with the Irish Revenue position as asserted in the audit finding letter and intend to contest it, and therefore the amount of adjustments, if any, that may ultimately be asserted by the Irish Revenue cannot be quantified at this stage.  The amount of any future assessment could be material.

(Emphasis added.)  Viewing this statement in "context and manner of presentation," Perrigo misled investors about whether it could quantify the amount of adjustments Irish Revenue would ultimately assert.  The Audit Findings Letter set out Irish Revenue's detailed calculation of Perrigo's tax liability after a year-long audit.  It was misleading for Perrigo to state that it could not quantify the amount Irish Revenue may ultimately assert.  The in-depth calculations in the Audit Findings Letter provided that exact quantification, even if it was not a final number.

18

II.  Materiality

"For an undisclosed fact to be material, there must be
a substantial likelihood that the disclosure of the omitted fact
would have been viewed by the reasonable investor as having
significantly altered the total mix of information made
available."  In re Synchrony, 988 F.3d at 170 (citation
omitted).  See also IBEW Loc. Union No. 58 Pension Tr. Fund &
Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783 F.3d 383,
389 (2d Cir. 2015).  "When contingent or speculative events are
at issue, the materiality of those events depends on a balancing
of both the indicated probability that the event will occur and
the anticipated magnitude of the event in light of the totality
of the company activity."  Castellano v. Young & Rubicam, Inc.,
257 F.3d 171, 180 (2d Cir. 2001) (quoting Basic Inc. v.
Levinson, 485 U.S. 224, 238 (1988)).  "Only if the established
omissions are so obviously important to an investor, that
reasonable minds cannot differ on the question of materiality is
the ultimate issue of materiality appropriately resolved as a
matter of law by summary judgment."  TSC Indus., Inc. v.
Northway, Inc., 426 U.S. 438, 450 (1976) (citation omitted).

The plaintiffs contend that there is no question of fact
that a tax liability of €1.6 billion was material to investors.
The plaintiffs are correct, and the defendants have not argued
to the contrary.

First, the sheer size of the calculated tax liability in the Audit Findings Letter demonstrates that it would be material to a reasonable investor.  At the time Perrigo received the Audit Findings Letter, the €1.6 billion figure amounted to 40% of Perrigo's revenues for 2018, over four times the amount of Perrigo's available cash as of September 29, 2018, and approximately one-third of Perrigo's total Shareholders' equity as of September 30, 2018.  Reasonable minds cannot differ that the omission of such a large number in relation to Perrigo's revenues and available cash would be material.

Additionally, Perrigo has conceded materiality.  For example, Perrigo's General Counsel testified that "[t]he ultimate number that was included in the audit findings letter, if ultimately assessed, would be a material number."

The defendants argue in opposition that materiality is a question of fact that should not be decided on summary judgment. Materiality may be resolved as a matter of law on summary judgment when the "established omissions are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality."  TSC Indus., 426 U.S. at 450.  As explained, reasonable minds cannot differ in this case.

The defendants also argue that prior to the issuance of the Notice of Assessment, "it was not a foregone conclusion that any assessment would be issued and the amount of any potential

assessment was unknown." As a result, they argue, the €1.6 billion figure in the Audit Findings Letter was not material information.

This argument is not about whether a reasonable investor would find the €1.6 billion figure in the Audit Findings Letter material. This argument goes to Perrigo's duty to disclose, not the materiality of the disclosure.

## Conclusion

The plaintiffs' March 31, 2021 partial motion for summary judgment on the elements of falsity and materiality is granted. The defendants' March 31, 2021 motion for summary judgment is denied. Whether the defendants had the requisite scienter is a question of fact to be determined by a jury.


Dated:    New York, New York
          July 15, 2021

                          _____
                          DENISE COTE
                          United States District Judge